## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN RUDOLF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| AMERICAN INTERNATIONAL | ) | |
| GROUP, INC., NATIONAL UNION | ) | |
| FIRE INSURANCE COMPANY OF | ) | |
| PITTSBURGH, PA., and | ) | |
| ALEXANDER BAUGH, | ) | |
| | ) | |
| Defendants. | ) | Filed Electronically |

## <u>COMPLAINT</u>

Plaintiff John Rudolf, by and through undersigned counsel, files the following Complaint in civil action.

## <u>I.  PARTIES</u>

1.      Plaintiff John Rudolf ("Rudolf") is a resident of Allegheny County, Pennsylvania and a former long-time employee of Defendants American International Group, Inc. ("AIG") and/or National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union").

2.      AIG is a Delaware corporation engaged in a broad range of insurance and insurance – related activities in the United States and abroad, is headquartered at 175 Water Street New York, New York 10038, and has a Pittsburgh Office located at One Oxford Centre, 301 Grant Street, Suite 1200, Pittsburgh, PA 15219.

3.      AIG's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and is listed on the New York Stock Exchange.

4.     National Union is one of AIG's principal general insurance company subsidiaries, is headquartered at 175 Water Street New York, New York 10038, and Rudolf worked for National Union at One Oxford Centre, 301 Grant Street, Suite 1200, Pittsburgh, PA 15219.

5.     Rudolf was an employee of AIG and National Union working primarily out of an office in Pittsburgh, PA.

6.     Defendant Alexander Baugh ("Baugh") is AIG's Chief Executive Officer of North America General Insurance and an officer, employee, and agent of AIG, with a business address at 175 Water Street New York, New York 10038; he participated in the unlawful adverse employment action made and/or approved the decision to terminate Rudolf, was Rudolf's supervisor, and controlled Rudolf's employment.

## II.  JURISDICTION

7.     The jurisdiction of this Court over the matters in this Complaint is founded upon 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

## III.  VENUE

8.     The facts related in this Complaint occurred primarily in Allegheny County, Pennsylvania, in the Western District of Pennsylvania; therefore, venue is appropriate in this Court.

9.     For purposes of venue, Defendant corporations reside in the Western District of Pennsylvania.

10.     Venue is appropriate because Rudolf would have worked in this judicial district but for the alleged unlawful employment practice.

2

## IV.  ADMINISTRATIVE EXHAUSTION

11.     On May 8, 2018, Rudolf filed a complaint against Defendants under the Sarbanes-Oxley Act with the Secretary of Labor through its designee, the Occupational Safety and Health Administration.

12.     The Secretary has not issued a final decision within 180 days of the filing of that complaint, and the delay is not due to any bad faith by Rudolf; therefore, Rudolf can file suit in federal district court.

13.     On April 25, 2018, Rudolf filed a charge against Defendants with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") raising claims related to sex discrimination, age discrimination, and retaliation.

14.     The EEOC right-to-sue letters were received on or about August 30, 2019 (533-2018-01320), and on or about September 5, 2019 (533-2018-01324; 533-2018-01321; 533-2018-01323).

15.     More than one year has passed since Plaintiff filed his PHRC Charges and, as a result, he has exhausted his administrative remedies.

## V.  FACTS

**A.     Rudolf's AIG Employment History.**

16.     Rudolf is male, born in 1964, and is 55 years of age.

17.     Rudolf, a longtime AIG employee, was terminated in 2017 after reporting certain improprieties to senior management and internal investigations.

18.     Rudolf began working for National Union in commercial insurance in October 1994.

19.     Throughout his more than two decades with AIG, Rudolf's responsibilities steadily increased and he eventually became the head of nine business units managing over 170 employees and over $1.2 billion in gross written premiums (although his compensation did not keep pace with his increasing responsibilities).

20.     From 1994 to 1999, Rudolf was a Senior Vice President in the Financial Institutions Group.

21.     From 1999 to 2006, Rudolf was the President of the Loss Mitigation Unit ("LMU").

22.     In or about 2002, Rudolf also was placed in charge of Mergers and Acquisitions ("M&A").

23.     From 2006 to 2008, Rudolf was a Senior Vice President in the Strategic Relationship Group ("SRG").

24.     From 2008 to 2012, Rudolf was a Senior Vice President in the Mid-Atlantic Region and Branch Manager, Pittsburgh, PA.

25.     Between 2012 until Rudolf's termination in November 2017, Rudolf's duties and responsibilities substantially increased to include the following positions: (1) Head of U.S. and Canada Client Engagement, (2) Head of Asian Corporate Solutions, (3) Head of Industry, (4) Head of Bermuda CAT Excess (Financial Lines and Casualty), (5) Head of Major Accounts Professional, (6) Head of Financial Lines – Financial Institutions, and (7) Head of Aerospace, (8) Head of Trade Credit and (9) Head of Political Risk.

4

**B.      AIG's Loss Mitigation Unit ("LMU").**

26.      In 1999, Rudolf was promoted to President of the troubled LMU.

27.      At the time, the LMU was under investigation by the Securities and Exchange Commission (SEC) for engaging in a "loss-portfolio transfer" that permitted a client (Brightpoint, Inc.) to transfer its loss portfolio to AIG in exchange for an above market premium thereby enabling the client to paint a rosier picture of its actual financial situation.

28.      Because there was virtually no risk transfer, the "loss-portfolio transfer" did not constitute and should not have been treated as insurance which has significant accounting and financial reporting benefits.

29.      Further, the transaction constituted a violation of AIG's Anti-Corruption and Antitrust and Fair Competition Code of Conduct Policies, including "never misrepresent yourself or your purpose in business interactions with a potential or current customer or business partner and conduct business with customers and suppliers in a manner that demonstrates our commitment to fair competition."

30.      As later found by the SEC, AIG violated Section 10(b) of the Securities Exchange Act and Rule 10b-5 when in 1998 the LMU assisted Brightpoint executives in covering up an additional $12 million loss by immediately paying a $12 million claim (which brought Brightpoint's actual losses of $29 million down to the anticipated losses of $17 million) in exchange for a $15 million premium paid out over three years.

31.      According to the SEC, "the 'retroactive coverage' should not have been accounted for as insurance.  It was merely a 'round-trip' of cash - a mechanism for Brightpoint to deposit

5

money with AIG, in the form of monthly 'premiums,' which AIG was then to refund to Brightpoint as purported 'insurance claim payments.'"

32.     The SEC's enforcement action against AIG settled in 2003 with AIG paying a $10 million civil penalty.  *See SEC v. Brightpoint, Inc., et al.*, Litig. Rel. No. 18340 (Sept. 11, 2003).

33.     As LMU President, Rudolf was made aware of a number of other serious allegations within the LMU including, but not limited to, that senior managers Peter Eastwood (former LMU President), Michael Mitrovic (President of National Union Claims), Greg Flood (President of M&A and Vendors (AIG Legal Advisors)), and Kris Moor (Head of Domestic Brokerage Group or underwriting) engaged in rigged claim workout deals in which AIG agreed to pay a disputed claim in exchange for additional or above-market rate premiums on new unlimited policies.

34.     This permitted the insured and AIG to achieve unwarranted accounting or financial reporting benefits; specifically, AIG recouped some or all of the paid claim by receiving additional insurance premiums and accounted for that amount as insurance revenue.  The insured, on the other hand, spread the impact of the prior loss by characterizing it as a premium and expensing it over the term of its new (or renewed) policies.

35.     Over the years, Rudolf reported the alleged accounting frauds to his supervisors and other senior managers including, but not limited to, Vince Tizzio, John Doyle, Kris Moor, Bill Jacobi (Head of Claims), and Paul Lavelle (Head of National Union Claims), and others.

36.     Jacobi and Lavelle said that they did not want to go to jail or, worse, for Hank Greenberg, AIG's then Chairman and CEO, to find out the truth.

37.     Lavelle even emailed other senior executives stating "we are all going to hell," or words to that effect.

38.     In or about 2003, it came to light that in 1998 AIG devised a rigged claim workout deal in connection with a pending securities class action lawsuit against MedPartners, Inc. which alleged that MedPartners had made a series of false and misleading statements concerning a planned merger and its overall financial condition ("MedPartners Securities Litigation").

39.     The class of investors alleged losses over a billion dollars plus punitive damages while MedPartners which had a $50 million D&O insurance policy from AIG (and other reinsurers) claimed it was on the verge of bankruptcy.

40.     AIG agreed with the plaintiffs' lawyers to settle the lawsuit for $56 million, which was $6 million more than the policy limits, in exchange for MedPartners buying a new "unlimited" insurance policy for $22.5 million.

41.     As a result of the transaction, AIG recouped some of the paid claim by receiving an additional insurance premium and accounted for that amount as insurance revenue; MedPartners could spread the impact of the prior loss by characterizing it as a premium and expensing it over the term of its new policy, and the plaintiffs' attorneys immediately received their contingency fee of millions of dollars.

42.     Contrary to generally accepted insurance practices, AIG did not perform a good faith analysis, diligence, or negotiations with respect to settlement value of the case. Nor did AIG inform Chubb insurance company, a reinsurer on the underlying MedPartners' policy, of the true

nature of the arrangement and Chubb, erroneously believing it was a valid claim, paid approximately $15 million of the MedPartners' settlement.

43.     In 1999, the attorneys involved in the settlement failed to disclose this unlimited insurance policy to the Court assuring that AIG agreed to pay the policy limits and, based upon those fraudulent representations, the Court approved the settlement.

44.     In or about 2003, AIG unintentionally revealed the existence of the MedPartners' unlimited insurance policy in another proceeding.

45.     Thereafter a lawsuit was filed in 2003 claiming that AIG and MedPartners had falsified having limited insurance coverage during the settlement negotiations and that if the unlimited insurance coverage was known at the time investors would have negotiated a higher settlement amount.  *See Lauriello et al. v. CVS Health et al.*,[1] 01-CV-2003-006630 (Ala. Circuit Court of Jefferson Cty).

46.     That lawsuit, as discussed more fully below, would continue for almost a decade and a half before finally settling in 2016.

47.     However, the true circumstances of the rigged claim workout deal as well as the existence of the other likewise rigged unlimited insurance policies remained suppressed.

48.     Beginning in or about 2005, AIG disclosed the MedPartners' lawsuit in its annual 10-K Reports disclosing that an excess insurance policy issued by AIG with respect to the 1999 litigation was expressly stated to be without limit of liability, and that it cannot reasonably estimate either the likelihood of its prevailing in the actions or the potential damages in the event liability

---

[1] In 2006, CVS Corp. acquired MedPartners which was known as Caremark Rx Inc.

is determined.  Under insurance law, this policy should have been voided in its entirety, without the transfer of risk, AIG misled shareholders and others. Rigged insurance policies like the ones at issue are not considered insurance as the policies are negotiated in bad faith and under false pretenses.

49.     AIG did not disclose in its annual 10-K report the existence of the other unlimited policies issued during this period.

50.     Based on information and belief, AIG never corrected the premiums it received on the accounting of these transactions.  These transactions did not constitute insurance and the money paid by the clients did not constitute a premium.  Again AIG allowed its clients to improperly expense their covered loss over the term of new (or renewed) policies.

**C.     Rudolf's Work with the Department of Justice Independent Monitor.**

51.     In or about 2003, the SEC brought another enforcement action against AIG for setting up a "special purpose entity" to which the client (PNC Financial Services Group, Inc.) would transfer troubled or other potentially volatile assets and thereby fraudulently improve its own financial picture.

52.     In 2004, AIG settled this action by paying $126 million in disgorgement and penalties, and agreeing to retain an independent monitor to review certain other transactions to which AIG had been a party.  *See SEC v. American Int'l Group, Inc.*, Litig. Rel. No. 18985 (Nov. 30, 2004).[2]

_____

[2]In 2006, the SEC brought another enforcement action against AIG for structuring two sham reinsurance transactions with General Re Corporation with the purpose to add a total of $500 million in phony loss reserves to AIG's balance sheet in the fourth quarter of 2000 and the

53.     James Cole, Esq. was appointed as the independent monitor by the Department of Justice with approval from the SEC to review certain AIG transactions entered into between 2000 and 2005.

54.     Rudolf worked closely with Cole and his team (including Thomas Zahnle, Esq.) and was able to build up a good rapport with them. Cole had said to Rudolf that he and his team were under the belief that employees at AIG are given a desk, a computer, a chair and a white paper or manual on how to commit fraud.

55.     Among other things, Rudolf reported to Cole as well as to AIG senior management newly discovered "fake" entries into AIG's ledger of approximately $80 million dollars.

56.     AIG's senior managers and attorneys specifically instructed all LMU employees including Rudolf not to disclose to the independent monitor the existence of the unlimited policies or any transactions that occurred prior to 2000 as they purportedly were outside the scope of the independent monitor's assignment.

57.     Cole and his team complimented Rudolf on his work given the difficult conditions, and publicly announced that if Rudolf ever were to leave AIG under questionable circumstances that he should contact the Department of Justice and/or Cole via AIG's legal department.

58.     In 2006, after receiving repeated reports of fraud and misconduct, Rudolf, on behalf of the LMU (underwriters, claims, legal and others) expressed dissatisfaction to Moor, his

---

first quarter of 2001.  AIG agreed to pay a civil penalty of $100 million, to disgorge ill-gotten gains of $700 million, and to an injunction from any further violations of the Securities Act.

supervisor, with management's failure to act on the many ethical issues he raised over the years including the unlimited limits rigged claim workout deals.

59.     Moor responded that he would investigate Rudolf's allegations and hold the wrongdoers accountable, but, despite Rudolf's follow-up on the status of the investigation, he never did.

60.     Thereafter, Rudolf was transferred to Pittsburgh, PA.

**D.     Rudolf's Protected Activity.**

61.     From 2014 until termination, Rudolf's job responsibilities and duties significantly expanded yet his Salary (comprised of Base Pay, Short-Term Incentive payments ("STI") and Long-Term Incentive payments ("LTI")) and Job Grade (26) remained flat.

62.     After 2014, each time AIG announced Rudolf's expanded responsibilities, Stephen Grabek, AIG's Interim President of Field Operations for US/Canada and previously Rudolf's direct supervisor (2012-2014), would congratulate Rudolf on expanding his "empire," telling him that he was running half of AIG, that AIG was taking advantage of Rudolf by underpaying him and overworking him, and that at Rudolf's age he would not be able to keep up the pace.

63.     Grabek repeatedly harassed Rudolf to leave AIG if the Company did not pay him appropriately.

64.     In April 2014, in connection with a reorganization of Commercial Insurance known as "Simplify AIG," Rudolf was promoted to a newly created position of Head of Client Engagement (CE), Asian Corporate Solutions (ACS) and Head of Industry for the US (Americas and Global lead for strategy and structure) and told by his then direct supervisor, Jeremy Johnson,

11

that his Salary and Job Grade were under review by the Commercial Leadership Team (CLT). With each delay, Rudolf asked what he should tell his wife, and the response was to "tell her to expect both salary and job grade increases."

65.     Rudolf became the leader of one of the four key priorities of Simplify AIG (Industry).

66.     The other leaders of the remaining three key priorities (Product, Geography, and Multinational) were Job Grade 27 or higher which, as Johnson admitted, was a clear difference for Rudolf's salary and job grade promotion particularly when compared with Rudolf's lower Job Grade 26.   Therefore, this newly created position, with enormous increased responsibilities, especially when compared to others, constituted a promotion which Johnson expressly stated warranted a salary and job grade review.

67.     In September 2014, Johnson discussed with Rudolf that other peers (including younger and/or female employees) had received salary and/or job grade increases as part of the "Simplify AIG" reorganization but not him.

68.     In the fall of 2014, Rudolf learned that the CLT declined any change in salary or job grade, although Johnson informed Rudolf that he and the rest of CLT would review again in April 2015.

69.     Johnson told Rudolf to keep working hard, stay focused on the business and performance, and things would work themselves out, meaning that Rudolf would receive an increase in salary and his pay grade would likely increase from 26 to 27 commensurate with his expanded responsibilities and duties.

70.     Despite these many assurances, Rudolf never received any increase in his base salary or pay grade.

71.     In addition, Rudolf was stripped of his secretarial support.

72.     While Johnson claimed it was due to cost cutting, Rudolf was the only one of his peers who lost secretarial support and he was forced to go without an assistant despite the fact that his responsibilities and duties had significantly expanded during this period.

73.     To keep up Rudolf regularly worked more than 100 hours per week.

74.     Johnson admitted that Rudolf's younger female counterpart makes significantly more money than Rudolf even though she has significantly less responsibility and less direct reports (3 direct reports compared to 170 direct reports).

75.     On July 19, 2016, Rudolf received an email update about the proposed settlement of the 2003 class action lawsuit against AIG and CVS Caremark f/k/a MedPartners from a former AIG executive.

76.     In the 2016 settlement, AIG and CVS Caremark agreed to payout $310 million; AIG agreed to pay $230 million and CVS Caremark (as successor in interest to MedPartners) agreed to pay $80 million.

77.     The former AIG executive, Steve Walsh, stated in the email, "Anytime I see this I think of you for some reason."

78.     Prompted by this email as well as a prior email from Director and former Board Chair Steve Miller to (CEO of Commercial Insurance) Rob Schimek requesting background information on the MedPartners' litigation, in late Summer 2016, Rudolf met with supervisor

Johnson to discuss the settlement announcement, the email, and consequences of misconduct. Rudolf explained in detail his special assignment, his work with LMU and the 10-K restatement team, work with DOJ, wrongful conduct and the consequences of not properly addressing wrongful conduct with regulatory agencies and AIG's SIFI status.

79.     Johnson brushed off Rudolf's concerns telling him he [Johnson] did not understand the past, he did not know about bad actors, and that Rudolf should stay focused on his business and performance.

80.     Johnson did not ask questions or ask for additional details from Rudolf, and to Rudolf's knowledge Johnson did not forward Rudolf's complaint to any superior, Human Resources, Investigations, or the Legal Department.

81.     Thereafter, in Fall 2016, Rudolf again raised his concerns to Robert Schimek (CEO of Commercial Insurance) including that the AIG Board likely had been misled about the facts behind the unlimited insurance policies, including the 1998 MedPartners Securities litigation and the $310 million settlement.

82.     Rudolf was concerned about reputational risk and that this past fraud could negatively impact and extend AIG's then designation as a systemically important financial institution ("SIFI").

83.     In July 2013, AIG had received a SIFI designation from the Financial Stability Oversight Council which imposed a barrage of extra regulations and oversight by the Federal Reserve with annual compliance costs of approximately $150 million or more.

84.     Rudolf said he was concerned that AIG allowed the former Chairman of the AIG Board and a current member of the AIG Board of Directors, Steve Miller, to be misled to the true nature of unlimited insurance policies and concerns with other transactions.  In February 2016, Larry Melo, the President and CEO of CVS Health, emailed Miller about a business matter with AIG that he wanted to discuss with him.  Miller forwarded Melo's email to Schimek and asked him to shed light on what issue CVS had with AIG.

85.     Therefore, Rudolf feared that Miller might have been misled to commit a new fraud including against CVS, an AIG client.

86.     Rudolf believed AIG had defrauded their own insureds (i.e. MedPartners/ Caremark (CVS)), plaintiffs, shareholders, regulators, customers, reinsurers, and U.S. Treasury through its rigged claim workout deals and unlimited insurance policies but believed that the full extent of such fraud had been withheld from Steve Miller and could jeopardize AIG's possible de-SIFI status and representations made in SIFI related applications.

87.     AIG's actions constituted unfair insurance practices including that it failed to fully disclose to its own insured, reinsurers, Chubb (excess insurer), plaintiffs, multiple classes, the Courts, state and including claimants' pertinent benefits, coverages or other provisions of a rigged or otherwise deficient insurance policy or of a "guarantee" insurance contract; which contained a secret side agreement where AIG agreed to pay any judgment or settlement, no matter how large.

- As stated in numerous underlying lawsuits/ settlements, AIG has the duty to inform all pertinent parties including reinsurers, competitors (Chubb an excess insurer), Plaintiffs, Multiple Classes, the Courts, state and federal agencies, including the US treasury, shareholders, Medpartners, CVS, Aetna, and others that there were no policy limits (expressly stated unlimited limits) and that AIG was responsible for paying any judgment or settlement, no matter how large ($3.2 billion plus interest over 19 years). This is why

15

AIG failed to place full and accurate disclosures in its 10K. The bad actors and advisors knew of the financial and reputational harm that the truth posed.

- Therefore, on repeated annual occasions, AIG had the Duty to inform all pertinent parties that the settlement was rigged, including that no transfer of risk existed and that under insurance law this policy should have been voided.

- Under insurance law, this policy should have been voided as it is not insurance (deposit or risk transfer accounting), it is fraudulent transaction negotiated unfairly by nefarious bad actors.

- AIG hid the truth, misled the market.

- AIG's suppressions were intentional, material, repeated over and over, again and again, including in each 10K disclosure, AIG's SIFI applications (including oral and written responses) while negotiating the $310 million MedPartners / Caremark (CVS) settlement or any other rigged settlements in bad faith.

88.     AIG's actions including its failures to disclose breached its prior settlement agreements with federal and state agencies including those permanently enjoining AIG from violating federal and state securities laws.

89.     From 2000-2016, Schimek was in various CFO and Leadership positions, involved with the 10K restatement period, settling and paying fines, and had a senior executive relationship with Miller.

90.     During the same period, Baugh held various Global Positions and at time of the Caremark (CVS) f/k/a Medpartners $310 million settlement, he was Global Head of Financial Lines which unit agreed to the settlement.

91.     Schimek told Rudolf he would handle it and that Rudolf should stay focused on his responsibilities and performance.

92.     In May 2017, Rudolf shared with Baugh Johnson's comments to Rudolf that a younger female counterpart makes significantly more money than he (Rudolf) does even though she has significantly less responsibility and less direct reports.

93.     Baugh acknowledged this was wrong.

94.     Rudolf was being underpaid by AIG; according to Grabek, Johnson and the younger female counterpart were having an affair and that AIG (including CLT, ELT and Human Resources) was aware of it.

95.     Again, Grabek harassed Rudolf to leave AIG, including if the Company did not pay him appropriately, especially if the Company was going to pay someone younger and female more money for less responsibility.

96.     Based on information and belief, Rudolf was paid less than similarly situated younger and/or female employees including, but not limited to, Marya Propis, Elizabeth Johnson, Gloria Watson, Alex Nagler, Dave Lynders, Steve Alexandris, and others.

97.     In Spring 2017, in response to Rudolf's claim that he was not fairly compensated, Schimek (CEO of Commercial Insurance) directed Human Resources to conduct a salary and job grade review.  Schimek directed HR to share the report and review it with Rudolf; however, despite Rudolf's repeated requests, the salary and job grade review report never was shown or provided to him.

98.     Rudolf complained to Schimek of unfairness in that AIG provided a significant raise to a similarly situated 40 year old, who like Rudolf was a member of the Executive Leadership

Group ("ELG"), whose responsibilities, size of book, and profitability were much smaller, plus he was younger.

99.     With each promotion, with each increase in responsibilities and promise of salary and job grade review, Rudolf responded to Johnson, Schimek, Sid Sankarin, CFO of AIG, and Human Resources that he had multiple job grade 26 direct reports who were ELG members and younger, yet they made about as much money as he does, and they all received raises as part of the Simplify Plan but Rudolf did not despite his increasing responsibilities, promotions, and Johnson setting clear expectations that his promotions would include salary and job grade advancement.

100.     In May 2017, AIG's Vice President of Human Resources Ryan Merritt after reviewing Rudolf's increased responsibilities and compensation issues inappropriately flat out said in a crowded elevator bank, "John, you need to realize there is no path to [job grade] 27 for you. There is no path, there never was a path."  This admission reflects that AIG had taken advantage of and misled Rudolf.

101.     Merritt (new to this Human Resources position) acknowledged that AIG had misled Rudolf [an older employee] regarding his advancement opportunities with the company and took advantage of Rudolf by significantly increasing his responsibilities compared to others, and by not paying him compared to others including younger employees.  At the same time, AIG paid Johnson significantly more money and raised his salary and job grade even though his duties did not change.

102.     Baugh later acknowledged to Rudolf that Merritt should not have said that to him.

103.     In August 2017, Rudolf's responsibilities expanded with additional job promotions, Head of Trade Credit and Head of Political Risk for the Americas reporting to John Novak of AIG Investment, and reporting to Johnson; these promotions warranted salary and job grade 27 advancement compared to others.  Rudolf was the only Americas employee to report into both AIG Investments and AIG Commercial Insurance.  Rudolf was informed that this was a major compliment and difference maker for salary and job grade review.  In order for Rudolf to report outside of Commercial Insurance, Rudolf was told that the CLT and ELT including Baugh, Johnson, and Schimek, had to approve this exception to standard Commercial operating and structure.  Specifically, Lex Baugh approved the transfer of these products to AIG Investments, as well as Rudolf's two new positions.  Rudolf, as well as AIG Commercial Insurance and AIG Investments employees, was informed by supervisors John Novac (Political Risk/Trade Credit) and Johnson of Rudolf's expanded responsibilities. Rudolf was told by Johnson, Novac and Baugh that CLT and ELT members approved such an historical transition of product and leadership, including, Rob Schimek, Jeremy Johnson, Martha Gallo, Sid Sankarin and other CLT and ELT members who were aware and supported this meaningful expansion.

104.     Rudolf was scheduled to meet with Johnson for his year-end evaluation.

105.     With the additional responsibilities, Baugh, Johnson, and Schimek all said that these two significant additions of responsibility would be considered for salary and job grade review.

E.      **Rudolf's Termination Immediately After Reporting Fraud to New Supervisor and Investigations.**

106.    In October 2017, Rudolf had dinner with a senior AIG executive, Marya Propis, where he expressed his concerns, including but not limited to unlimited policies, CVS settlement, fraud against customers, shareholders, regulators, plaintiffs, reinsurers, and the SIFI status.

107.    In early November 2017, Johnson departed AIG and Baugh became Rudolf's direct supervisor and, therefore, controlled Rudolf's employment.

108.    Rudolf expressed his concerns about additional retributions if he went to his new manager but Propis stated that he could trust Baugh.

109.    On Friday, November 10, 2017, Rudolf participated in a conference call co-hosted by Baugh, who had become his direct supervisor a few days before, and Peter S. Zaffino, CEO of AIG General Insurance, both of whom worked out of AIG's headquarters in New York City.

110.    During the call, Rudolf became concerned when it was announced that Baugh and Zaffino were considering rehiring former AIG executives to fill critical positions in the Company, including a position for Head of Global Claims.

111.    In addition, AIG's new CEO Brian Dupperault was a former AIG executive who had been rehired, and he talked about bringing back former AIG employees to work for the Company.

112.    Rudolf had the impression that Baugh and new management (Dupperault, Zaffino, General Counsel Lucy Fato, and others) might not be aware of all of the bad acts, bad actors and bad vendors from AIG's troubled past.

113.   On the call some of Rudolf's colleagues expressed concerns about certain people interviewing for the Head of Global Claims position; and Rudolf believed that some of these individuals were bad actors.

114.    Rudolf believed that some of these former AIG executives were central players in the perpetration of fraud and that the harm caused by these fraudulent acts continued to manifest itself in damage and/or potential damage to AIG.

115.   Rudolf felt compelled and duty-bound to bring his concerns to Baugh's attention.

116.   Previously, Baugh utilized Rudolf to jointly interview a former AIG employee and at Baugh's insistence, they discussed whether past bad acts should prohibit his or anyone's return to the company.

117.   Because the former AIG executives that Rudolf had concerns about, and some of the underlying pattern of fraudulent conduct fell within Baugh's watch in his role as President of AIG's Liability and Financial Lines, Rudolf was concerned that Baugh would be inclined from a self-preservation perspective to dismissively brush off Rudolf's concerns without giving them due consideration.

118.   From Rudolf's perspective, he wanted to make sure that the new management team at AIG, including Baugh in his new role, were aware of these issues.

119.   Rudolf requested an in-person meeting with Baugh to discuss these "bad actor" concerns, and to have the "year-end check in conversation" that his former boss, Jeremy Johnson, did not conduct prior to Johnson's departure.

120.    Rudolf felt that Baugh would understand his concern of "bad actors" returning to AIG.

121.    The two had worked closely together 20 years ago, and had a good working relationship.

122.    During the past five years, there were a number of occasions where customers and/or employees would ask Baugh and Rudolf how they knew each other so well.  Baugh answered more than once that Rudolf is one of the few if not the only one to survive the "Kris Moor/Mike Mitrovic mafia period."  Baugh, at times, would even go as far to say that he could not have survived what Rudolf put up with.

123.    During a telephone call on Sunday, November 12, 2017, Rudolf requested an in-person meeting with Baugh to discuss a number of issues including, but not limited to, his compensation and "bad actors" returning to AIG as well as a fraud against Miller, the former Chairman of the AIG Board and current member of the AIG Board of Directors.

124.    Rudolf's concerns included that "new hires" placed or hired into AIG leadership roles  might not appreciate the current, real-time harm caused by fraudulent practices, and the potential that past fraud had been undetected by those with a need to know.

125.    During the Sunday call, Baugh pressured Rudolf to specifically identify some of the "bad actors" he was concerned about, the nature of their past fraudulent behaviors against AIG, the AIG Board (specifically, Steve Miller), the AIG Shareholders, and also the current and future risk of repeated and continued frauds.

126.    In response to Baugh's request for examples of bad actors thought to be interviewing and seeking to return to AIG, Rudolf answered that the "bad actors" said to be coming back included Paul Lavelle and Mike Smith.

127.    Rudolf also stated that if he were to depart, he was required to have an exit interview with the Department of Justice/Monitor and that the conversation would be tough because he would have to disclose new discovery/concerns regarding past LMU transactions that could damage AIG. Especially, since his repeated concerns were not addressed.

128.    Rudolf asked Baugh to meet in person in New York City to discuss these and other matters further on Tuesday, November 14, 2017.  Baugh chose the date.

129.    Baugh then turned Rudolf over to AIG internal investigators; in doing so, Baugh made it clear that he understood Rudolf engaged in protected activity.

130.    The Rudolf matter was of sufficient importance to Baugh that he wrote an email to AIG General Insurance Chief Executive Officer and AIG Global Chief Operating Officer Peter S. Zaffino on Sunday November 12, 2017 at 11:50 am.

131.    Baugh falsely told Zaffino that Rudolf had "called me to render (sic) his resignation."

132.    Baugh informed the CEO that Rudolf said he is a government witness in the Department of Justice investigations, will be required to give an exit interview to DOJ and that "there will be negative ramifications for AIG from such an interview."

133.    Baugh recognized that Rudolf "has not been happy for many years."

134.    The reasons for Rudolf's unhappiness included that he was being overworked and unfairly paid.

135.    Baugh then assumed that Rudolf had not resigned but "needs to be based in Pittsburgh for personal reasons."

136.    Baugh then informed the AIG CEO that Rudolf's current role is "not going to survive."

137.    Baugh admitted that "we also have others who could step into that role."

138.    Baugh also informed Zaffino that "John is telling me there was a cover-up by Kris Moor, John Doyle, Peter Eastwood, Mike Smith and Paul Lavelle that they did not tell the Board the truth."

139.    Neither Baugh nor Zaffino inquired further of Rudolf about what the problems at AIG were and/or details to any alleged cover-up.

140.    On Monday morning, November 13, 2017, while still in Pittsburgh, Rudolf received a phone call from Andrew J. Curtin, AIG's Senior Managing Director – Global Legal, Compliance and Regulatory – Global Head of Investigations.

141.    Curtin confirmed that Baugh had said that Rudolf reported allegations of fraud against AIG and its Board, and that Curtin and his colleagues would investigate.

142.    Due to the sensitive and lengthy nature of these issues, Rudolf requested an in-person meeting to discuss the fraud matters with Curtin.

143.     Curtin read to Rudolf over the phone AIG's strict anti-retaliation policy for whistleblowing activities, required Rudolf's verbal acknowledgment that he heard and understood the policy, and then Curtin and two other investigators initialed the script read to Rudolf.

144.     During the call, Rudolf conveyed key points to Curtin including his assignment to work with the LMU and interface with outside regulators, the fraud with unlimited insurance policies (one example was MedPartners), false 10-k disclosures, reputational risks, SIFI status problems, and expressed that he had other frauds to discuss.

145.     By email of November 13, 2017, Rudolf thanked Curtin for speaking with him that day and attached a copy of his organization and structure.

146.     On Tuesday morning, November 14, 2017, at 8:00 a.m., Rudolf first met with Baugh for approximately 25 minutes during which they conducted normal business activities.

147.     During the meeting on Tuesday, Rudolf recalled a recent conference in Detroit attended by Rudolf, Baugh, and the Executive Leadership Group ("ELG") in which Mike Smith was a guest speaker and told the audience that he finally had made enough money "to tell the truth."

148.     Rudolf asked Baugh why he thought Smith made that statement, Rudolf also told Baugh that it is outrageous to think that you have to make a certain amount of money to be able to tell the truth, and Rudolf said that it was ironic that Rudolf in comparison to Smith makes very little money, tells the truth, while Smith makes millions more and could not tell the truth.

149.     Rudolf had told Baugh that Smith and Lavelle, like a number of other bad actors, were aware of the bad acts and bad actors and in various senior positions (including, but not limited

to, Head of Global Financial Lines/Head of Claims), and were required to report them but failed to do so which, in turn, constituted new and continuing frauds.

150.     Rudolf had reported to Baugh that AIG's U.S. Commercial Insurance division misled Miller, the AIG Board, and CVS including Larry Melo on settling the CVS/AIG claims. Rudolf warned Baugh of reputational risks, including AIG's SIFI application and consideration for de-SIFI status was in jeopardy.

151.     Rudolf was concerned AIG defrauded the U.S. Treasury, including approximately $65 billion in tax carry forwards, and that AIG committed new frauds each time it was obligated to come clean but failed to do so.  The background of the SIFI situation is as follows:

- In 2013, American International Group, Inc. (AIG) was designated as a SIFI.

- The SIFI label brought with it extra capital, extra expense and US Treasury (Federal Reserve) requirements and oversight.

- In 2013, AIG Board of Directors established and passed the 2013 Clawback Policy which renews annually.

- As a result of past admitted wrongdoings, lack of compliance with SIFI, violations of past permanent settlement requirements with federal and state agencies, AIG's Clawback policies recover compensation in cases of financial restatement, failures of risk management, material mistakes and wrongdoings and/or acts that hurt AIG's viability and reputation.

- AIG extensively trained all employees and executives on identifying failures of risk management, mistakes and wrongdoings or acts that hurt AIG's reputation and reputational risk.

- AIG's annual claw back policy requires AIG to take action on a Covered Event by any Covered Employee "that results in material financial or reputational harm."

- From 2013 to present, AIG repeatedly failed to follow and execute on the AIG claw back policy.

- The AIG Code of Conduct expressly states that employees must report allegations of fraud, including allegations of accounting fraud. Failure to do so, by any employee (at-will or contract) is subject to discipline, including termination.

- Throughout Rudolf's career, including in 2016 and 2017, Rudolf reported allegations of mistakes, wrongdoings, allegations of fraud, including accounting mismanagement all which would rise to material mistakes and wrongdoings, as well as reputational risk to AIG.

- AIG CEOs Robert Benmoshe, Peter Hancock and Duperault all state in AIG's Code of Conduct Policy that "These Words Matter – and acting on these words matters more."

- "No reason, including the desire to achieve business goals, can ever be an excuse for violating Code, AIG Policies, laws or regulations."

- AIG policy, including The AIG Handbook, Code of Conduct and other Policies prohibit retaliation against an employee for making a good faith report of actual or suspected violations of these policies.

152.    There is no question that AIG, including Baugh, used Rudolf to vet former AIG employees returning to AIG.

153.    There is no question that Rudolf reported actual or suspected violations of AIG Policies

154.    There is no question that Baugh reported Rudolf's allegations to AIG Legal.

155.    Based on information and belief, when Baugh learned of Rudolf's allegations, including the objection to bad actors returning to AIG, he falsely concocted that Rudolf had resigned to avoid proper investigation, including AIG's SIFI post-SIFI requirements and new claw back policy.

156.    Based on their past reporting relationship and work over the years as well as Baugh's approval of Rudolf's most recent responsibility increases, Rudolf came forward with his concerns to Baugh as Marya Propis had encouraged him to do.

157.    Rudolf informed Baugh that immediately after their meeting he was going to meet with Curtin to discuss his fraud concerns.

158.    Based on the sensitive nature of the fraud allegations, Rudolf asked Baugh if he had told anyone else besides Curtin about them.

159.    Baugh replied that he called Zaffino on Sunday and told Zaffino that Rudolf had resigned his position, which was false.

160.    Rudolf immediately disputed the claim that he had resigned.

161.    The claim that Rudolf had offered his resignation or resigned was false.

162.    At no time did Rudolf tender his resignation or say that he had resigned or that he was resigning.  No one from AIG contacted Rudolf informing him or stating that he resigned.

163.    During his Sunday call with Baugh, to make sure the gravity of the issues on the table were fully appreciated, Rudolf had stated that if his concerns went unheard, then he would have to consider leaving AIG.

164.    As is clear from Rudolf's email to Human Resources at 12:47pm on November 12, 2017 shortly after the Sunday call with Baugh, the issue was "if" he decided to resign, not when or that he had decided to leave.  As Rudolf stated in his email to HR: "If I were to resign from AIG, can you clarify ...."

165.   In response to a question from Baugh whether Rudolf had other employment opportunities, Rudolf replied that he was aware of two companies in the past had expressed interest in hiring him, which Rudolf took as a compliment.

166.   However, Rudolf had no pending job offers and during his 24 years with AIG Rudolf never had participated in a single job interview outside of the company or received a single job offer.

167.   It would make no sense for Rudolf or any AIG executive at his level voluntarily to resign his position without a job offer or in November of a year when a substantial component of annual compensation would be forfeited.

168.   In addition, after the Sunday phone call, Rudolf engaged in productive work on AIG's behalf and interacted with the AIG Investigation Team including on the following Monday, November 13 and Tuesday, November 14 2017.

169.   On Monday afternoon, Rudolf traveled to New York to attend the Global Client Council meeting to be held the following day.  On Monday night, Rudolf had dinner with Grabek and they reviewed the agenda and Rudolf's participation in the Global Council Meeting.  There was no mention or discussion of any alleged resignation.

170.   Following the Tuesday morning meeting with Baugh, Rudolf met with Curtin and two other AIG fraud investigators.

171.   At the November 14, 2017 meeting, (the second interview), Curtin handed Rudolf a copy of that Monday's initialed anti-retaliation script and asked Rudolf to read and acknowledge.

172.    Rudolf conveyed to Curtin that Baugh just had claimed that Rudolf had resigned his position on Sunday, which Rudolf disputed firmly.

173.    Admitting surprise, Curtin said he had no knowledge of any resignation, that it must be a mistake, and that the matter likely would be cleared up in a matter of minutes.

174.    Then due to the uncertainty of Rudolf's employment status, the meeting with Curtin was postponed by Curtin until the matter could be resolved.

175.    However, before adjournment Rudolf complained to Curtin of "bid rigging of LMU" (the unlimited policies), "claim work out deals," misrepresentations in the 10-K statements, other bad acts such as misleading regulators, reputational risk, and expressed concern about the possible impact on AIG's recent decertification from SIFI status.

176.    Curtin brushed off the fraud allegations as "old news" and said that he had spoken with AIG counsel Mike Leahy.

177.    Rudolf disputed that Curtin's concerns were old news, and told Curtin that in order to comprehend the current frauds, one needed to understand the past history of rigged claim workout deals, especially those policies issued with unlimited limits, other fraudulent transactions including Steele Software, that state and federal regulators were misled, and that AIG had not disclosed all of the circumstances surrounding the MedPartners' unlimited insurance transaction to the other insurers and/or reinsurers involved.

178.    Steele Software was another rigged claim work out deal orchestrated by Mitrovic, Flood, and/or Moor with complicit plaintiffs' attorneys in or about 2003.

179.     As with other large limit transactions, AIG did not want to take on the entire limit so AIG had it reinsured by 50% with Berkshire Hathaway via its executives Warren Buffett and Ajit Jain.

180.     The fraudulent transaction was discovered by AIG employee Mike Rappaport who, as directed by Rudolf, reported it to AIG's Legal Department.

181.     Rudolf followed up on this complaint with the Legal Department, the claims Department's direct supervisors, and former supervisors.

182.     Rudolf was informed that the complaint would be investigated but to his knowledge no action ever was taken.

183.     Similar to the MedPartners' transaction, AIG fraudulently treated the premium and loss payments, defrauded a Court by a failure to disclose, fraudulently collected reinsurance of approximately $50 million from Berkshire Hathaway, and failed to disclose the true nature of the transaction to Berkshire Hathaway and state and federal regulators.

184.     Rudolf was directed to remain in New York City; during this time he was confined to AIG's Investigation Conference room or to his office.

185.     Rudolf met with Rick Joers, AIG's Head of Employee Relations, and told him (Joers) that contrary to Baugh's claims that he had not resigned and that he was trying to report fraud.

186.     It was decided that Rudolf, Head of Client Engagement and others jobs, would not attend the Global Client Council Dinner, a major business event for Rudolf, that evening because he would be meeting with Curtin and his investigative team.

187.    Fearing his allegations were being ignored in violation of The AIG Handbook, Code of Conduct and other Policies, Rudolf offered Curtin more details including, but not limited to, bid rigging, Steele Software, the 10K and SIFI.  Rudolf told Curtin of his frustration, that he wanted the AIG Board to know he was voluntarily cooperating and that he wanted to make sure his voice, facts, and concerns were heard and properly investigated, but Curtin did not follow up on any of the allegations.

188.    Later on Tuesday afternoon, Rudolf followed up with Curtin via email regarding his employment status.

189.    Curtin responded that there had been no updates on Rudolf's employment status, and at one point told Rudolf that he should understand that he would receive "zero feedback" on anything he reports.

190.    Rudolf reasonably believed that Baugh was preventing him from participating in his most important work event, and restricting Rudolf and AIG from properly investigating his claims.

191.    On Wednesday, November 15, 2017, Rudolf spoke with Joers and Curtin.

192.    Rudolf told them that he did not resign, that he had more information to provide to Curtin, that the whole situation was very odd, and that the person claiming that Rudolf resigned (Baugh) was in charge of the area where Rudolf reported that the fraud had originated.

193.    Joers warned Rudolf in a threatening tone that he should watch what was he was saying, which is contrary to AIG's strict anti-retaliation policy.

194.    On Wednesday, November 15, 2017, Rudolf emailed Joers requesting an update on his employment status.

195.    Joers responded by telephone and told Rudolf that Baugh would like to meet with him on Friday, November 17, 2017.

196.    Later in the afternoon on Wednesday, November 15, 2017, Rudolf emailed Baugh as follows:

> I would like to have the opportunity to speak with you asap. Around 2:45 pm today, I spoke with Rick Joers and he informed me that you would like to meet this Friday. First, I am scheduled to depart Thursday to pick up my son from college. However, if this is the only time to meet, then I will meet Friday or might I suggest we meet Monday?
>
> As Rick is aware, my conversations with Andrew have been on hold since Tuesday until I received clarification on my employment status. Today, I asked Rick for an update, but he informed that you were still of the opinion that I had resigned over the phone on Sunday November 11th. For the record, I did not resign and I have not resigned.
>
> My main reason to speak with you was to discuss options around me and a path forward. After 24 years, my passion to build and protect this company is second to none. My goal was to not only discuss my current situation around compensation vs. performance, but to also discuss my concerns of some x-AIGr's returning to the company that could have an adverse impact to the company. My intentions were to inform you of what I know and to receive guidance. Lastly, I also requested to meet in person, because I did not want anything to be misconstrued. Through our discussion, I was shocked to learn that you had told Peter Zaffino that I had resigned. I immediately corrected you and thought you understood that I had not resigned.
>
> After 24 years and all that I have done to perform and protect AIG, I hope this is truly a misunderstanding. I did not resign, nor do I plan to resign. I really would like to be able to fully complete my conversations with Andrew and his team to help better protect AIG in the future. I think what I have to say is relative to AIG's future success. I look forward to meeting with you and hopefully being able to finish my constructive conversations with Andrew.

197.    Baugh agreed to meet with Rudolf on Monday, November 20, 2017.

198.    On Monday, November 20, 2017, Rudolf met with Baugh and Human Resources employee Merritt.

199.   Baugh repeated the false claim that Rudolf had resigned his position on Sunday, November 12, 2017.  Rudolf told Baugh and Merritt that he did not resign.

200.   AIG's claim that Rudolf resigned is false and a pretext.

201.   Rudolf adamantly denies that he ever resigned his position during the November 12th telephone call with Baugh or at any time.

202.   It simply would not be rational for an employee raising issues of misconduct and fraud while in the same conversation requesting the scheduling of his year-end evaluation with his new direct supervisor of four days to simultaneously announce his resignation.

203.   Rudolf repeated orally and in writing that he in fact had not resigned and had reported allegations of wrongdoing, misconduct, and fraud.

204.   Rudolf never submitted a written resignation in accordance with AIG's policies, which request resigning employees to "submit a written statement and provide at least two (2) weeks' notice" to management in order to "provide[] sufficient time to transition work within [the employee's] department and to prepare [the employee's] exit paperwork."

205.    A manager may request that the employee leave sooner than the notice period, but the employee still "will be paid through the end of the notice period."

206.   Rudolf never submitted a written resignation or provided two weeks' notice.

207.   No one ever contacted him about transitioning his work within his department.

208.   Critically, AIG never asked Rudolf to submit a written statement or provide at least two weeks' notice.

209.    In contrast, when a substantially younger colleague resigned within two weeks of Rudolf's termination, his supervisor would not accept his resignation unless he specifically put his resignation in writing; which he did.

210.    Tellingly no such request ever was made to Rudolf.

211.    Rudolf now was told that AIG treated his employment separation as a termination without cause, and that it was not a position elimination.

212.    AIG presented him with a Settlement Agreement and Release.

213.    In exchange for certain consideration (monetary payments and continuation of health benefits for a period), Rudolf was to provide a general release including, but not limited to, any and all claims he may have under the Title VII, the ADEA, and the "Sarbanes-Oxley Act of 2002."

214.    AIG's release language is contrary to the requirements of Sarbanes-Oxley and OSHA regulations regarding waiver of SOX claims including as set forth in the statute and the Department of Labor's 2016 "New policy guidelines for approving settlement agreements in whistleblower cases."

215.    Rudolf did not sign the Settlement Agreement and Release.

216.    Rudolf engaged in protected activity and Defendants knew or should have known.

217.    Rudolf's protected activities included fraud allegations with management and raising compliance concerns with others who might reasonably have been effective at commencing enforcement proceedings.

218.     A causal connection exists between Rudolf's protected activity and his termination including the close temporal proximity of just a few days.

219.     Defendants discriminated against Rudolf and maintained a hostile work environment against him on account of protected activities.

220.     The hostility, discrimination and retaliation included trying to falsify a resignation, discharging Rudolf from employment on November 20, 2017, relieving Rudolf of his duties, damaging Rudolf's reputation and future employment opportunities by falsely claiming that he voluntarily resigned his position.

221.     Defendants have a history of inadequate whistleblowing policies and procedures and a culture that inhibits and does not protect whistleblowers.

222.     Defendants discriminated and retaliated against Rudolf on account of protected activities.

223.     Defendants discriminated against Rudolf because of his age and/or gender when it terminated his employment and paid him less than similarly situated employees outside of his protected classes.

224.     Defendants retaliated against Rudolf including by contriving his resignation and firing him after he asserted discrimination in compensation.

225.     Based on information and belief, Baugh and AIG (Management – ELT & CLT) were aware that Rudolf was being discriminated against by his boss, Johnson, so that Johnson could advance the financial and business interest of the younger female direct report with whom

Grabek alleged Johnson had a personal relationship, a reporting relationship AIG and HR apparently decided to not address appropriately.

226.   Based on information and belief, the ELT and CLT promoted and/or increased the pay of both Johnson and the younger female employee and others; Rudolf's job responsibilities increased significantly where theirs did not change.

227.   As a result of the wrongful termination, Rudolf has suffered significant financial damages including the loss of his annual salary, year-end benefits (STI and LTI), health insurance benefits, non-qualified pension, vacation pay, 401k match, life insurance, and a Continuity Award.

228.   Since termination, Rudolf has incurred out-of-pocket expenses and attorneys' fees.

229.   In addition, Rudolf has suffered damage to his professional reputation based on AIG's repeated false claim published to third parties that he had resigned his position.

230.   Defendants discriminated against Rudolf because of his age and/or gender in terms of his compensation and pay grade.

231.   Rudolf seeks all remedies and damages permitted under the Sarbanes-Oxley Act of 2002, the False Claims Act, (retaliation), the Age Discrimination in Employment Act, Title VII of the Civil Rights Act, the Pennsylvania Human Relations Act, and common law.

232.   Rudolf requests a Jury trial.

## VI.  COUNTS

### Count I
### Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A
### Whistleblower Retaliation
### Plaintiff v. Defendants

233.   The preceding paragraphs are incorporated as if set forth at length herein.

234.   Rudolf alleges violations of the employee protection provisions of Sarbanes-Oxley Act, 18 U.S.C. § 1514.A.

235.   Rudolf was an employee of a publicly traded company, AIG, and its subsidiary, National Union, who reported information he reasonably believed constituted mail fraud, wire fraud, bank fraud, or securities fraud, and/or a violation of the rules or regulations of the Securities and Exchange Commission, and/or a provision of Federal law relating to fraud against shareholders.

236.   Rudolf engaged in protected activity or conduct when he reported that information to his supervisor and AIG investigators.

237.   AIG, National Union, and Baugh knew or suspected, actually or constructively, that Rudolf engaged in the protected activity.

238.   Rudolf suffered an adverse employment action when in November 2017 Defendants falsely asserted that he had resigned his position and then discharged him from employment.

239.   The circumstances are sufficient to raise the inference that Rudolf's protected activity was a contributing factor in the adverse employment action including, but not limited to, that he was falsely accused of resigning which began the separation process within a day or two

after he reported the fraud information to Baugh and AIG investigators, the claim that he resigned is false and a pretext, and AIG's corporate culture is hostile to whistleblowers.

240.    As a result, Rudolf has suffered loss of salary, bonuses, incentive payments, benefits, non- qualified pension, mental anguish, loss of reputation, and loss of advancement opportunities.

241.    Rudolf seeks all remedies and damages permitted under law including, but not limited to, reinstatement or front pay, back pay, raises, bonuses, benefits, reinstatement of seniority and tenure, non-qualified pension, and other orders necessary to make Rudolf whole, abatement from any further violations of the whistleblower provisions of the Act, requiring Defendants to take prompt and effective action against any reported violations, an order expunging Rudolf's alleged resignation, and ordering Defendants to remove any records of disciplinary action against Rudolf, to preserve them only in the files of their legal counsel, and to use them only for purposes of defending rights in this proceeding, an order prohibiting Defendants from disclosing any disparaging information about Rudolf to prospective employers, or otherwise interfering with any applications he might make in the future, compensatory monetary damages in an amount determined to be fair and equitable compensation for Rudolf's emotional distress and loss of reputation, reasonable attorney fees for Rudolf's attorneys, costs of this litigation, and pre-judgment and post-judgment interest.

## Count II
## False Claims Act Retaliation
## 31 U.S.C. § 3730(h)
## Plaintiff v. Defendants

242.    The preceding paragraphs are incorporated as if set forth at length herein.

243.    Rudolf alleges violations of the employee whistleblower protection provisions of the False Claims Act.

244.    As set forth above, Rudolf engaged in protected conduct, (i.e., acts done in furtherance of an action under § 3730).

245.    Rudolf engaged in internal reporting of his employer's false or fraudulent claims.

246.    The false or fraudulent claims caused or would cause economic loss to the government.

247.    Rudolf's employer(s) were aware of his internal reporting.

248.    Rudolf was discriminated against because of his protected conduct when he was terminated.

249.    Rudolf seeks all remedies and damages permitted for retaliation under the False Claims Act to be made whole including, but not limited to, reinstatement with the same seniority status that Rudolf would have had but for the discrimination, double the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

**Count III**
**ADEA – Age Discrimination**
**Plaintiff v. AIG and National Union**

250.     The preceding paragraphs are incorporated as if set forth at length herein.

251.     Rudolf is a member of the age protected class.

252.     Rudolf is qualified for his position.

253.     Rudolf suffered an adverse employment action when he was separated from his employment under false pretenses.

254.     Rudolf was paid less than similarly situated sufficiently younger individuals.

255.     An inference of age discrimination arises because similarly situated sufficiently younger individuals (with less responsibility and duties) were paid more than Rudolf and management made ageist comments.

256.     Based on information and belief, Rudolf's duties were assumed by sufficiently younger individuals to permit an inference of age discrimination.

257.     As a result of the discrimination Rudolf has suffered loss of salary, bonuses, incentive payments, benefits, non- qualified pension, mental anguish, loss of reputation, and loss of advancement opportunities.

258.      Rudolf seeks all remedies and damages permitted under law including, but not limited to, reinstatement or front pay, back pay, raises, bonuses, benefits, reinstatement of seniority and tenure, non-qualified pension, and other orders necessary to make Rudolf whole, liquidated damages, reasonable attorney fees for Rudolf's attorneys, costs of this litigation, and pre-judgment and post-judgment interest.

## Count IV
## ADEA – Retaliation
## Plaintiff v. AIG and National Union

259.     The preceding paragraphs are incorporated as if set forth at length herein.

260.     Rudolf engaged in protected activity when he complained that younger employees with similar or less job responsibilities and duties made more money than he did.

261.   Following the protected activity, Rudolf suffered a materially adverse action including when he was separated from employment under false pretenses.

262.   A causal connection exists between the protected activity and the termination including, but not limited to, the close temporal proximity between Rudolf's complaints and his termination, and the pretextual nature of Defendants' claim that Rudolf had resigned his employment.

263.     As a result, Rudolf has suffered loss of salary, bonuses, incentive payments, benefits, non- qualified pension, mental anguish, loss of reputation, and loss of advancement opportunities.

264.     Rudolf seeks all remedies and damages permitted under law including, but not limited to, reinstatement or front pay, back pay, raises, bonuses, benefits, reinstatement of seniority and tenure, non-qualified pension, and other orders necessary to make Rudolf whole, liquidated damages, reasonable attorney fees for Rudolf's attorneys, costs of this litigation, and pre-judgment and post-judgment interest.

## Count V
### Title VII – Gender Discrimination
### Plaintiff v. AIG and National Union

265.    The preceding paragraphs are incorporated as if set forth at length herein.

266.    Rudolf is a member of the gender protected class.

267.    Rudolf is qualified for his position.

258.    Rudolf suffered an adverse employment action when he was separated from his employment under false pretenses.

269.    Rudolf was paid less than similarly situated females.

270.    An inference of gender discrimination arises because similarly situated females (including with less responsibility and duties) were paid more than Rudolf and one of whom was romantically involved with Rudolf's supervisor.

271.    Based on information and belief, Rudolf's duties were assumed by females permitting an inference of gender discrimination.

272.    As a result, Rudolf has suffered loss of salary, bonuses, incentive payments, benefits, non- qualified pension, mental anguish, loss of reputation, and loss of advancement opportunities.

273.    Rudolf seeks all remedies and damages permitted under law including, but not limited to, reinstatement or front pay, back pay, raises, bonuses, benefits, reinstatement of seniority and tenure, non-qualified pension, and other orders necessary to make Rudolf whole, compensatory damages for emotional distress and reputation damage, reasonable attorney fees for Rudolf's attorneys, costs of this litigation, and pre-judgment and post-judgment interest.

**Count VI**
**Title VII – Retaliation**
**Plaintiff v. AIG and National Union**

274.    The preceding paragraphs are incorporated as if set forth at length herein.

275.    Rudolf engaged in protected activity when he complained that female employees with similar or less job responsibilities and duties made more money than he did.

276.    Following the protected activity, Rudolf suffered a materially adverse action including when he was separated from employment under false pretenses.

277.    A causal connection exists between the protected activity and the termination including, but not limited to, the close temporal proximity between Rudolf's complaints and his termination, and the pretextual nature of Defendants' claim that Rudolf had resigned his employment.

278.    As a result, Rudolf has suffered loss of salary, bonuses, incentive payments, benefits, non- qualified pension, mental anguish, loss of reputation, and loss of advancement opportunities.

279.    Rudolf seeks all remedies and damages permitted under law including, but not limited to, reinstatement or front pay, back pay, raises, bonuses, benefits, reinstatement of seniority and tenure, non-qualified pension, and other orders necessary to make Rudolf whole, compensatory damages for emotional distress and reputation damage, reasonable attorney fees for Rudolf's attorneys, costs of this litigation, and pre-judgment and post-judgment interest.

## Count VII
### PHRA – Gender and Age Discrimination
### Plaintiff v. Defendants

280.    The preceding paragraphs are incorporated as if set forth at length herein.

281.    Rudolf is a member of the gender and age protected classes.

282.    Rudolf is qualified for his position.

283.    Rudolf suffered an adverse employment action when he was separated from his employment under false pretenses.

284.    Rudolf was paid less than similarly situated sufficiently younger individuals and females.

285.    An inference of age discrimination arises because similarly situated sufficiently younger individuals (with less responsibility and duties) were paid more than Rudolf and management made ageist comments.

286.    Based on information and belief, Rudolf's duties were assumed by sufficiently younger individuals to permit an inference of age discrimination.

287.    An inference of gender discrimination arises because similarly situated females (including with less responsibility and duties) were paid more than Rudolf and one of whom was romantically involved with Rudolf's supervisor.

288.    Based on information and belief, Rudolf's duties were assumed by females permitting an inference of gender discrimination.

289.    As a result, Rudolf has suffered loss of salary, bonuses, incentive payments, benefits, non- qualified pension, mental anguish, loss of reputation, and loss of advancement opportunities.

290.    Rudolf seeks all remedies and damages permitted under law including, but not limited to, reinstatement or front pay, back pay, raises, bonuses, benefits, reinstatement of seniority and tenure, non-qualified pension, and other orders necessary to make Rudolf whole, compensatory damages for emotional distress and reputation damage, reasonable attorney fees for Rudolf's attorneys, costs of this litigation, and pre-judgment and post-judgment interest.

### Count VIII
### PHRA – Retaliation
### Plaintiff v. Defendants

291.    The preceding paragraphs are incorporated as if set forth at length herein.

292.    Rudolf engaged in protected activity when he complained that female and/or sufficiently younger employees with similar or less job responsibilities and duties made more money than he did.

293.     Following the protected activity, Rudolf suffered a materially adverse action including when he was separated from employment under false pretenses.

294.    A causal connection exists between the protected activity and the termination including, but not limited to, the close temporal proximity between Rudolf's complaints and his termination, and the pretextual nature of Defendants' claim that Rudolf had resigned his employment.

295.    As a result, Rudolf has suffered loss of salary, bonuses, incentive payments, benefits, non- qualified pension, mental anguish, loss of reputation, and loss of advancement opportunities.

296.    Rudolf seeks all remedies and damages permitted under law including, but not limited to, reinstatement or front pay, back pay, raises, bonuses, benefits, reinstatement of seniority and tenure, non-qualified pension, and other orders necessary to make Rudolf whole, compensatory damages for emotional distress and reputation damage, reasonable attorney fees for Rudolf's attorneys, costs of this litigation, and pre-judgment and post-judgment interest.

**Count IX**
**Equal Pay Act Violation**
**Plaintiff v. AIG and National Union**

297.    The preceding paragraphs are incorporated as if set forth at length herein.

298.    Defendants are employers who, on the basis of sex, pay different wages for equal work in violate of the EPA.  See 29 U.S.C. § 206(d).

299.    As stated above, an employee of the opposite sex was paid differently and more than Rudolf for performing equal work — work of substantially equal skill, effort and responsibility, under similar working conditions.

300.    A significant portion of the two jobs is identical.

301.    Any differing or additional tasks did not make the work substantially different.

302.    Defendants cannot show that the pay differential was due to a bona fide seniority system, a merit system, a system which measures earnings by quantity or quality of production, or a differential based on any factor other than sex.

303.     As a result of Defendants' violation of the EPA, Plaintiff has suffered damages.

304.     Plaintiff seeks all remedies and damages permitted under the EPA including, but not limited to, lost wages, liquidated damages, attorney's fees and costs to remedy the alleged Equal Pay Act violation, and pre-judgment and post-judgment interest.

**Count X**
**Equal Pay Act Retaliation Violation**
**Plaintiff v. AIG and National Union**

305.     The preceding paragraphs are incorporated as if set forth at length herein.

306.     Plaintiff engaged in protected activity when he complained that he was paid less than a similarly situated female executive who had significantly less responsibility than he.

307.     Following the complaints, Plaintiff suffered an adverse employment action.

308.     Defendants falsely asserted that he had resigned his position and they terminated his employment on November 20, 2017.

309.     There is a causal connection between Rudolf's protected activity and the adverse action based on temporal proximity, antagonism, and other evidence.

310.     As a result of the retaliation prohibited by the EPA, Plaintiff has suffered damages.

311.     Plaintiff seeks all remedies and damages permitted under the EPA for retaliation including, but not limited to, lost wages, liquidated damages, punitive damages, attorney's fees and costs, and pre-judgment and post-judgment interest.

## Count X1
## Common Law – Intentional Interference with Contractual Relationship
## Plaintiff v. Baugh

312.   The preceding paragraphs are incorporated as if set forth at length herein.

313.   In the alternative, Plaintiff pleads a claim of intentional interference against Baugh.

314.   Rudolf had an existing employment relationship with National Union.

315.   Baugh interfered with that relationship by falsely telling Rudolf's employer that he had resigned his position on November 12, 2017.

316.   Baugh, an AIG employee, was not privileged to act in this manner.

317.   As a result of Baugh's interference and false claim that Rudolf had resigned, Rudolf's employer terminated his employment relationship causing him to suffer significant pecuniary harm.

318.   As a result of the interference, Rudolf suffered loss of salary, bonuses, incentive payments, benefits, non- qualified pension, mental anguish, loss of reputation, and loss of advancement opportunities.

319.   Rudolf seeks all damages permitted under law.

Wherefore, Rudolf claims damages against Baugh for an amount in excess of $75,000.

## Count XII
## Common Law – Fraud
## Plaintiff v. Defendants

320.   The preceding paragraphs are incorporated as if set forth at length herein.

321.   In the alternative, Plaintiff pleads a claim of Fraud against Defendants.

322.    On November 12, 2017, Baugh told Rudolf to contact Human Resources regarding the status of his various compensation components and awards if he were to leave and take a job elsewhere.

323.    Based on this directive, Rudolf emailed Human Resources on November 12, 2017 asking what would happen to his various compensation components and awards if he were to leave and take a job elsewhere.

324.    In the November 20, 2017 termination meeting, Defendants relied on Rudolf's November 12 inquiry email to Human Resources  which he sent at the direction of Baugh to claim falsely and negligently that he had resigned his employment.

325.    Defendants tricked Rudolf into sending this email and misrepresented that he had resigned his employment.

326.    As a result of the fraud, Rudolf suffered loss of salary, bonuses, incentive payments, benefits, non- qualified pension, mental anguish, loss of reputation, and loss of advancement opportunities.

Rudolf seeks all remedies and damages permitted under law in excess of the arbitration limit of this Court.

## Count XIII
## Wrongful Discharge – Public Policy
## Plaintiff v. Defendants

327.    The preceding paragraphs are incorporated as if set forth at length herein.

328.    An at-will employee may state a claim for wrongful discharge where a clear mandate of public policy is violated, and there is no plausible and legitimate reason for terminating the at-will relationship.

329     Here, a clear mandate of public policy was violated when Defendants terminated Rudolf in retaliation for engaging in protected whistleblower activities.

330.    There was no plausible and legitimate reason for terminating Rudolf and Defendants' claims that he was not discharged but had resigned are false, disputed, and pretexts.

331.    As a result of the wrongful discharge, Rudolf suffered significant financial losses an emotional distress and reputation harm.

332.    Rudolf seeks all remedies and damages permitted under law in excess of the arbitration limit of this Court.

## Count XIV
## Breach of Contract
## Plaintiff v. Defendants

333.    The preceding paragraphs are incorporated as if set forth at length herein.

334.    Defendants promised Rudolf as an employee that they would not retaliate against him for reporting financial wrongdoing or other similar violations.

335.    That promise is found in Defendants' employee handbook and similar manuals.

336.    Defendants repeated this promise orally and in writing specifically to Rudolf on

Monday, November 12, 2017 and Tuesday, November 13, 2017 and had him initial it in connection with his interview with investigations.

337.    Defendants made a promise that they should reasonably expect to induce a definite action by Rudolf.

338.    Rudolf acted in reliance on this promise not to retaliate.

339.    Rudolf reported financial wrongdoing and other similar violations to AIG supervisors and investigators.

340.    Defendants breached this promise to Rudolf when they terminated his employment under false pretenses that he resigned.

341.    Injustice only can be avoided by enforcement of the promise.

342.    As a result of the breach, Rudolf suffered loss of salary, bonuses, incentive payments, benefits, non- qualified pension, mental anguish, loss of reputation, and loss of advancement opportunities.

343.    Rudolf seeks all damages permitted under law.

344.    Wherefore, Rudolf claims damages against Defendants for an amount in excess of $75,000.

Respectfully Submitted,

LIEBER HAMMER HUBER & PAUL, P.C.


s/James B. Lieber
James B. Lieber
Pa. I.D. No. 21748
Thomas M. Huber
Pa. I.D. No. 83053
Jacob M. Simon
Pa. I.D. No. 202610
5528 Walnut Street
Pittsburgh, PA 15232-2312
(412) 687-2231 (telephone)
(412) 687-3140 (fax)
Jlieber@lhhb-law.com