**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOHN RUDOLF,           )
                           )
       Plaintiff,          )      Civil Action No. 19-1468
                           )      Magistrate Judge Maureen P. Kelly
        v.             )
                           )
AMERICAN INTERNATIONAL GROUP,  )      Re: ECF No. 20
INC., NATIONAL UNION FIRE        )
INSURANCE COMPANY OF          )
PITTSBURGH, PA, and ALEXANDER   )
BAUGH,                  )
                           )
       Defendants.      )

## <u>MEMORANDUM OPINION</u>

Plaintiff John Rudolf ("Plaintiff") initiated this action against Defendants American International Group, Inc. ("AIG"), National Union Fire Insurance Company of Pittsburgh, PA ("NUFIC") and Alexander Baugh ("Baugh") (collectively, "Defendants") arising out of allegations that he was unlawfully terminated from his employment in violation of the Sarbanes-Oxley Act, the False Claims Act, the Age Discrimination in Employment Act, Title VII of the Civil Rights Act, and the Pennsylvania Human Relations Act. Plaintiff also brings claims for Equal Pay Act violations, intentional interference with contractual relations, fraud, wrongful discharge, and breach of contract.

Presently before the Court is Defendants' Motion to Transfer or, in the Alternative, Dismiss the Complaint as to Defendant Alexander Baugh and Dismiss the SOX Whistleblower Claim for

Failure to State a Claim ("Motion to Transfer/Dismiss").  ECF No. 20.  For the reasons that follow, the Motion to Transfer/Dismiss is denied.[1]

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Parties

Rudolf is a senior insurance executive who was formerly employed by AIG and/or NUFIC from 1994 until his termination in November 2017.  ECF No. 1 ¶ 5; ECF No. 31-1 ¶¶ 2-3.  He was born in 1964 and is currently 55-years old.  ECF No. 1 ¶ 16.  Rudolf resides in Allegheny County, Pennsylvania.  Id. ¶ 1.

AIG is a Delaware corporation engaged in a broad range of insurance activities, with headquarters in New York.  Id. ¶ 2.  AIG has an office in Pittsburgh, Pennsylvania.  Id.

NUFIC is one of AIG's principal general insurance company subsidiaries.  Id. ¶ 4.  NUFIC is incorporated in Pennsylvania and maintains a branch office in Pittsburgh, Pennsylvania.  ECF No. 31-1 ¶ 9.  NUFIC's headquarters are in New York.  ECF No. 1 ¶ 4.

Baugh is currently AIG's Global Chief Underwriting Officer for Casualty and Financial Lines and the Interim Chief Executive Officer, International General Insurance.  ECF No. 22-1 ¶ 2.  Baugh works out of AIG's New York City headquarters and resides in New Jersey.  Id. ¶¶ 3-4. In Fall 2017, Baugh became Chief Executive Officer of North America General Insurance and Rudolf's second-line manager.  Id. ¶ 7.  After this time, Rudolf reported directly to Stephen Grabek ("Grabek"), who in turn reported to Baugh.  Id.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties voluntarily consented to having a United States Magistrate Judge conduct all proceedings in this case, including the entry of a final judgment.  ECF Nos. 15 and 16.

### B. Rudolf's Employment

Rudolf began working for NUFIC in commercial insurance in October 1994.  ECF No. 1 ¶ 18.  At times from 2012 to November 2017, Rudolf served as the head of nine business units managing over 170 employees.  Id. ¶¶ 19, 25.

Rudolf claims that, from 2006 until his termination in 2017, he worked primarily out of an office in Pittsburgh, Pennsylvania.  ECF No. 31-1 ¶ 4.  From 2006 to 2012, his job duties were considered regional and based in Pittsburgh.  Id.  Upon being promoted to Head of Client Engagement (U.S. and Canada) in 2013, he was told that his new position was based at AIG's New York City headquarters.  Id.  However, he was authorized to remain living and working in Pittsburgh.  Id.

Thereafter, Rudolf's direct reports lived across the country, instead of in Pittsburgh.  Id. He traveled as needed, including to New York City.  Id.  In 2016, as part of the "Simplify AIG" internal reorganization, Rudolf received a newly created executive position and promotion.  Id. Although he received an office at the New York City headquarters, he continued to maintain, and work out of, his office in Pittsburgh.  Id.  AIG/NUFIC paid for Rudolf's office parking in Pittsburgh and withheld Pennsylvania state payroll taxes for Rudolf.  Id. ¶¶ 4, 10.

### C. Discriminatory Conduct

Although his job responsibilities expanded from 2014 until his termination in 2017, Rudolf claims that his salary, short and long-term incentive payments, and job grade did not increase. ECF No. 1 ¶ 61.  Rudolf alleges that he was paid less than similarly situated younger and/or female employees.  Id. ¶ 96.

In September 2014, Rudolf's then-supervisor, Jeremy Johnson ("Johnson"), discussed with Rudolf that other peers (including younger and/or female employees) had received salary and/or job grade increases as part of the "Simplify AIG" reorganization, but that Rudolf did not.  Id. ¶ 67. Despite Johnson's reassurances that Rudolf would receive a salary and pay grade increase if he continued to work hard, this did not occur.  Id. ¶¶ 69-70.  Instead of receiving additional benefits, Rudolf was stripped of his secretarial support, and he was regularly required to work more than 100 hours per week.  Id. ¶¶ 72-73.

In May 2017, Rudolf told Baugh that a younger female counterpart was making significantly more money than him, despite having less responsibility and fewer direct reports.  Id. ¶ 92.  Rudolf also raised various complaints with Johnson, Rob Schimek ("Schimek"), the CEO of Commercial Insurance, and Sid Sinkarin, the CFO of AIG, that younger employees made more money than he did, notwithstanding Rudolf's promotions and increased responsibilities.  Id. ¶¶ 98-99.  Grabek repeatedly "harassed" Rudolf to leave AIG if the company would not pay him appropriately.  Id. ¶¶ 63, 95.

The Vice President of Human Resources, Ryan Merritt ("Merritt"), informed Rudolf in May 2017 that he had "no path" to improving his job grade.  Id. ¶ 100.

### D.  Allegations of AIG's Misconduct

From 1999 to 2006, Rudolf was President of the Loss Mitigation Unit ("LMU").  Id. ¶ 21. At this time, the LMU was under investigation by the Securities Exchange Commission ("SEC") for fraudulent practices and the use of insurance transactions to hide company losses.  Id. ¶ 27; ECF No. 31-1 ¶ 21.  Rudolf became aware of serious allegations involving AIG, including that Peter Eastwood ("Eastwood"), Michael Mitrovic ("Mitrovic"), and Kris Moor ("Moor") had engaged in "rigged claim workout deals," in which AIG resolved certain litigation claims by

agreeing to pay a disputed claim in exchange for additional or above-market rate premiums on new unlimited policies.  ECF No. 1 ¶ 33.  In making such deals, AIG achieved unwarranted accounting and financial reporting benefits, because it recouped some of the disputed claim by receiving additional insurance premiums and accounted for that value as insurance revenue.  Id. ¶ 34.

In 2003, AIG revealed that it had previously entered into a rigged claim workout deal in connection with settling a securities class action lawsuit against MedPartners, Inc.  Id. ¶¶ 38-45.  This resulted in a subsequent lawsuit (the "CVS lawsuit") arising out of allegations that AIG and MedPartners had falsified issues related to insurance coverage.  Id. ¶¶ 45-46.  Rudolf alleges that the "true circumstances" of this rigged claim workout deal, however, and the existence of other rigged unlimited insurance policies were not fully disclosed.  Id. ¶¶ 47-49.  He asserts that AIG did not properly disclose these policies in its 10-K reports, and that AIG has never corrected the premiums it received in the accounting of these transactions.  Id. ¶¶ 49-50.

On July 19, 2016, Rudolf learned that the CVS lawsuit had been settled.  Id. ¶¶ 75-76.  Rudolf became concerned, however, that the AIG Board had been misled regarding the "true nature" of the unlimited insurance policies, and that the undisclosed fraud could jeopardize AIG's status as a systematically important financial institution ("SIFI").  Id. ¶¶ 78-86.

Rudolf discussed the settlement announcement and AIG's misconduct with Johnson in Summer 2016.  Id. ¶¶ 78-79.  In Fall 2016, Rudolf raised concerns to Schimek that the AIG Board had likely been misled about facts involving the unlimited insurance policies, including the MedPartners securities litigation and the CVS lawsuit settlement.  Id. ¶ 81.

### E.  DOJ Independent Monitor

In 2003, the SEC brought an enforcement action against AIG for setting up an improper special purpose entity.  Id. ¶ 51.  AIG settled this action, which included agreeing to retain an independent monitor to review certain transactions to which AIG was a party.  Id. ¶ 52.  The Department of Justice ("DOJ") appointed attorney James Cole ("Cole") as the independent monitor, and Rudolf assisted Cole and his team.  Id. ¶¶ 53-55.  Cole informed Rudolf that if he were ever required to leave AIG under "questionable circumstances," he should contact the DOJ or Cole through AIG's legal department.  Id. ¶ 57.

### F.  November 10, 2017 Conference Call

In early November 2017, Johnson departed AIG and Baugh became Rudolf's supervisor.  Id. ¶ 107.  Several days later, on November 10, 2017, Rudolf participated in a conference call from Pittsburgh that was co-hosted by Baugh and Peter Zaffino ("Zaffino"), the CEO of AIG General Insurance.  Id. ¶ 109; ECF No. 31-1 ¶ 15.  Rudolf became concerned regarding potential new hires that were announced on this call, whom Rudolf believed to have been involved in prior AIG misconduct.  ECF No. 1 ¶¶ 110-115.

### G.  November 12, 2017 Communications with Baugh

On November 12, 2017, Rudolf texted Baugh from Pittsburgh.  ECF No. 22-1 at 6; ECF No. 31-1 ¶¶ 16-17.  Rudolf requested a meeting with Baugh in New York City in order to discuss his concerns of "bad actors" returning to AIG and to conduct a "year-end check in conversation" regarding his position.  ECF No. 1 ¶ 119; ECF No. 31-1 ¶¶ 17; ECF No. 22-1 at 6.  Baugh responded that he was unavailable to meet on Monday in New York, but that he could be available on Tuesday.  ECF No. 22-1 at 6.  Citing "timing issues," Rudolf requested a phone conversation, to which Baugh agreed.  Id. at 6-7.

Rudolf called Baugh in New York later that day.  ECF No. 31-1 ¶ 19.  During this conversation, Rudolf disclosed fraudulent activities related to "rigged claim workout deals," in which AIG had agreed to pay disputed claims in exchange for above-market premiums on new unlimited policies.  Id.  Rudolf told Baugh that if he were to leave AIG, he was required to have an exit interview with the DOJ, and that the conversation "would be tough" because Rudolf would disclose AIG misconduct.  Id. ¶ 22.  Rudolf also requested that AIG pay for him to retain legal counsel.  Id.  During this call, Baugh pressured Rudolf to specifically identify the "bad actors" and the nature of their past misconduct, and he instructed Rudolf to inquire with Human Resources as to how resigning would affect his compensation and awards.  ECF No. 1 ¶¶ 125, 322-323.

Following this call, Baugh texted Rudolf:

> John – I sensed you were not satisfied with our conversation and that you are very upset.  I heard you say family first and I fully agree with that.  I also sensed you are telling me that your resignation will have grave consequences for AIG and while trying not to appear thick, I really don't follow.  I think it's terrible that you feel you have 19 lost years.  That only allows me to try to help you in the way you are asking for help – to exit.  It sounds to me like an on boarding session in Philadelphia is not your most crucial issue right now.  The offer to meet at 8:00 a.m. Tues. still stands.  Entirely at your discretion.  Lex.

ECF No. 22-1 at 8.

In response, Rudolf agreed to meet Baugh in New York the following Tuesday, November 14, 2017, to continue their discussion.  Id.

On November 12, 2017, Baugh sent an email to Zaffino, who was also based in New York.  ECF No. 22-1 ¶ 9.  Baugh reported that Rudolf had just called to "render his resignation," and that Baugh was "inclined to accept it."  ECF No. 22-1 at 10.  Baugh noted that Rudolf had "not been happy for many years" and "[h]e needs to be based in Pittsburgh for personal reasons." Id.  Baugh also referred to "legal issues" that Rudolf raised on the call, stating "John is telling me there was

a cover up by Kris Moor, John Doyle, Peter Eastwood, Mike Smith and Paul Lavelle and that they did not tell the Board the truth." Id.

### H. AIG's Investigation/Rudolf's Meetings in New York

The next day, Andrew J. Curtin ("Curtin"), AIG's Senior Managing Director – Global Legal, Compliance and Regulatory – Global Head of Investigations, called Rudolf in Pittsburgh. ECF No. 1 ¶ 140. Curtin stated that Baugh had reported Rudolf's allegations of fraud against AIG and its Board, and he informed Rudolf that he and his colleagues would investigate. Id. ¶ 141. He also notified Rudolf of AIG's anti-retaliation policy for whistleblowing activities. Id. ¶ 143. Although Rudolf requested an in-person meeting to further discuss his allegations, he "conveyed key points" to Curtin on this call, including "his assignment to work with the LMU and interface with outside regulators, the fraud with unlimited insurance policies . . . , false 10-k disclosures, reputational risks, SIFI status problems, and expressed that he had other frauds to discuss." Id. ¶¶ 142, 144.

Rudolf subsequently met with Baugh in New York City on Tuesday, November 14, 2017. ECF No. 31-1 ¶ 33. He reported that AIG's U.S. Commercial Insurance Division had misled Miller, the AIG Board, and CVS on settling claims. He warned Baugh of "reputational risks" to AIG, including that AIG's SIFI application and consideration for de-SIFI status "was in jeopardy." Id. He stated that AIG "bad actors" in senior positions fraudulently failed to report misconduct. Id. ¶ 36.

In the course of their meeting, Baugh disclosed that he had reported Rudolf's resignation to Zaffino. Id. ¶ 38. Rudolf responded that he did not, in fact, resign; rather, he only indicated that "if [his] concerns went unheard, then [he] would have to consider leaving AIG." Id. ¶¶ 38-39.

Following his meeting with Baugh, Rudolf met in person with Curtin in New York.  Id. ¶ 41.  Rudolf told Curtin that Baugh claimed he had resigned, but it was not true.  Id.  Given this uncertainty, Curtin postponed the meeting until Rudolf's employment status could be resolved. ECF No. 1 ¶ 174.  Before the meeting concluded, however, Rudolf spoke with Curtin about AIG's misconduct, including "bid rigging," "claim work out deals," misrepresentations in 10-K statements, and other "bad acts" such as misleading regulators, reputational risk, and Rudolf's concern regarding the effect on AIG's decertification from SIFI status.  ECF No. 31-1 ¶ 42.

Rudolf subsequently met with Rick Joers ("Joers"), AIG's Head of Employee Relations, and he reiterated that he did not resign.  Id. ¶ 44.  In a phone conversation with Joers and Curtin on November 15, 2017, Rudolf again confirmed that he did not resign and the "person claiming Rudolf resigned (Baugh) was in charge of the area where Rudolf reported that the fraud had originated."  ECF No. 1 ¶ 192.  Joers warned Rudolf in a "threatening tone" that he should "watch what he was saying."  Id. ¶ 193.  That same day, Rudolf emailed Baugh requesting an opportunity to speak with him as soon as possible and stated: "[f]or the record, I did not resign and I have not resigned."  Id. ¶ 196.

### I. Rudolf's Termination

On November 20, 2017, Rudolf traveled from Pittsburgh to AIG's headquarters in New York.  ECF 31-1 ¶ 31.  Rudolf met with Baugh and a human resources employee.  ECF No. 1 ¶ 198.  Baugh repeated his claim that Rudolf had resigned on November 12, 2017, which Rudolf disputed.  Id. ¶ 199.

Rudolf was informed that his employment had been terminated.  ECF No. 31-1 ¶ 53.  He was asked to sign a general release, including a release of any claims under Title VII, the ADEA, and the Sarbanes-Oxley Act of 2002, which he refused to sign.  Id. ¶¶ 54-55.

### J.   Administrative Filings

On April 25, 2018, Rudolf filed a charge against Defendants with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") raising claims related to sex discrimination, age discrimination and retaliation.   ECF No. 1 ¶ 13.   Thereafter, Rudolf also filed a complaint against Defendants with the Secretary of Labor through the Occupational Safety and Health Administration ("OSHA") under the Sarbanes-Oxley Act.  Id. ¶ 11.

### K.   Rudolf's Claims

In the instant Complaint, Rudolf asserts fourteen claims: Count I: Sarbanes-Oxley Act ("SOX"); Count II: False Claims Act Retaliation; Count III: ADEA – Age Discrimination; Count IV: ADEA – Retaliation; Count V: Title VII – Gender Discrimination; Count VI; Title VII – Retaliation; Count VII: PHRA – Gender and Age Discrimination; Count VIII: PHRA – Retaliation; Count IX; Equal Pay Act Violation; Count X: Equal Pay Act Retaliation Violation; Count XI: Intentional Interference with Contractual Relationship; Count XII: Fraud; Count XIII: Wrongful Discharge; Count XIV: Breach of Contract.  ECF No. 1 ¶¶ 233-344.

Counts III, IV, V, VI, IX and X are only asserted against AIG and NUFIC.  Count XI is only asserted against Baugh.  The other counts are asserted against all of the Defendants.

### L.   Procedural History

Rudolf filed his Complaint on November 11, 2019.  ECF No. 1.  Defendants filed the instant Motion to Transfer/Dismiss and Brief in Support on February 3, 2020.  ECF Nos. 20 and 21.  Rudolf filed a Response in opposition on April 27, 2020.  ECF No. 31.  Defendants filed a Reply, ECF No. 32, and Rudolf filed a Sur-Reply, ECF No. 35.

The Motion to Transfer/Dismiss is now ripe for consideration.

## II.   STANDARD OF REVIEW

### A.  Personal Jurisdiction

"Once a defendant challenges a court's exercise of personal jurisdiction over it, the plaintiff bears the burden of establishing personal jurisdiction." D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 102 (3d Cir. 2009) (citing Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001)).  For purposes of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), the "plaintiff must prove by affidavits or other competent evidence that jurisdiction is proper."  Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009) (quoting Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1302 (3d Cir. 1996)) (internal quotations omitted).  When the district court does not hold an evidentiary hearing, "the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor."  Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004).

### B.  Venue

In deciding a motion to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3), the Court must "accept as true all of the allegations in the complaint, unless those allegations are contradicted by the defendants' affidavits."  Bockman v. First Am. Marketing Corp., 459 F. App'x 157, 158 n. 1 (3d Cir. 2012).  "This Court may evaluate facts outside the complaint to determine proper venue; however, all reasonable inferences must be drawn in the plaintiff's favor."  Rabner v. Titelman, No. 15-1313, 2016 WL 1613444, at *4 (W.D. Pa. Apr. 22, 2016).  The moving party bears the burden of proof.  Id.  If venue is improper, a district court may either dismiss the case or transfer it to a district in which it could have originally been brought. Id.; 28 U.S.C. § 1406(a).

### C.  Rule 12(b)(6) Motion to Dismiss

In assessing the sufficiency of a complaint pursuant to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all material allegations in the complaint and all reasonable factual inferences must be viewed in the light most favorable to the plaintiff.  Odd v. Malone, 538 F.3d 202, 205 (3d Cir. 2008).  The Court, however, need not accept bald assertions or inferences drawn by the plaintiff if they are unsupported by the facts set forth in the complaint.  See Cal. Pub. Employees' Retirement Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004) (citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)).  Nor must the Court accept legal conclusions set forth as factual allegations.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Id. (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).  Indeed, the United States Supreme Court has held that a complaint is properly dismissed under Fed. R. Civ. P. 12(b)(6) where it does not allege "enough facts to state a claim to relief that is plausible on its face," id. at 570, or where the factual content does not allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); see also Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (finding that, under Twombly, "labels, conclusions, and a formulaic recitation of the elements of a cause of action" do not suffice but, rather, the complaint "must allege facts suggestive of [the proscribed] conduct" and that are sufficient "to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s] of his claim").

## III.    DISCUSSION

In the instant Motion to Transfer/Dismiss, Defendants move to transfer this action to the United States District Court for the Southern District of New York on the grounds that venue is improper in this District pursuant to 28 U.S.C. § 1391(b)(2).  Even if venue is proper, however, Defendants argue in the alternative that this action should nevertheless be transferred pursuant to 28 U.S.C. § 1404(a), which provides:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.

To the extent that the Court does not transfer this case, Defendants argue that Baugh should be dismissed because he is not subject to personal jurisdiction.  In addition, Defendants move for the dismissal of Rudolf's SOX claim, Count I, arguing that he fails to state a claim.

For the reasons that follow, the Court finds that it has personal jurisdiction over Baugh. The Court further concludes that venue is proper and declines to transfer this action to the United States District Court for the Southern District of New York.  Finally, the Court finds that Rudolf has stated a claim as to Count I, and therefore denies Defendants' request to dismiss the SOX claim.

### A.  Personal Jurisdiction

The Court first addresses Defendants' argument that Baugh is not subject to personal jurisdiction.[2]  A District Court exercises personal jurisdiction according to the law of the state where it sits.  O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 316 (3d Cir. 2007) (citing

---

[2] Courts generally consider whether personal jurisdiction exits before addressing the issue of proper venue. Cumberland Truck Equip. Co. v. Detroit Diesel Corp., 401 F. Supp. 2d 415, 419-20 (E.D. Pa. 2005) (citing Leroy v. Great W. United Corp., 443 U.S. 173, 180 (1979)).  The Court may analyze venue first, however, if venue "resolves" the case before the Court.  Id. (citing Lomanno v. Black, 285 F. Supp. 2d 637, 640 (E.D. Pa. 2003)). Because the Court does not conclude that this action should be transferred, for the reasons that follow, it first considers Defendants' challenge based on personal jurisdiction.

Fed. R. Civ. P. 4(k)(1)(A)).   Under Pennsylvania's long-arm statute, the Court may exercise jurisdiction to the fullest extent permitted under the Due Process Clause of the Fourteenth Amendment.   42 Pa. C.S. §§ 5322(a)-(b); Abramson v. Agentra, LLC, No. 18-615, 2018 WL 6617819, at *4 (W.D. Pa. Dec. 18, 2018).   Accordingly, the Court looks to whether, under the Due Process Clause, Baugh has "certain minimum contacts with . . . [Pennsylvania] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." O'Connor, 496 F.3d at 316-17 (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

There are two types of personal jurisdiction: general and specific jurisdiction.   Helicopteras Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984); O'Connor, 496 F.3d at 317. General jurisdiction applies if the defendant "maintained systematic and continuous contacts with the forum state." Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007).   Specific jurisdiction exists if plaintiff's claim "arises from or relates to conduct purposely directed at the forum state."   Id. To establish specific jurisdiction, plaintiff must prove (1) defendant has purposefully directed his activities at the forum; (2) the plaintiff's claim arises out of or relates to at least one of those specific activities; and (3) the court's exercise of jurisdiction over the defendant comports with traditional notions of fair play and substantial justice.   Id. (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985); Helicopteras, 466 U.S. at 414; Int'l Shoe, 326 U.S. at 320; Grimes v. Vitalink Communications Corp., 17 F.3d 1553, 1559 (3d Cir. 1994)).

If plaintiff claims that defendant committed an intentional tort, however, the "effects tests" set forth in Calder v. Jones, 465 U.S. 783 (1984) could "enhance otherwise insufficient contact with the forum such that the 'minimum contacts' prong of the Due Process test is satisfied." IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 260 (3d Cir. 1998); see also Merical v. Valor Healthcare,

Inc., No. 12-1681, 2013 WL 5408986, at *3 (W.D. Pa. Sept. 25, 2013).  Under the effects test, a plaintiff can establish personal jurisdiction if he demonstrates:

(1) The defendant committed an intentional tort;

(2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort;

(3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

Marten, 499 F.3d at 297 (citing IMO Indus., 155 F.3d at 265-66).

Here, Rudolf does not contend that Baugh has the "systematic and continuous" contacts necessary to establish general jurisdiction in Pennsylvania.  See ECF No. 31 at 16-22.  Instead, Rudolf claims that Baugh committed intentional torts, and that specific jurisdiction exists pursuant to the Calder effects test.  Id.  Therefore, the Court focuses its inquiry on whether Baugh's contacts with Pennsylvania satisfy the effects test.

In applying the effects test, the United States Court of Appeals for the Third Circuit has instructed that the analysis should begin with the third prong.  Marten, 499 F.3d at 297 ("Only if the 'expressly aimed' element of the effects test is met need we consider the other two elements."). Under the third prong, plaintiff must show "that the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." IMO Indus., 155 F.3d at 266.  If a plaintiff does not establish the defendant "manifest[ed] behavior intentionally targeted at and focused on the forum," he cannot establish jurisdiction under the effects test.  Id. at 265 (citing ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617 (4th Cir. 1997)); see also Marten, 499 F.3d at 298.

It is undisputed that Baugh does not live or work in Pennsylvania.  As to the third prong of the effects test, however, Rudolf asserts that Baugh had "several contacts with Rudolf in PA" out of which his claims arose.  ECF No. 31 at 20.  In particular, he points to multiple text messages that Baugh sent Rudolf in Pennsylvania on November 12, 2017 and his phone conversation with Rudolf on this same date.  Id.  He claims that Baugh followed this phone call with a text in which he referred to the effects of Rudolf's "resignation," arguing that Rudolf's purported resignation is "at the heart of this case."  Id.  Because Baugh clearly knew that Rudolf lived and worked in Pennsylvania, he argues, Baugh's actions were expressly aimed at injuring Rudolf in this forum.  Id. at 20-21.  Finally, because Baugh was the President of a Pennsylvania corporation, and he supervised and terminated a Pennsylvania employee, Rudolf claims that exercising specific jurisdiction in this forum does not "offend traditional notions of fair play and substantial justice."  Id. at 22.

In moving for dismissal, Defendants argue that Baugh did not "expressly aim" his activities at Pennsylvania, pointing to evidence that Baugh became Rudolf's manager only a "short time" before his termination; Baugh did not travel to Pennsylvania during this time; and he does not recall initiating any phone calls with Rudolf in Pennsylvania.  ECF No. 22 at 32.  Defendants contend that Baugh's November 12, 2017 communications do not give rise to jurisdiction because they were minimal, initiated by Rudolf, and the events related to Rudolf's termination all occurred in New York.  ECF No. 32 at 13-15.  That Rudolf happened to live in Pennsylvania, Defendants argue, is insufficient to confer jurisdiction over Baugh.  ECF No. 22 at 32.

Upon review, the Court finds that Baugh "expressly aimed" his alleged tortious and retaliatory conduct at Pennsylvania, and therefore Rudolf establishes the third element of the effects test.  Rudolf asserts intentional tort claims against Baugh arising out his termination.  Baugh

knew that Rudolf would "suffer the brunt of the harm" caused by his termination in Pennsylvania, because Rudolf lived and worked in Pennsylvania.  See IMO Indus, 155 F.3d at 265-66.  Indeed, in Baugh's email to Zaffino claiming that Rudolf had resigned, he noted that Rudolf "needs to be based in Pittsburgh for personal reasons."  ECF No. 22-1 at 10.

Moreover, Rudolf's claims arise in part out of communications with Baugh that took place on November 12, 2017, while Rudolf was in Pennsylvania.  During the parties' call, Rudolf claims that he reported, with "pressure" from Baugh to do so, details of alleged misconduct that led to his retaliatory termination.  ECF No. 1 ¶ 125.  Rudolf further alleges that Baugh directed him to contact Human Resources regarding the effects of his potential resignation, which Defendants fraudulently relied upon as evidence that Rudolf had resigned.  Id. ¶¶ 322-323.  Although Rudolf initiated the call, as Defendants note, Baugh affirmatively reached out to Rudolf by text message in order to further this discussion.  As such, there is sufficient evidence that the wrongful and tortious conduct of Baugh occurred in communications aimed at Pennsylvania so as to give rise to personal jurisdiction.

The Court also concludes that Rudolf satisfies the first two parts of the effects test.  First, Rudolf asserts intentional tort claims against Baugh.  He asserts claims of fraud, intentional interference with contractual relations, wrongful discharge, retaliation and discrimination pursuant to the PHRA, and violations of SOX and the False Claims Act.  Second, Rudolf reasonably contends that he felt the brunt of the harm in Pennsylvania because he lived and worked in Pennsylvania.  Thus, Baugh's contacts with Pennsylvania satisfy the effects test.

Based on the totality of Baugh's contacts with Pennsylvania, the Court has personal jurisdiction over Baugh.  Accordingly, the Motion to Transfer/Dismiss is denied to the extent it seeks to dismiss Baugh based on lack of personal jurisdiction.

**B.  Venue**

**1.  Venue is proper in this District.**

In support of the instant Motion to Transfer/Dismiss, Defendants argue that Rudolf cannot establish venue pursuant to the federal venue statute, 28 U.S.C. § 1391(b).  Defendants argue that the only potentially applicable provision is 28 U.S.C. § 1391(b)(2), which provides that civil actions "may be brought in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  ECF No. 22 at 19 n. 11.  Here, they argue, a substantial portion of events giving rise to Rudolf's claims occurred in New York City, as opposed to Pittsburgh.  Id. at 19.  Defendants assert that the events surrounding Rudolf's alleged termination occurred in New York, and that Rudolf's allegations make no connection between his claims and the Western District of Pennsylvania other than Rudolf's residency in Allegheny County, Pennsylvania.  Id. at 15, 20-22.  To the extent that Rudolf brings claims unrelated to his termination, they argue, the claims involve Johnson, Schimek and Grabek—all of whom have connections to New York and not Pittsburgh.  Id. at 21.

In response, Rudolf argues his Title VII claims are properly brought in this District pursuant to Title VII's exclusive venue provision.  ECF No. 31 at 22-23.  As to his other claims, Rudolf argues that a substantial portion of events did, in fact, occur in this District.  He points to Rudolf's workplace in Pittsburgh, and he argues that Rudolf would have continued to work in this District if his employment had not been terminated.  Id. at 24.  Rudolf further relies upon a November 10, 2017 phone call in which he learned "bad actors" would return to AIG, his communications from Pittsburgh with Baugh on November 12, 2017, and his phone call with Curtin on November 13, 2017, when Rudolf reported fraud, and during which AIG agreed not retaliate.  Id. at 24-25.

### a.  Title VII claims (Counts V and VI)

Title VII's exclusive venue provision authorizes suit "in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice."  42 U.S.C. § 2000e-5(f)(3).  Rudolf worked for Defendants in Pittsburgh, Pennsylvania, and he claims that he would have continued to work in this District but for the alleged unlawful employment practices.[3]  Therefore, venue is proper in this District for Rudolf's Title VII claims, Counts V and VI.

### b.  Other claims

Venue as to Rudolf's remaining claims is governed by 28 U.S.C. § 1391(b), which is the general venue statute for actions not founded solely on diversity.  See Lomanno v. Black, 285 F. Supp. 2d 637, 642 n. 8 (E.D. Pa. 2003).  Under 28 U.S.C. § 1391(b), "[a] civil action may be brought in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action."  28 U.S.C. § 1391(b).

"When venue is challenged, the court must determine whether the case falls within one of the three categories set out in § 1391(b).  If it does, venue is proper; if it does not, venue is

---

[3] Rudolf claims that he lived in Pennsylvania and worked primarily out of his office in Pittsburgh, Pennsylvania during the relevant time period.  Although Defendants point to an OSHA submission filed by Rudolf that appears to contradict these statements in part, Defendants claim that Rudolf was, in fact, based in Pittsburgh.  ECF No. 22 at 23 ("Defendants believe and have asserted that, during all relevant times, Rudolf was based in Pittsburgh, and not New York . . . .).  Accordingly, there is no dispute regarding whether Rudolf was based in Pittsburgh for his work.

improper, and the case must be dismissed or transferred under § 1406(a)." Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex., 571 U.S. 49, 56 (2013).

Rudolf asserts venue pursuant to 28 U.S.C. § 1391(b)(2), which requires that a substantial part of the events or omissions giving rise to Rudolf's claims occurred in this District. In order to determine "whether a substantial part of the events or omissions occurred in a specific jurisdiction '[t]he test . . . is not the defendant's contacts with a particular district, but rather the location of those events or omissions giving rise to the claim.'" Bockman v. First American Marketing Corp., 459 F. App'x 157, 161 (3d Cir. 2012) (quoting Cottman Transmission Sys., Inc. v. Martino, 36 F.3d 291, 294 (3d Cir. 1994)). Moreover, "[i]n assessing whether events or omissions giving rise to the [plaintiff's] claims are substantial, it is necessary to look at the nature of the dispute.'" Id. (quoting Cottman, 36 F.3d at 295) (internal quotations omitted).

 The purpose of this analysis is to "preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute." Id. (quoting Cottman, 36 F.3d at 294) (internal quotations omitted). Courts are not required to determine "the best forum" or "the forum with the most substantial events," however, and "venue may be proper in more than one district." TriState HVAC Equip., LLP v. Big Belly Solar, Inc., 752 F. Supp. 2d 517, 528 (E.D. Pa. 2010) (citing Cottman, 36 F.3d at 295; Superior Precast, Inc. v. Safeco Ins. Co. of Am., 71 F. Supp. 2d 438, 444 (E.D. Pa. 1999)) (internal quotations omitted).

Upon review, Defendants do not establish that venue is improper. Defendants broadly argue that all of Rudolf's claims sounding in wrongful termination arise out of New York, where the facts surrounding his termination occurred. Where the termination occurred, however, is not the only fact relevant to Plaintiff's claims. See, e.g., Jackson v. Saber Healthcare Grp. LLC, No. 13-cv-3690, 2013 WL 6210482, at *5 (E.D. Pa. Nov. 26, 2013) (considering location of plaintiff's

employment and where his termination took place for purposes of venue in wrongful termination claim).  Here, Rudolf raises claims arising out his Pittsburgh-based employment, and he alleges that he engaged in whistleblowing relevant to Counts I and II from Pittsburgh.  As such, this District bears a substantial connection to Rudolf's claims.

As to Rudolf's employment discrimination claims involving Johnson, Schimek and Grabek, venue is not improper simply because these individuals are based in New York, as Defendants argue.  In Dilmore v. Alion Science & Tech. Corp., No. 11-72, 2011 WL 1576021, at *6 (W.D. Pa. April 21, 2011), for example, the district court found that facts relevant to plaintiff's employment discrimination claims occurred both where the plaintiff worked and would have continued working, as well where the adverse employment action occurred.  Here, Rudolf primarily worked in this District, and he claims that he would have continued to do so but for his termination.  He was terminated, however, in New York City.  As a result, his employment discrimination claims arise out of events that took place in both Pittsburgh and New York, and venue is proper in this District.[4]

### 2.   Transfer of venue pursuant to 28 U.S.C. § 1404(a)

In the alternative, Defendants argue this action should be transferred pursuant to 28 U.S.C. § 1404(a).  Under this statute, "a district court may transfer a civil action to another district where the action might have been brought, . . . for the convenience of the parties and witnesses and in the interest of justice."  Osborne v. Employee Benefits Admin. Bd. of Kraft Heinz, No. 2:19-cv-00307, 2020 WL 1808270, at *3 (W.D. Pa. Apr. 9, 2020) (quoting In re McGraw-Hill Glob. Educ. Holdings LLC, 909 F.3d 48, 57 (3d Cir. 2018)) (internal quotations omitted).

In considering a motion to transfer under §1404(a), district courts in our Circuit apply a two-part inquiry.  First, as required by §1404(a), a court must determine

---

[4] With respect to Rudolf's Title VII claims, venue is proper for the reasons previously discussed.

> whether the action could have been originally brought in the transferee forum (i.e., whether venue in the transferee district is proper).  Then, in addition to considering the factors enumerated by §1404(a), a court should apply the balancing test set forth by the Third Circuit in Jumara [v. State Farm Ins. Co., 55 F.3d 873 (3d Cir. 1995], which requires district courts to weigh a number of public and private interests in order to determine whether the transferee forum "would best serve the convenience of the parties and witnesses as well as the interests of justice."

Id. (citing Mitel v. Networks Corp. v. Facebook, Inc., 943 F. Supp. 2d 463, 467 (D. Del. 2013)).

"At each step of the transfer inquiry, the moving party bears the burden of demonstrating that transfer of venue is appropriate and, 'unless the balance of convenience of the parties is strongly in favor of defendant, the plaintiff's choice of forum should prevail.'"  Id. at *4 (quoting Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970)).

### a.  Venue in the transferee district is proper.

A district court may only transfer an action to a "district or division where it might have been brought" originally.  28 U.S.C. § 1404(a).  Here, there is no dispute that Rudolf could have filed in his claims in the United States District Court for the Southern District of New York.  Rudolf clearly alleges in his Complaint that a substantial portion of events took place in New York, thus satisfying the requirements for venue.  See 28 U.S.C. § 1391(b)(2).

### b.  The Jumara factors

Having concluded that venue is proper in the Southern District of New York, the Court must balance the public and private interest factors set forth in Jumara.  The private interests pertain to § 1404(a)'s focus on "the convenience of the parties and witnesses" and include:

> plaintiff's forum preference as manifested in the original choice; the defendant's preference; whether the claim arose elsewhere; the convenience of the parties as indicated by their relative physical and financial condition; the convenience of the witnesses—but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

Jumara, 55 F.3d at 879 (internal citations omitted); see also Osborne, 2020 WL 1808270, at *3.

The public interests derive from § 1404(a)'s consideration of "the interests of justice," and include:

> the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public policies of the fora; and the familiarity of the trial judge with the applicable state law in diversity cases.

Id. at 879-80 (internal citations omitted); see also Osborne, 2020 WL 1808270, at *3.

In considering these factors, the Court must determine "whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." Jumara, 55 F.3d at 879 (quoting 15 Charles A. Wright, et al., Federal Practice & Procedure § 3847 (2d ed. 1986)). In general, "[t]he purpose of transferring venue under § 1404(a) 'is to prevent the waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense.'" Stillwagon v. Innsbrook Golf & Marina, LLC, No. 11-1338, 2013 WL 1180312, at *24 (W.D. Pa. Mar. 20, 2013) (quoting Van Dusen v. Barrack, 376 U.S. 612, 616 (1964)).

In support of the Motion to Transfer/Dismiss, Defendants argue that the Jumara private interest factors support transfer of this action. ECF No. 22 at 22-23. In particular, Defendants argue that Rudolf's claims arose in New York, because the facts surrounding Rudolf's termination, including various meetings and communications, took place in New York and involved individuals based in New York. Id. at 23. Because the operative facts occurred in New York, Defendants argue, the Court is not required to defer to Rudolf's choice of forum. Id. at 26-27. Defendants further assert that the majority of witnesses are based in New York, making it a more convenient forum for the parties and witnesses. Id. at 24-25.

In response, Rudolf argues that the <u>Jumara</u> factors do not support transfer.  As to the private interest factors, he contends that his choice of forum is entitled to significant weight, and that a substantial number of events occurred in Pittsburgh.  ECF No. 31 at 29-30.  He claims that convenience of the parties weighs against transfer, because it would be a financial hardship for him to litigate and secure additional counsel in New York; by contrast, he argues, Defendants are large companies with the financial means to litigate in this District.  <u>Id.</u> at 31.  With respect to the public interest factors, Rudolf argues that Pennsylvania has an interest in this action because Rudolf was injured in Pennsylvania, and he asserts two claims under Pennsylvania law.  <u>Id.</u> at 31-32.

### (1) Private interest factors

### (a) Plaintiff's choice of forum

The Court first considers the parties' choice of forum.  "As a general rule, a plaintiff's choice of venue is of paramount consideration and 'should not be disturbed lightly.'"  <u>Jelley v. Colton Auto, Inc.</u>, No. 17-1221, 2018 WL 585554, at *4 (W.D. Pa. Jan. 29, 2018) (quoting <u>In re Amkor Tech., Inc. v. Sec. Litig.</u>, No. 06-298, 2006 WL 3857488, at *3 (E.D. Pa. Dec. 28, 2006)).  "Moreover, where . . . the plaintiff files suit in [his] home forum, that choice is entitled to considerable deference."  <u>Coppola v. Ferrellgas, Inc.</u>, 250 F.R.D. 195, 198 (E.D. Pa. 2008) (quoting <u>Am. Argo Corp. v. U.S. Fid & Guar. Co.</u>, 590 F. Supp. 1002, 1004 (E.D. Pa. 2004)).  A plaintiff's choice is entitled to less weight, however, if the operative facts did not occur in his chosen forum.  <u>See</u> <u>Conroy v. Pa. Turnpike Comm'n</u>, No. 10-1234, 2011 WL 578779, at *1 (W.D. Pa. Jan. 19, 2011) ("However, the deference normally accorded to the plaintiff's preference is lessened when, as here, 'the operative facts that give rise to the action occur in another district'") (quoting <u>Cameli v. WNEP-16 The News Station</u>, 134 F. Supp. 2d 403, 405 (E.D. Pa. 2001)).

Upon review, this factor strongly weighs in favor of Rudolf.  He not only brought suit in this judicial district, but he also resides here.  To the extent Defendants argue that the Court should disregard Rudolf's choice because the operative facts did not occur in Pennsylvania, the Court disagrees.  While some relevant events did occur in New York, including Rudolf's termination, Rudolf's claims also bear a significant connection to Pennsylvania.  Rudolf pleads, for example, multiple employment discrimination claims arising out of his work he performed in Pennsylvania, and he engaged in alleged whistleblowing giving rise to Counts I and II from Pennsylvania.

### (b) Defendants' choice of forum

Defendants prefer the Court to transfer this action to the United States District Court for the Southern District of New York.  "Notwithstanding the 'common sense' nature of this factor, it is, however, generally afforded little deference."  Osborne, 2020 WL 1808270, at *7; see also EVCO Tech. & Dev. Co. v. Precision Shooting Equip, Inc., 379 F. Supp. 2d 728, 730 (E.D. Pa. 2003) (noting that the defendant's choice of forum is "entitled to considerably less weight than Plaintiff's, as the purpose of a venue transfer is not to shift inconvenience from one party to another").  Accordingly, the Court will consider this factor in favor of transfer but grants it little weight.

### (c) Where the claim arose

The next factor the Court must consider is whether "the claim arose elsewhere."  Jumara, 55 F.3d at 879.  "This consideration focuses on where the activities relevant to the claims at issue took place."  Stillwagon, 2013 WL 1180312, at *26 (citing Van Cauwenberghe v. Biard, 486 U.S. 517, 529 (1988) (the "locus of alleged culpable conduct" determines the place where the claim arose)).  For the reasons previously discussed, Rudolf's claims arise out of events in both Pittsburgh and New York City.  Accordingly, this factor is neutral.  See Sparkler v. Home Infusion

Solutions, LLC, No. 13-3969, 2013 WL 6476501, at *4 (E.D. Pa. Dec. 9, 2013) (holding that where events occurred in multiple districts, this factor is neutral).

### (d) Convenience of the parties

Next, the Court considers "the convenience of the parties as indicated by their relative physical and financial condition." Jumara, 55 F.3d at 879. This factor weighs against transfer. Defendants AIG and NUFIC are corporations that regularly conduct business in Pennsylvania, and NUFIC is incorporated in Pennsylvania. Baugh is represented by the same counsel as AIG and NUFIC. While Defendants note that relevant employee witnesses are largely based in New York, they do not identify any purported financial or other hardship associated with litigating Rudolf's claims in this District.

By contrast, Rudolf is an individual plaintiff who resides in Pennsylvania and was terminated from his employment. ECF No. 31-1 ¶ 5. He claims in an affidavit that it would be a financial hardship for him to litigate this matter in the Southern District of New York, including having to retain local counsel to represent him in New York. Id. ¶ 6. As such, the parties' relative physical and financial conditions favor Rudolf's position. See, e.g., Dilmore v. Alion Science & Tech. Corp., No. 11-72, 2011 WL 1576021, at *7 (W.D. Pa. Apr. 21, 2011) (holding that convenience of the parties favored plaintiff where employer was a corporation doing business in Pennsylvania with financials means to litigate in Pennsylvania).

### (e) Convenience of the witnesses

Fifth, the Court must consider the convenience of the witnesses, but "only to the extent that the witnesses may actually be unavailable for trial in one of the fora." Jumara, 55 F.3d at 879; see also Smart Audio Techs., LLC v. Apple, Inc., 910 F. Supp. 2d 718, 732 (D. Del. 2012) (noting that this factor applies only insofar as there is reason to believe "a witness actually will refuse to testify

absent a subpoena").  Moreover, "witnesses who are employed by a party carry no weight," because "each party is able, indeed, obligated to procure the attendance of its own employees for trial." Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp. 2d 192, 203 (D. Del. 1998).  In assessing this factor, "the Court should be particularly concerned not to countenance undue inconvenience to third-party witnesses, who have no direct connection to the litigation."  Intellectual Ventures I LLC v. Altera Corp., 842 F. Supp. 2d 744, 757 (D. Del. 2012).

Upon review, Defendants have identified approximately three non-party witnesses in the New York area that are not within the subpoena power of this Court.  See ECF No. 22-2 at 2-3. Rudolf does not identify any non-party witnesses that are available in this District, but not in New York.  The Court notes, however, that alternative arrangements (e.g., video conferencing) may be available, and Defendants have not argued that these individuals would be unwilling to testify absent a subpoena, or that these witnesses are material.  See Dilmore, 2011 WL 1576021, at *7. Based on these facts, this factor weighs slightly in favor of transfer.

### (f)  Location of documents

Lastly, the Court must consider the location of relevant records, to the extent any materials may be unavailable in either New York City or Pittsburgh.  Jumara, 55 F.3d at 879.  Here, nothing in the record indicates that relevant materials would be unavailable in either forum.  Thus, this factor is neutral.

### (2) Public interest factors

Neither party argues that the enforceability of the judgment; practical considerations that could make the trial easy expeditious, or inexpensive; relative court congestion; or the public policies of either Pennsylvania or New York favor venue in either district.  Therefore, the Court considers these factors as neutral.

Rudolf argues, however, that the local interest factor weighs against transfer.  In balancing this factor, the Court must consider the "local interest in deciding local controversies at home." Jumara, 55 F.3d at 879.  Both New York and Pennsylvania have a local interest in Rudolf's claims. Although Rudolf lives and worked in Pennsylvania, both NUFIC and AIG are headquartered in New York.  However, the fact that Rudolf brings PHRA claims under Pennsylvania law weighs slightly in favor of Rudolf's position.  See Dilmore, 2011 WL 1576021, at *9.  Therefore, this factor weighs marginally against transfer.

Upon consideration of all of the factors, three factors weigh against transfer to varying degrees, whereas only two factors weigh marginally in favor of transferring venue.  Defendants therefore do not satisfy their burden to show that transfer is proper at this time.  Accordingly, the Motion to Transfer is denied, and the Court does not transfer this action to the United States District Court for the Southern District of New York.

### C.  SOX Claim (Count I)

Defendants also move to dismiss Rudolf's SOX claim.  In order to establish a *prima facie* case for retaliation in violation of SOX, Rudolf must allege he "(1) engaged in a protected activity; (2) [t]he respondent knew or suspected that the employee engaged in a protected activity; (3) [t]he employee suffered an adverse action; and (4) [t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action."  Wiest v. Lynch ("Wiest I"), 710 F.3d 121, 129 (3d Cir. 2013) (quoting 29 C.F.R. § 1980.104(e)(2)(i)-(iv)) (internal quotations omitted).  In the instant Motion, Defendants argue that Rudolf fails to plead facts demonstrating the first and fourth prongs of his *prima facie* case.  The Court therefore addresses these two factors.

### 1.  Protected activity

To establish that he participated in a protected activity, Rudolf must show that he "provide[d] information" that he "reasonably believes constitutes a violation of" (1) federal criminal law provisions prohibiting mail, wire, bank, or securities and commodities fraud; (2) any rule or regulation of the SEC; or (3) any provision of federal law relating to fraud against shareholders.  18 U.S.C. § 1514A(a)(1).  Plaintiff must have "both a subjective and an objective belief that the conduct that is the subject of the communication relates to an existing or prospective violation of one of the federal laws referenced in § 806."  Wiest I, 710 F.3d at 134.

In support of the Motion to Dismiss, Defendants argue that Rudolf did not engage in protected activity.  ECF No. 22 at 33.  Defendants contend that information Rudolf conveyed to Baugh does not state a violation of any of the SOX provisions, and that Rudolf does not demonstrate why he reasonably would have believed it did.  Id. at 34-35.  Defendants further argue that Rudolf's statements regarding the return of "bad actors" from AIG's past; statements that AIG employees misled the board; concerns about AIG's "reputational risks" and SIFI status; and his purported belief he was required to interview with a DOJ monitor do not identify conduct that relates to a violation of any of the specific federal laws referenced in § 806.  Id. at 35-40.

In response, Rudolf argues that he conveyed information regarding rigged claim workout deals, which allowed AIG to fraudulently represent its financial status, and that he reasonably believed this violated a provision of SOX.  ECF No. 31 at 36.  He argues that this type of activity was "in keeping" with prior SEC enforcement actions against AIG.  Id.  He further argues that his claims regarding "bad actors" returning to AIG involved a SOX violation, because those individuals were involved in the rigged claim workout deals and fails to disclose their existence to the AIG Board.  Id. at 39.

Upon review, Rudolf pleads facts identifying fraudulent misconduct that he reported to Baugh and AIG's investigators, which he believed had not been properly disclosed.   At this preliminary stage, the allegations set forth by Plaintiff support an inference that Rudolf's communications to Baugh and others reflected a reasonable belief that Defendant's conduct constituted a securities violation and thus was protected activity under the statute.

### 2.   Causation

Defendants next argue that Rudolf cannot establish causation, because he has not alleged that management officials involved in or responsible for Rudolf's termination were aware of his protected activity.   ECF No. 22 at 40-41.   Defendants maintain there is no evidence that Baugh, who made the termination decision, participated in the investigation or was advised of any specific information that Rudolf imparted.   Id.

As set forth above, the causation element of a *prima facie* case requires allegations that '[t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action."   Wiest I, 710 F.3d at 129 (citing 29 C.F.R. § 1980.104(e)(2)(iv)).   Further, the United States Court of Appeals for the Third Circuit has held that:

> a contributing factor [is] any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.   A plaintiff need not provide direct evidence to satisfy this element; rather, circumstantial evidence may be sufficient.   To that end, temporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation.

 Wiest v. Tyco Elecs. Corp., 812 F.3d 319, 330 (3d Cir. 2016) (citations and quotation marks omitted).

Rudolf need only allege sufficient facts to establish an inference that circumstances were sufficient to raise the inference that his protected activity was a contributing factor in the adverse

action, i.e., his termination.  Here, Rudolf claims, *inter alia*, that he notified Baugh of alleged misconduct, and that he was terminated shortly after he reports and the initiation of the investigation.  The close temporal proximity between Rudolf's protected conduct and the alleged termination is noted.  At this preliminary stage, the circumstances are certainly sufficient to raise an inference that Rudolf's protected activity was a contributing factor in his termination. Accordingly, the Motion to Dismiss is denied as to Count I.

## IV.   CONCLUSION

For the foregoing reasons, the Motion to Transfer/Dismiss is DENIED.  Accordingly, the following Order is entered.

### ORDER

AND NOW, this 16th day of September, 2020, IT IS HEREBY ORDERED that Defendants' Motion to Transfer or, in the Alternative, Dismiss the Complaint as to Defendant Alexander Baugh and Dismiss the SOX Whistleblower Claim for Failure to State a Claim, ECF No. 20, is DENIED.

BY THE COURT,

MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

cc:   All counsel of record via CM/ECF.

31