**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOHN RUDOLF,                                    :
                                                :
                        Plaintiff,              :
                                                :   *Electronically Filed*
            v.                                  :
                                                :   Civil Action No. 2:19-cv-01468
AMERICAN INTERNATIONAL                          :
GROUP, INC., NATIONAL UNION                     :   Magistrate Judge Maureen P. Kelly
FIRE INSURANCE COMPANY OF                       :
PITTSBURGH, PA., and                            :
ALEXANDER BAUGH,                                :
                                                :
                        Defendants.             :
                                                :

## DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56 of the Local Rules of the United States District Court for the Western District of Pennsylvania, Defendants American International Group, Inc. ("AIG, Inc."), National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union," and together with AIG, Inc. and their respective subsidiaries and affiliates, "AIG"), and Alexander Baugh ("Baugh," and together with National Union and AIG, Inc., "Defendants") respectfully submit the following Concise Statement of Material Facts in support of their Motion for Summary Judgment. In addition, Defendants incorporate herein the further evidentiary support set forth in the Appendix filed herewith including exhibits attached thereto.

# TABLE OF CONTENTS

**Page**

I.     Rudolf and His Employment History ................................................................ 1

II.    Baugh and The Corporate Defendants ............................................................. 3

III.   Compensation and Job Grades at AIG .............................................................. 4

IV.    Rudolf's Historical Compensation Increases and Dissatisfaction with His
       Compensation and Job Grade ........................................................................ 6

V.     Rudolf's Compensation Compared to His Peers ............................................. 10

VI.    Settlement of the Caremark Action in 2016 .................................................... 22

VII.   Rudolf's Code of Conduct Certifications; Employee Handbook and Policies ................ 23

VIII.  Rudolf's Separation of Employment in 2017 ................................................... 24

IX.    The GIG Investigation ................................................................................... 35

X.     Background on Rudolf's Alleged Concerns ..................................................... 38

       A.     Alleged Rehiring of "Bad Actors" ...................................................... 38

       B.     Alleged Board "Cover-Up" ................................................................. 40

XI.    A Planned Reorganization of AIG's Commercial Insurance Business Would Have
       Impacted Rudolf's Role ................................................................................. 43

XII.   The Reasons Baugh Accepted Rudolf's Resignation ....................................... 45

XIII.  Rudolf's Role No Longer Existed After the 2017-2018 Reorganization ......................... 48

XIV.   Plaintiff Has Received Extensive Fact Discovery ........................................... 50

## I.      Rudolf and His Employment History

1.      Plaintiff John Rudolf ("Plaintiff" or "Rudolf") is male, born in 1964, and was 53 years old at the time of his separation from National Union in November 2017.  (Amended Complaint ("ECF 41") ¶ 16; Joint Statement of Undisputed Facts ("JSUF"), ECF 175 ¶ 6.)

2.      Rudolf was employed by National Union beginning on October 17, 1994.  (JSUF ¶ 1.)  Rudolf's last working day with National Union was November 20, 2017.  (*Id.*)  Rudolf was employed for almost all of his employment by National Union, including the entire time from 2009 until his separation.  (ECF 41 ¶ 4; Ex. 14 at AIG000005; Declaration of Richard Joers dated 8/3/22 (Ex. 1) ¶ 6.)

3.      Rudolf was never employed by AIG, Inc.  (Ex. 14 at AIG000005; Ex. 1 ¶ 5.)

4.      Rudolf was based for a number of years in AIG's New York offices and then relocated to AIG's offices in Pittsburgh, PA in or around 2006 where he remained until his separation in November 2017.  (JSUF ¶ 11.)  From 2006 until the present, Rudolf has resided in Pittsburgh, PA and, from 2006 until his separation, Rudolf worked, and was based, in Pittsburgh, PA.  (*Id.*; Ex. 11, 10:6-15, 133:10-14, 145:2-146:2; Order on Defendants' Motion to Dismiss, ECF 36 at 19 and n. 3.)

5.      Rudolf held a senior role in the Loss Mitigation Unit ("LMU") from in or about 2000 to in or about 2006.  (JSUF ¶ 8.)

6.      In 2013, Rudolf was promoted to the role of Head of Client Engagement (U.S. and Canada) (Ex. 65 ¶ 4), also known as "Major Accounts Practice Leader," which was a national (North America) client engagement and distribution (i.e. sales) function.  (*Id.*; Ex. 69 ¶ 8.)  That same year, Rudolf was promoted from job grade[1] 24 to job grade 26.  (JSUF ¶ 13.)  Rudolf held

---

[1] AIG's job grading system is described in more detail below.

this role and title until his separation.  (JSUF ¶ 13; Ex. 12, 132:6-10; Plaintiff's Motion to Compel, ECF 85 ¶ 12.)

7.      Beginning in the first part of 2016 and also in 2017, Rudolf took on other responsibilities.  (Ex. 11, 56:10-20, 57:9-20; Ex. 12, 132:19-134:13, 135:21-136:13.)  Rudolf's duties included overseeing global product lines of business from a North America perspective at the request of his manager Jeremy Johnson ("Johnson").  (Ex. 36 at AIG001345; Ex. 69 ¶ 9; Ex. 2, 148:22-149:8.)  Those would have included what Rudolf describes as: (1) "Head of Bermuda CAT Excess (Financial Lines and Casualty)," (2) "Head of Financial Lines/Institutions," (3) "Head of Aerospace," (4) "Head of Trade Credit," and (5) "Head of Political Risk."  (Ex. 69 ¶ 9; ECF 85 ¶ 12.)  A portion of Rudolf's client engagement/distribution duties are described by Rudolf as his Asian Corporate/Client Solutions and "Head of Industry" responsibilities that he was assigned in April 2016.  (ECF 41 ¶¶ 25, 64, 65; Ex. 12, 133:9-134:13; ECF 85 ¶ 12.)

8.      During the years 2014-2015, and through in or about March 2016, Rudolf reported directly to Stephen Grabek ("Grabek"), then Head of Field Operations and Distribution, North America.  (Ex. 12, 82:25-83:4, 134:8-9; Ex. 54 at AIG000825-26.)  Grabek is male and was 57 years old at the time of Rudolf's separation, born in 1960.  (Ex. 68 ¶ 9(a).)

9.      From in or about April 2016 until in or about early November 2017, Rudolf reported directly to Johnson.  (Ex. 69 ¶ 7; Ex. 12, 134:10-135:10; Ex. 54 at AIG000827-828.)  Johnson is male and was 46 years old at the time of Rudolf's separation, born in 1971.  (JSUF ¶ 15; Ex. 68 ¶ 9(b).)  Johnson had various responsibilities and held various roles and titles during his tenure, including as President of U.S. Commercial Insurance beginning in February 2016 through the Fall of 2017.  (JSUF ¶ 15; Ex. 6, 23:12-18.)  In this role, Johnson reported directly to Robert Schimek ("Schimek"), then Chief Executive Officer ("CEO") of Commercial Insurance.  (Ex. 6, 23:9-25:5;

Ex. 13, 19:12-18, 24:24-26:11.)  Johnson's employment ended in November 2017.  (JSUF ¶ 15; Ex. 6, 61:8-14.)

10.     After Johnson's departure, Rudolf began reporting to Grabek.  (Ex. 69 ¶ 7; Ex. 64 ¶ 7; Ex. 40; Ex. 12, 162:25-163:5; Ex. 5, 61:1-62:9 Ex. 2, 62:19-63:1.)  At that time, Grabek was Global Head of Broker and Client Engagement.  (Ex. 5, 11:23-12:12, 22:8-18; Ex. 2, 62:25-63:7.)

11.     Schimek is male and was 52 years old at the time of Rudolf's separation, born in 1965 (he is less than one year younger than Rudolf).  (JSUF ¶ 14; Ex. 68 ¶ 9(c).)  Schimek had various responsibilities and held various roles and titles during his tenure, including as CEO of Commercial Insurance from December 2015 through September 2017.  (JSUF ¶ 14; Ex. 72 ¶ 14.)  Schimek's employment ended effective October 31, 2017.  (JSUF ¶ 14; Ex. 13, 12:11-13.)

## II.     Baugh and The Corporate Defendants

12.     Baugh is male and was 56 years old at the time of Rudolf's separation, born in 1961.  (Ex. 68 ¶ 9(d); JSUF ¶ 7.)

13.     Baugh joined AIG in June 1983.  (JSUF ¶ 4.)

14.     As of early November 2017, Baugh was the CEO of North America General Insurance.  (Ex. 69 ¶ 7; JSUF ¶ 5; Ex. 38.)   At that time, Baugh reported to Peter Zaffino ("Zaffino"), then the CEO of General Insurance.  (Ex. 64 ¶ 9.)

15.     National Union is a direct, wholly-owned (100%) subsidiary of AIG Property Casualty U.S., Inc., which is a wholly-owned (100%) subsidiary of AIG Property Casualty Inc., which is a wholly-owned (100%) subsidiary of AIG, Inc.  (Disclosure Statement, ECF 10.)

16.     AIG, Inc. does not write insurance policies.  (Ex. 67 at Response to Request No. 12.)

### III.   Compensation and Job Grades at AIG

17.   At AIG, an employee's compensation is made up of three parts: salary, short-term incentive pay ("STI") (cash bonus), and long-term incentive ("LTI") award (non-cash deferred compensation that vests over time).   (Ex. 71 ¶ 15; Ex. 11, 129:9-19.)   Taken together, these components make up an employee's "total direct compensation" ("TDC").   (Ex. 71 ¶ 15.)

18.   For every given year, employees have a target STI and target LTI, which, together with their base salary, equals a target TDC.   Depending on their personal performance and the performance of the company, employees will receive a percentage of their target STI, which could equal, exceed, or be below 100%.   (*See, e.g.*, Ex. 8, 44:1-45:2; Ex. 5, 146:23-147:13, 151:10-152:2; Ex. 6, 235:11-22; Ex. 12, 15:3-9.)

19.   Generally, compensation at AIG is based on, among other things, job grade and geographic region.   (Ex. 71 ¶ 16.)

20.   The job grading system was implemented in the several years prior to 2013 in which every type of job at AIG was grouped, coded, and evaluated for its impact to the organization. This process resulted in, for each type of job, a job code and an attendant job grade.   (*Id.* ¶ 4.)

21.   Each job grade has a corresponding range for base salary, target STI, target LTI, and target TDC.   (Ex. 8, 36:3-15.)   Ex. 60 lists the compensation ranges (salary, STI, LTI, and TDC) from 2013-2017 for US-4 for job grade 26 (the structure code Rudolf was in and his job grade).   (Ex. 71 ¶ 17.)   Ex. 62 is a chart showing the incremental differences between the geographic structure codes as compared to US-4.   (*Id.*)   US-4 represents the "national" ranges and, as reflected in Ex. 62, the ranges for the remaining seven structures (US-1–US-3 and US-5–US–8) are built off the US-4 ranges by applying geographical differentials up or down.   (*Id.*; Ex. 60; Ex. 62.)

22.     Everything else being equal, the compensation of an individual working in Pittsburgh, PA generally would be less than that of an individual in the same job grade working in New York City, NY, where the cost of labor and cost of living are substantially greater.  (Ex. 71 ¶ 16.)  More specifically, at AIG, Pittsburgh is aligned to the "US-4" geographic structure code and New York City is aligned to "US-8." (*Id.*)  In basic terms, if a role pays $100,000 in Pittsburgh, the same role would pay $120,000 in New York City.  (*Id*; Ex. 11, 130:24-131:5.)

23.     Unlike roles below job grade 27, roles that are job grade 27 and above are market-priced and benchmarked directly.  (Ex. 7, 70:9-24.)

24.     The job grades at AIG range from 11-31.  (Ex. 71 ¶ 7; Ex. 61 at AIG002877.)  From 2013 through his separation in November 2017, Rudolf continued to be a job grade 26.  (JSUF ¶ 13.)

25.     As of August 2017, only 0.2% of the Commercial Insurance organization held a more senior job grade than Rudolf did at the time of his separation.  (Ex. 34 at AIG006856.)

26.     The individuals who made the recommendation as to Rudolf's compensation in 2014, 2015, and 2016 were his managers – Grabek (in 2014 and 2015) and Johnson (in 2016, the last full year of Rudolf's employment).  (Ex. 11, 39:1-41:8; *see also* Ex. 11, 47:11-16.)  Rudolf does not know what Grabek's and Johnson's recommendations for his compensation were, or whether their recommendations were accepted or modified.  (Ex. 11, 43:9-19, 44:16-23.)

27.     Rudolf alleges that Grabek, Johnson, and Schimek harbored discriminatory animus towards him on the basis of his age and gender with respect to compensation.  (Ex. 11, 32:8-19, 44:12-15, 178:1-179:10.)  Rudolf filed a Charge of Discrimination with the EEOC against Defendants on April 25, 2018.  (Ex. 52.)

28.     Rudolf himself is familiar with the compensation process because he made compensation recommendations with respect to his direct reports.  (Ex. 11, 35:9-18.)  Rudolf believes the compensation process at AIG was "a good process, a fair process."   (Ex. 11, 35:19-20.)

**IV.     Rudolf's Historical Compensation Increases and Dissatisfaction with His Compensation and Job Grade**

29.     During the last eight years of his employment, Rudolf had the following compensation targets and received the following actual compensation:

| Year | Base Salary | STI Target | LTI Target | Target TDC | STI Award | LTI Award | Actual TDC |
|------|-------------|------------|------------|------------|-----------|-----------|------------|
| 2017 |  |  |  |  |  |  |  |
| 2016 |  |  |  |  |  |  |  |
| 2015 |  |  |  |  |  |  |  |
| 2014 |  |  |  |  |  |  |  |
| 2013 |  |  |  |  |  |  |  |
| 2012 |  |  |  |  |  |  |  |
| 2011 |  |  |  |  |  |  |  |
| 2010 |  |  |  |  |  |  |  |

(Ex. 12, 13:4-14:9; Ex. 54 at AIG000825-828; Ex. 28 at AIG003307.)

30.     Rudolf was unhappy with his compensation and expressed such displeasure to several people, including over the course of 2016 and 2017 to Johnson and Schimek.  (JSUF ¶¶ 16, 17; Ex. 11, 166:1-8, 174:15-18.)

31.     Schimek testified that Rudolf "was very unhappy with his compensation and he raised that with [Schmiek] probably more times than any person in [Schimek's] 12-year tenure at AIG ever raised their compensation as an issue."  (Ex. 13, 80:23-81:2.)

32.     In or about early 2016, AIG implemented "Simplify AIG" – an initiative aimed at reducing the number of matrices in the organization, globalizing functions of the company,

reducing costs, and decreasing headcount.[2]  (Ex. 2, 174:22-175:3; Ex. 6, 76:1-77:2; Ex. 11, 56:10-15, 81:23-82:3.)  Simplify AIG resulted in widespread reductions in force at AIG.  (Ex. 12, 114:5-14; Ex. 8, 74:11-15.)  At the same time, AIG was practicing "zero-base funding," meaning that additional funds used to pay a certain employee would be allocated from elsewhere (*e.g.,* a resignation).  (Ex. 11, 221:21-223:18.)

33.     In or about September 2016, Johnson requested that Nonna Shikhman ("Shikhman")[3] of AIG Compensation, perform an analysis of Rudolf's compensation, which she did.  (Ex. 6, 97:15-18; Ex. 21 at AIG002993-4.)  The analysis concluded with Johnson requesting a 15% increase to Rudolf's TDC and providing a business justification for that increase, including the fact that Rudolf's responsibilities had expanded in the prior six months.  (Ex. 21 at AIG002991; Ex. 6, 71:13-17, 97:20-23, 98:20-23, 113:25-114:12.)  Schimek was strongly supportive of the increase.  (Ex. 23; Ex. 11, 177:14-21, 193:7-11.)

34.     Before Rudolf's 15% increase, Rudolf's target salary was above the TDC range maximum, yet Schimek wanted to support Rudolf and show appreciation for his contributions to the organization, thereby creating a business case that would support paying Rudolf an amount that might otherwise by rejected for being outside of the benchmarking for his role in the market.  (Ex. 13, 181:24-182:21, 185:18-186:8, 189:8-191:2.)

---

[2] Rudolf conceded that the references in his Amended Complaint to Simplify AIG having taken place in 2014, were erroneous and that this error was carried through the Amended Complaint.  (Ex. 12, 133:5-134:18.)

[3] Shikhman's legal last name is "Marinoff" and her maiden name is "Shikhman."  She identifies as both.

35.     In September 2016, Rudolf received the 15% increase in his target TDC from ███████ to ███████ (Ex. 54 at AIG00826-827; Ex. 11, 28:7-16.)  But he was still unsatisfied with his compensation.  (Ex. 11, 189:11-19; Ex. 12, 114:2-4.)

36.     Several months after his target TDC was increased, in April 2017, Rudolf approached Schimek and spoke with him about his dissatisfaction with his compensation.  (Ex. 11, 166:9-22; JSUF ¶ 17.)  Based on the conversation, Schimek considered Rudolf potentially "at risk" for leaving the organization.  (Ex. 26 at AIG003139; Ex. 13, 205:14-208:10.)  According to Rudolf, in late March or early April 2017, Schimek directed Human Resources to do a salary and job grade review, which did not result in any adjustment to Rudolf's TDC or job grade, but that in lieu of that, he was offered a continuity award.  (ECF 41 ¶ 97; Ex. 11, 166:9-18.)

37.     On April 12, 2017, Ryan Merritt ("Merritt") in Human Resources[4] sent an email to Tracy McMillan ("McMillan"),[5] copying Yogita Naik ("Naik").[6]  The email reflects that Schimek and Johnson wanted to retain Rudolf but felt that no TDC adjustment was necessary because of "John's position in range and comparison to peers . . . ."  (Ex. 27.)  In an email from Shikhman containing analyses of Rudolf's compensation, she wrote that "John is one of three Industry Segment leaders under Jeremy Johnson.  John's TDC is the lowest of the three, but given the geographic differences he has the highest TDC PIR of the group."  (Ex. 26 at AIG003138.)  "PIR"

---

[4] Merritt was employed as a Human Resources Business Partner from in or about August 2016 until in or about August 2021.  (JSUF ¶ 27; Ex. 9, 9:18-25, 15:22-23.)

[5] McMillan was employed from in or about September 2000 until in or about December 2020. (Ex. 72 ¶ 2.)  During her tenure with AIG, McMillan held a variety of senior Human Resources positions, including Head of Human Resources for General Insurance from in or about Fall 2017 until in or about October 2019.  (*Id.*)

[6] Naik, a former Senior Human Resources Business Partner, was employed from in or about April 2012 until in or about May 2018.  (Ex. 72 ¶ 6.)  As of November 2017, Naik was a Senior Human Resources Executive for General Insurance.  (JSUF ¶ 27.)

stood for "position in range," which represented the percentage of the individual's compensation as compared to the ranges used by AIG.  (Ex. 10, 21:23-22:6.)

38.     Rudolf was offered a continuity award in the amount of ██████ (50% of his target TDC).  (Ex. 30.)  Both Johnson and Schimek were supportive of the award.  (Ex. 11, 166:9-18, 193:19-194:1.)  AIG decided against offering a TDC increase at that time because it determined that Rudolf had been treated fairly and consistently in terms of compensation and thus no TDC increase was warranted.  But Rudolf was a strong performer and had strong followership, and the decision was made to offer the continuity award "[i]n an effort to retain and motivate" Rudolf.  (Ex. 31; Ex. 13, 197:25-199:3; Ex. 6, 35:13-18, 148:1-25.)  Rudolf's target salary and STI were already above the TDC range maximum as a result of his TDC increase from the year prior, and Rudolf wanted cash on hand, which could be achieved by a continuity award.  (Ex. 13, 212:13-213:1; Ex. 22; Ex. 60.)

39.     The continuity award was to be paid in three annual installments of approximately ██████ from April 20, 2018 through April 20, 2020, subject to the requirement that Rudolf remain employed through the vesting dates (except if his employment was terminated without cause).  (Ex. 30.)

40.     On or about April 20, 2017, Johnson presented the continuity award to Rudolf.  Johnson later informed Human Resources that his conversation with Rudolf was a "[w]eird conversation" and Rudolf had a "[m]uted reaction."  (Ex. 28 at AIG003306; Ex. 6, 151:10-152:5.)

41.     Rudolf told Merritt that he considered the continuity award a "temporary solution" to his perceived problem of insufficient compensation for his role if AIG felt differently, he would need to look for a different job.  (Ex. 11, 200:1-201:1; Ex. 29 at AIG003345; Ex. 9, 69:1-5.)

42.     Merritt suggested to Johnson, Schimek, and others in Human Resources that contingency plans should be considered for Rudolf's potential replacement.   (Ex. 29 at AIG003346.)  Merritt did so because he understood that Rudolf expressed that he was considering leaving AIG due to his dissatisfaction with his compensation.  (Ex. 9, 70:7-18.)

43.     Rudolf ultimately accepted the continuity award.   (Ex. 30.)   But he was still unsatisfied with his compensation.  (Ex. 11, 167:1-169:1.)  In his September 2017 Performance Check-In Conversation, just four months after receiving the continuity award, Rudolf wrote: "My biggest disappointment is compensation and job grade."  (Ex. 35 at AIG000515; Ex. 11, 215:8-12, 217:15-19.)

44.     Rudolf did not directly complain to AIG Human Resources that he thought he was discriminated against due to his age or gender.  (Ex. 11, 162:6-13, 163:11-18.)  Rudolf never made a report to anyone at AIG that he was discriminated against based on his age or gender, except that certain conversations with Johnson about Marya Propis ("Propis") (described in more detail below) were "on gender."  (*Id.* at 163:19-164:17.)  According to Rudolf, Johnson confirmed that Propis "made more with less responsibility."  (*Id.* at 164:1-3.)  Rudolf "just didn't understand why a younger female was getting paid so much more. . . ."  (*Id.* at 164:5-7.)

**V.     Rudolf's Compensation Compared to His Peers**

45.     According to Schimek, when comparing compensation of peers, the best way to do so is to compare individuals who report to the same leader in the same geography.  (Ex. 13, 57:16-58:10; *see also* Ex. 6, 233:11-16; Ex. 5, 200:14-18.)

46.     Rudolf was *the highest paid* individual of those who reported directly to Grabek in 2014 and 2015.  (*See* Ex. 54 at AIG000825-826.)

47.     Rudolf was the *highest paid* individual of those who reported directly to Johnson in 2016 (following his increase in TDC that year) and had *the highest target TDC* of the same

people in 2017, taking into account the cost of labor and cost of living in the geographic structure code Rudolf was in (i.e. Pittsburgh).  (*See* Ex. 54 at AIG000827-828; Ex. 71 ¶¶ 16, 17; Ex. 62.)

48. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 54 at AIG000825-828.)

49. The only basis Rudolf asserts for his age and gender discrimination claims is that younger and/or female employees were paid more than he was for equal or lesser responsibilities than his own.  (Ex. 12, 16:23-17:16, 18:25-19:23.)

50. Rudolf testified that the individuals listed in the following paragraphs had equal or lesser responsibilities than he did and were paid more than he was due to age and/or gender discrimination.  (Ex. 12: 19:24-21-14, 90:21-23, 101:19-102:17, 109:3-20, 120:20-25.)

51. Gloria Watson ("Watson")

    a.    Rudolf alleges that Watson, a female, was paid more than he was for equal or lesser responsibilities from 2016-2018.[7]  (Ex. 12, 27:5-24; Ex. 56 at AIG002868 (service date 03/17/2003).)

    b.    Watson is the same age as Rudolf.  (Ex. 56 at AIG002868 (service date 03/17/2003).)  Rudolf claims that Watson was paid more than he was only based on gender.  (Ex. 12, 28:3-17.)

    c.    Watson reported to Rudolf in 2017 (but not 2016).  (Ex. 56 at AIG002868 (service date 03/17/2003).)   Watson had a different manager than Rudolf in 2016.  (Ex. 12, 29:5-10.)

---

[7] Watson's compensation for 2016 and 2018 are not in the evidentiary record.

d.   In 2017, Watson received lower compensation than Rudolf and her job grade was ███████████████ (*Id.*; Ex. 12, 34:6-17.)  Watson also received lower compensation than Rudolf in 2014 and 2015, when they both reported to Grabek.  (Ex. 54 at AIG000825-826 (service date 03/17/2003).)

e.   Rudolf had not seen Watson's performance reviews prior to supervising her. (Ex. 12, 29:11-13.)

f.   Watson was based in Philadelphia, structure code US-6, during the years 2016 and 2017.  (*Id.* at 29:14-22; Ex. 56 at AIG002868 (service date 03/17/2003).)

g.   In 2016 and 2017, Watson had a different role from Rudolf – she ran Aerospace in the U.S.  (Ex. 12, 29:23-31:2.)

52.   David Lynders ("Lynders")

a.   Rudolf alleges that Lynders, a younger male, was paid more than he was for equal or lesser responsibilities from 2016-2018.[8]  (*Id.* at 22:7-22; Ex. 56 at AIG002867 (service date 10/05/2009).)

b.   Rudolf was Lynders's manager and had a role in determining Lynders's compensation in 2016 and 2017.  (Ex. 12, 23:9-15.)

c.   Lynders was based in New York City during 2016 and 2017.  (Ex. 12, 24:17-20; Ex. 56 at AIG002867-68 (service date 10/05/2009).)

d.   Lynders was never paid as much as Rudolf and his ███████████████ ███████████████  (Ex. 12, 25:12-19; Ex. 56 at AIG002867-68 (service date 10/05/2009).)

---

[8] Lynders's compensation for 2018 is not in the evidentiary record.

e.   Rudolf does not know who supervised Lynders prior to 2016, has not seen his performance reviews prior to supervising him, and is not aware of his work history at AIG or prior to AIG.  (Ex. 12, 24:8-25:6.)

53.   Carolina Klint ("Klint

a.   Rudolf alleges that Klint, a younger female, was paid more than he was for equal or lesser responsibilities in 2016 and 2017.  (Ex. 12, 34:18-35:13; Ex. 58.)

b.   Rudolf testified at his deposition that he did not know Klint's age.  (Ex. 12, 35:14-16.)

c.   Klint was based in Atlanta on assignment from Europe in 2016 and 2017. (Ex. 12, 36:9-15; Ex. 58 at AIG003991-3992.)

d.   Klint was the zonal or "regional" president of Atlanta – a role different from Rudolf's.  (Ex. 12, 34:24-35:5.)

e.   During each of 2016 and 2017, Klint and Rudolf both reported to Johnson. (*Id.* at 35:17-19.)  In 2016 and 2017, Klint's TDC was less than Rudolf's. (*Id.* at 37:15-38:21; Ex. 58 at AIG003991-3992.)   Accounting for conversion from Swedish Krona (how Klint's compensation is kept in AIG's records) to U.S. dollars, Klint's TDC in 2016 was approximately ███████ and her target TDC in 2017 (she separated from AIG on June 30, 2017) was approximately ██████ (Ex. 58 at AIG003991-3992; https://www.irs.gov/individuals/international-taxpayers/yearly-average-currency-exchange-rates) Her job grade was █████████████ (Ex. 58 at AIG003991-3992.)

54.     Marya Propis

a.      Rudolf alleges that Propis, a female, was paid more than he was for equal or lesser responsibilities from 2014-2017.  (Ex. 12, 39:10-17; Ex. 57.)

b.      Propis is four years younger than Rudolf.  (Ex. 57.)

c.      Rudolf testified at his deposition that he had never seen Propis's performance reviews.  (Ex. 12, 40:18-20.)

d.      Propis was based in New York City for each of the years 2014-2017.  (*Id.* at 41:13-21; Ex. 57 at AIG003946-47; Ex. 54 at AIG000827-28 (service date 03/07/2005).)

e.      Propis received a compensation increase in 2013 as a result of being bid back from accepting a job at an insurance start-up at Berkshire Hathaway.  (Ex. 12, 42:17-20, 43:2-49:24; Ex. 13, 88:11-89:8, 214:9-215:8, 228:3-9; Ex. 17.)  AIG never increased any component of her target TDC again.  (Ex. 57 at AIG003946-47; Ex. 54 at AIG000827-28 (service date 03/07/2005).)  Rudolf was never approached to join the Berkshire Hathaway start-up.  (Ex. 12,50:19-21.)

f.      The decision to increase Propis's compensation in 2013 to bid her back was not made by Johnson.  (Ex. 6, 106:10-21.)

g.      Rudolf and Propis ▮▮▮▮▮▮▮▮▮ each reported to the same manager in 2016 and 2017.  (Ex. 54 at AIG000827-28 (service date 03/07/2005).)  Following Rudolf's TDC increase in September 2016, Rudolf's TDC in 2016 and target TDC in 2017, were greater than Propis's in each of those years, after adjustment for an employee living in New York City (a US-8

14

geography) compared to one living in Pittsburgh (a US-4 geography).  (*Id.*; Ex. 60; Ex. 62.)

55.    Tracie Grella ("Grella")

a.    Rudolf alleges that Grella, a female, was paid more than he was for equal or lesser responsibilities in the years 2017 and onward.[9]  (Ex. 12, 53:5-11.)

b.    Grella was the Global Head of Cyber, a role different from and more senior to Rudolf's.  (*Id.* at 51:9-52:6.)

c.    Rudolf alleges that he matrix reported into Grella in 2016-2017.  (*Id.* at 51:21-52:2.)

d.    Grella had a different manager than Rudolf in 2016 and 2017.  (Ex. 54 at AIG000827-28.)

e.    Rudolf does not know Grella's age, but speculated that she is 7 or 8 years younger than himself.  (Ex. 12, 52:8-25.)

f.    Grella was based in New York City.  (*Id.* at 54:2-3.)

g.    Rudolf has no knowledge what Grella was paid, who she reported to, who completed her performance reviews, the substance of her reviews, or how long she was employed.  (*Id.* at 53:12-25, 54:4-6.)

---

[9] Grella's compensation is not in the evidentiary record.

56.   Elizabeth Johnson

    a.   Rudolf alleges that Elizabeth Johnson, a female, was paid more than he was for equal or lesser responsibilities in the years 2016 and onward.[10]   (*Id.* at 54:10-25.)

    b.   Elizabeth Johnson's role was Global Head of Excess Casualty, a role different from Rudolf's.   (*Id.* at 55:6-14, 55:19-56:14.)   Rudolf had no Casualty background.   (*Id.* at 57:12-14.)

    c.   Elizabeth Johnson had a different manager than Rudolf.   (*Id.* at 57:24-58:9.)

    d.   Rudolf does not know Elizabeth Johnson's age, but speculated at his deposition that she is 10 younger than himself.   (*Id.* at 54:16-18.)

    e.   Elizabeth Johnson was based in New York City.   (*Id.* at 55:17-18.)

    f.   Rudolf has no knowledge what Elizabeth Johnson was paid.   (*Id.* at 55:2-5.)

    g.   Rudolf has never seen Elizabeth Johnson's performance reviews.   (*Id.* at 58:13-15.)

57.   Lynn Oldfield ("Oldfield")

    a.   Oldfield, a female, is older than Rudolf.   (*Id.* at 59:3-7; Ex. 59.)

    b.   Oldfield was the Head of Canada for AIG in 2016 and 2017.   Rudolf never had a role as the head of a country.   (Ex. 12, 59:8-10, 59:23-60:3; Ex. 59.)

    c.   Oldfield was based in Toronto.   (Ex. 12, 61:4-8; Ex. 59.)

    d.   Rudolf has never seen Oldfield's performance reviews.   (Ex. 12, 61:9-11.)

    e.   Rudolf testified at his deposition that he had no knowledge what Oldfield was paid.   (*Id.* at 61:12-20.)

---

[10] Elizabeth Johnson's compensation is not in the evidentiary record.

  f. During each of 2016 and 2017, Oldfield and Rudolf both reported to Johnson.  (*Id.* at 60:4-6.)  In 2016 and 2017, Oldfield's TDC was less than Rudolf's and her job grade was █████████████████ [11]  (Ex. 59 at AIG007321-22.)   She was paid in Canadian dollars; accounting for conversion to U.S. dollars, her TDC in 2016 and 2017 was approximately ████████ and ████████ respectively.   (*Id.*; https://www.irs.gov/individuals/international-taxpayers/yearly-average-currency-exchange-rates)

58. Michelle Faylo ("Faylo")

  a. Faylo, a female, is younger than Rudolf.  (Ex. 12, 63:8-9.)

  b. Rudolf was Faylo's manager in 2016 and 2017.  (Ex. 12, 62:7-11; Ex. 56 at AIG002867-68 (service date 05/08/2006).)

  c. Faylo was based in New York City.  Ex. 56 at AIG002867 (service date 05/08/2006.)

  d. In 2016 and 2017, Faylo was never paid as much as Rudolf and had a █████ ██████████████ [12]  (Ex. 12, 62:4-6; Ex. 56 at AIG002867-68 (service date 05/08/2006.)

  e. Rudolf testified at his deposition that he had no recollection as to Faylo's compensation.  (Ex. 12, 64:6-14.)

---

[11] Other than for 2016 and 2017, Oldfield's compensation is not in the evidentiary record.

[12] Other than for 2016 and 2017, Faylo's compensation is not in the evidentiary record.

59.   Jonathan Novak ("Novak")

    a.    Rudolf testified that Novak, a male, was in AIG Investments and part of Trade Credit and Political Risk.  (Ex. 12, 66:23-67:4.)

    b.    Rudolf alleges that he matrix reported into Novak, and Novak was senior to Rudolf.  (*Id.* at 67:3-10.)

    c.    Novak reported to a different manager than Rudolf.  (*Id.* at 68:7-13.)

    d.    Rudolf has never seen Novak's performance reviews and has no knowledge regarding Novak's job grade, compensation, or age[13]  (*Id.* at 67:13-17, 68:14-18.)

    e.    Rudolf testified at his deposition that Novak was based in Los Angeles and/or New York City.  (*Id.* at 67:18-68:6.)

60.   Timothy DeSett ("DeSett")

    a.    DeSett is male and about four years younger than Rudolf.  (Ex. 68 at ¶ 9(e).)

    b.    Rudolf's employment did not overlap with DeSett's and therefore has no view of DeSett's performance.  (Ex. 12, 71:8-13.)

    c.    DeSett reported to a different manager than Rudolf did during his employment.  (*Id.* at 73:8-12.)

    d.    DeSett commenced employment on February 5, 2018.  DeSett became head of one of the eleven then newly-formed North America business segments: U.S. Field Operations, North America General Insurance.  (Ex. 69 ¶ 12; Ex. 49.)  DeSett's role existed in a prior structure, before 2016, and had been

---

[13] Novak's compensation is not in the evidentiary record.

performed by Grabek, to whom Rudolf reported at such time.  (Ex. 7, 86:4-23, 265:3-18.)

e.   DeSett's role is much broader than any role Rudolf ever held at AIG both in terms of scope and seniority.  (Ex. 69 ¶ 12; Ex. 51; Ex. 49.)  Specifically, while DeSett oversees "Industry leaders, Broker, and Client Engagement, branch managers, and zonal leaders," Rudolf never oversaw brokers, never oversaw branch managers, and never oversaw zonal leaders when he was Head of Client Engagement (U.S. and Canada).  (Ex. 51; Ex. 12, 74:4-76:14; Ex. 69 ¶ 12.)  When Michael Hayes ("Hayes") took over Rudolf's client engagement role in the fall of 2018, he reported to DeSett.  (Ex. 69 ¶ 13; *see infra* ¶ 173.)

61.   John Gambale ("Gambale")

a.   Rudolf alleges that Gambale, a younger male, was paid more than Rudolf was for equal or lesser responsibilities because Gambale assumed some of Rudolf's responsibilities.[14]  (Ex. 12, 101:19-102:17; 103:8-21; (Ex. 55 at AIG006685 (service date 08/16/1999).)

b.   Gambale was a zonal president when he assumed some of Rudolf's responsibilities in 2018.  (Ex. 12, 102:18-103:4; *see infra* ¶ 174.)  Rudolf was never a zonal lead.  (Ex. 12, 103:5-7.)

c.   Rudolf is not sure who Gambale reported to.  (*Id.* at 106:15-22.)

d.   Gambale was based in New York City.  (*Id.* at 106:12-14.)

---

[14] Other than for 2018 through 2021, Gambale's compensation is not in the evidentiary record.

e.      Rudolf testified at his deposition that he had never seen Gambale's performance reviews, did not know who decided Gambale's compensation, and had no knowledge what he was paid.  (*Id.* at 101:19-23; 106:23-107:4; 127:9-15.)

f.      Rudolf's target TDC in 2017, after adjustment for an employee based in New York City compared to one based in Pittsburgh, was greater than Gambale's in each of the years 2018-2021.   (Ex. 55 at AIG006685-88 (service date 08/16/1999); Ex. 60; Ex. 62.)  Gambale's job grade was ███ ███████████ (Ex. 55 at AIG006685 (service date 08/16/1999).)

62.      Alexander Nagler ("Nagler")

a.      Rudolf alleges that Nagler, a male, was paid more than he was in 2016 and 2017 for equal or lesser responsibilities due to age discrimination.[15]  (Ex. 12, 109:3-20.)

b.      Rudolf testified that Nagler was based in Germany and ran several European countries.  (*Id.* at 118:22-119:4.)

c.      According to Rudolf, "it's hard to compare" his role to Nagler's.  (*Id.* at 119:5-9.)

d.      Nagler reported to a different manager than Rudolf.  (*Id.* at 120:2-6.)

e.      Rudolf has no knowledge regarding the substance of Nagler's performance reviews or the compensation Nagler was paid (except that Nagler allegedly told Rudolf his LTI in an unspecified year.)  (*Id.* at 109:21-110:6, 120:7-14.)

---

[15] Nagler's compensation is not in the evidentiary record.

63.     Sierra Signorelli ("Signorelli")

   a.     Rudolf alleges that Signorelli, a female, was paid more than he was in 2016 and 2017.[16]  (*Id.* at 120:20-121:5.)

   b.     Signorelli reported to a different manager than Rudolf and in "[M]ultinational," an area in which Rudolf did not work.  (*Id.* at 121:14-25.)

   c.     Rudolf testified that Signorelli was based in Singapore and New York City; Rudolf was never based outside the U.S.  (*Id.* at 121:17-22, 122:2-8.)

   d.     Rudolf has no knowledge what Signorelli was paid in 2016 or 2017.  (*Id.* at 121:6-13.)

64.     Stephen Alexandris ("Alexandris")

   a.     Alexandris, a younger male, was an aerospace expert, which Rudolf is not. (*Id.* at AIG002867 (service date 01/15/2014); Ex. 12, 91:4-6, 92:11-12.)

   b.     Rudolf was Alexandris's manager in 2016 and 2017.  (Ex. 56 at AIG002867-68 (service date 01/15/2014).)

   c.     Alexandris's TDC in 2016 was less than Rudolf's and Alexandris's target TDC in 2017 (he separated from AIG on June 9, 2017) was less than Rudolf's.  (*Id.* at AIG002867-68 (service date 01/15/2014); Ex. 12, 90:24-91:3.)  Alexandris's job grade was a ███████████████ (*Id.* at AIG002868 (service date 01/15/2014).)

---

[16] Signorelli's compensation is not in the evidentiary record.

65.     Rudolf testified that in general, AIG favored men over women.  (Ex. 11, 241:15-18.)  Rudolf also testified that AIG was losing too many women and that was a bad thing.  (*Id.* at 239:13-24.)

66.     Rudolf considered himself a "jack of all trades" throughout his career and at the end of his employment.  (Ex. 12, 128:10-15.)  The role Rudolf occupied at the time of his separation was "unique" and no one had a job that was significantly the same as his.  (*Id.* at 129:2-5, 129:21-130:4.)

**VI.     Settlement of the Caremark Action in 2016**

67.     In 1999, MedPartners, Inc. ("MedPartners") settled securities litigations filed against it (the "MedPartners action").   (ECF 41 ¶ 43.)

68.     In 2003, two putative class actions were filed in state court in Alabama against AIG and Caremark Rx, a successor entity to MedPartners.[17]  The Caremark action arose out of the settlement of the MedPartners action.  In the Caremark action, the plaintiffs alleged that the judge approving the MedPartners settlement was misled as to the extent of available insurance coverage and would not have approved the settlement had he known of the existence and/or unlimited nature of an excess insurance policy (the "MedPartners excess policy") issued by an AIG subsidiary.  The plaintiffs further alleged that AIG and Caremark were liable for fraud and suppression for misrepresenting or concealing the nature and extent of coverage.  (Ex. 19; Ex. 24 at AIG002104-2105.)

69.     The court in the Caremark action granted preliminary approval of a settlement on June 1, 2016 and final approval of the settlement on August 15, 2016.  (Ex. 19; Ex. 24 at

---

[17] Other successor entities as a result of name changes and merger activity include CVS Caremark and CVS Health.  For simplicity, the 2003 actions will be referred to as the "Caremark action" and the entity will be referred to as "Caremark" or "CVS".

AIG002106.)  AIG paid the settlement amount allocated to it on September 12, 2016.  (Ex. 24 at AIG002106.)

## VII.    Rudolf's Code of Conduct Certifications; Employee Handbook and Policies

70.    Employees are required to complete a Code of Conduct Certification on an annual basis.  (Ex. 1 ¶ 3.)  Rudolf completed Code of Conduct Certifications in each of the years 2012-2016.  (Ex. 25 at AIG000496-505.)  Company records reflect that Rudolf completed the 2016 Code of Conduct Certification on December 19, 2016.  (Ex. 1 ¶ 4.)  In each of those years, Rudolf answered "No" to the following question: "Do you have any violations of the Code of Conduct, AIG policy, law, or regulation to report?"  (Ex. 25 at AIG000496-505; Ex. 11, 101:8-20.)  Because of the timing of his separation (November 20, 2017), Rudolf did not complete a Code of Conduct Certification for 2017.  (Ex. 63 ¶ 8.)

71.    The AIG Employee Handbook for 2017 states "Your Employment with AIG is 'at-will.'"  (Ex. 16 at AIG000355.)

72.    The AIG Employee Handbook for 2017 provides as follows:

This Handbook is Not a Contract.  You understand that this Handbook is neither a contract of employment, nor a legally binding agreement and does not create a contract for wages or any other working conditions.  AIG may, in its sole discretion, alter or amend these policies at any time, with or without notice.  You are responsible for being aware of, and abiding by, all of the Handbook's policies, including any of its future modifications and understand that the current version of the Handbook is available for review at any time on AIG's intranet.  (*Id.* at AIG000355.)

73.    The AIG Employee Handbook for 2017 also states the following:

AIG depends upon your assistance to ensure the Company's policies are upheld.  You will not be retaliated against for honestly reporting any concerns regarding violations of Company policy.  You are further protected from being retaliated against when called upon to participate in an investigation conducted by Employee Relations or other AIG investigatory departments.  Retaliation will not be tolerated, and acts of retaliation should be reported immediately to an HR Shared Services ER Advisor at 1-800-265-5054 to be promptly investigated.  (*Id.* at AIG000365.)

74.     During his employment, Rudolf was aware that AIG had a Fraud Reporting Policy. (Ex. 11, 106:2-4.)  AIG documents reflect that Rudolf completed training on the Fraud Reporting Policy.  (*Id.* at 106:9-14.)  Rudolf understood that the Fraud Reporting Policy provided direction about who to call to make complaints of fraud.  (*Id.* at 113:12-18.)

75.     Rudolf has not contacted the SEC, DOJ, or Cole since he departed from AIG.  (*Id.* at 326:12-17; Ex. 12, 181:16-21.)

76.     Rudolf is not aware of any alleged false claims submitted by AIG to the U.S. Government for payment that AIG was not entitled to receive.  (Ex. 12, 420:23-421:24.)

## VIII.   Rudolf's Separation of Employment in 2017

77.     On November 10, 2017, Zaffino and Baugh co-hosted a conference call with a large group to introduce Baugh as the CEO of the General Insurance North America business.  (Ex. 11, 256:10-257:3, 258:8-12.)  Rudolf alleges that on this call, it was announced that AIG was creating a Global Head of Claims role and that there were two former AIG executives who were candidates for the position.  (*Id.* at 259:3-15.)  The two candidates were not identified on this call.  (*Id.* at 259:24-260:2; Ex. 12, 323:19-324:9.)  Rudolf alleges that he was told by two colleagues that the candidates were Mike Smith ("Smith") and Paul Lavelle ("Lavelle").  (Ex. 11, 260:8-23.)  Rudolf never heard from Zaffino or Baugh that Smith and/or Lavelle were being considered for rehire. (*Id.* at 261:22-262:1.)  Rudolf considers Lavelle and Smith (among others as explained further below) "bad actors" because of their alleged involvement in policies like the MedPartners excess policy.  (ECF 41 ¶ 149.)

78.     According to Rudolf, his alleged concern that AIG would hire "bad actors" that he believed might "perpetuate unaddressed frauds or even potentially repeat" new frauds, caused him to reach out to speak with Baugh.  (Ex. 11, 275:8-276:1, 294:19-295:2.)

24

79.     On Sunday, November 12, 2017 at 8:11 a.m., Rudolf contacted Baugh by text message requesting to speak with him concerning "some developments with me" and that while he would rather speak in person, a "phone conversation [would] do as I do have some timing issues."  (Ex. 41 at AIG000001; JSUF ¶ 18.)

80.     In later communication with Baugh on Wednesday, November 15, 2017, Rudolf described, among other things, the purpose of him reaching out to Baugh that Sunday:

> **My main reason to speak with you was to discuss options around me and a path forward.** After 24 years, my passion to build and protect this company is second to none. **My goal was to not only discuss my current situation around compensation vs. performance,** but to also discuss my concerns of some x-AlGr's returning to the company that could have an adverse impact to the company.

(Ex. 44 at AIG000756 (emphasis added).)

81.     Rudolf and Baugh spoke over the telephone on the morning of Sunday, November 12, 2017.  (JSUF ¶ 19.)

82.     The telephone call lasted approximately 15 minutes.  (Ex. 12, 327:13-18.)  During the call, Rudolf told Baugh that "John Rudolf has given more to AIG than AIG has given to John Rudolf."  (Ex. 11, 349:18-24.)

83.     In addition, Rudolf testified that he told Baugh he wanted to speak with him for the following reasons:

   a.     To reschedule his year-end check-in conversation that was cancelled because of Johnson's departure.

   b.     To discuss Rudolf's supposed concern of "bad actors" returning to AIG.

   c.     To understand Rudolf's supposed concern of "bad actors" returning to AIG, he wanted Baugh to understand his concerns of past frauds as well as current frauds.  The context of describing to Baugh the "old bad acts" was to make him understand why the "bad actors" should not be rehired.

25

(*Id.* at 295:15-296:20; Ex. 12, 326:7-14.)

84.     Rudolf testified that the following exchange took place during the call:

a.     Rudolf told Baugh that with Johnson's departure, Rudolf was concerned about his year-end review given "all [of his] previous conversations [with Baugh] about [Rudolf's] increased responsibilities . . . ." (Ex. 11, 297:13-20.)

b.     Baugh told Rudolf that he did not understand what Rudolf meant by "bad actors returning." Rudolf responded that "[i]n order to understand [his] concern of bad actors returning, [Baugh had] to understand . . . [Rudolf's] previous work with the Department of Justice [("DOJ")] and [Securities and Exchange Commission ("SEC")],[18] including . . . unlimited rigged claim workout deals and CVS." (*Id.* at 297:21-298:14; *see also* Ex. 12, 326:15-327:12.)

c.     Baugh asked, "What do you mean by the 'bad actors?'" and asked Rudolf to name them. Rudolf named Smith and Lavelle, among others. (Ex. 11, 298:15-23, 306:20-309:1.)

d.     Baugh told Rudolf that he did not understand what Smith and Lavelle did. Rudolf responded that Smith and Lavelle were not "the ones that originated the fraud" but that others "rigged" transactions, using the MedPartners

---

[18] James Cole, Esq. ("Cole"), then of the law firm Bryan Cave, LLP, was selected by the DOJ and approved by the SEC as the Independent Consultant to examine certain AIG transactions and conduct a review related to certain AIG policies and procedures. (JSUF ¶ 9.) Cole was appointed in 2005. (*Id.*) In connection with Cole's work, Rudolf had interactions with Cole from approximately the beginning of 2005 through 2007. (*Id.* at ¶ 10; Ex. 12, 160:20-22.) The last time Rudolf interacted with Cole was in approximately 2007. (Ex. 12, 167:23-168:7.)

excess policy as an alleged example, which Rudolf allegedly said was listed in AIG's 10-K annual statements for ten plus years.  (*Id.* at 298:24-299:11.)

e.    Rudolf told Baugh "that the unlimited limits in CVS transactions were rigged."  (Ex. 12, 319:14-18.)  Rudolf did not explain to Baugh what was "rigged" about the MedPartners excess policy or its relationship to state or federal law.  (Ex. 11, 310:14-19, 313:21-314:6.)

f.    Rudolf then told Baugh that Smith and Lavelle and others "discovered the frauds and were aware of the frauds" and that "eventually . . . the AIG board was duped."  Baugh asked Rudolf what he meant by the AIG board ("Board") being "duped," and Rudolf responded that the true nature of the MedPartners excess policy was covered up in the process of settling the Caremark action.  (Ex. 11, 299:12-300:1.)

g.    Baugh told Rudolf that he still did not understand "the frauds."  Rudolf responded only with if the "bad actors" returned, then it "might be a sad day for the Rudolf family" because the "bad actors" would "have another bite at the apple" and Rudolf would have to consider leaving AIG.  (*Id.* at 300:2-17.)  Rudolf meant that his family sacrificed everything for him to work six and a half days a week, 12-14 hours a day and all of that would be for naught if the "bad actors get to return to perpetuate the fraud or create new frauds . . . ."  (*Id.* at 320:3-23, 334:9-335:1; Ex. 12, 337:25-338:11.)

h.    In the context of it being a sad day for the Rudolf family, Rudolf likely used the language "family first" with Baugh in addition to discussing with Baugh the negative impacts that his job, such as the hours and travel, were having

on his family and the toll it took on him and his family to work the way he did.  (Ex. 11, 332:9-24, 350:1-351:11; Ex. 12, 336:23-337:18.)

i.    Rudolf told Baugh that there had been two employers, one on Long Island and one in Pittsburgh, who over the years had expressed an interest in him if he were to ever leave AIG, that "might be opportunities" for him.  (Ex. 11, 300:18-301:3, 328:5-15, 330:17-18.)

j.    Rudolf told Baugh that if he were to leave AIG under "questionable circumstances," he had an agreement with Cole, from approximately ten years earlier, that he should contact AIG Legal, which would put him in contact with the DOJ/Independent Consultant.  (*Id.* at 301:13-23.)  Rudolf told Baugh that this conversation with the DOJ/Independent Consultant "would be tough because he would have to disclose new discovery/concerns with past transactions that could damage AIG."  (ECF 41 ¶ 127.)  Rudolf alleged at his deposition that the "questionable circumstances" under which he would need to have an exit interview were the "bad actors" returning and that AIG Legal would put him in touch with the DOJ/Independent Consultant.  (Ex. 12, 169:4-11; 177:5-22, 283:17-284:20.)

k.    At some point during the telephone call, Baugh and Rudolf discussed how Rudolf leaving AIG would impact the variable parts of his compensation, such as his pension and LTI.  (Ex. 11, 302:16-24; Ex. 12, 339:8-340:24.)

l.    Baugh concluded the telephone call by telling Rudolf that Baugh would contact AIG Legal regarding Rudolf's alleged need to have an exit interview with Cole and that Rudolf should contact Human Resources to understand

28

how his compensation would be impacted upon separating from AIG.  (Ex. 11, 303:1-9.)

85.     Rudolf could not recall whether he spoke with Baugh about this during the Sunday telephone call, but Rudolf testified that he definitely told Baugh on prior occasions that he felt he was not recognized financially by AIG for his work and was being underpaid for increased responsibilities.  (Ex. 12, 337:19-24, 411:25-412:25.)

86.     Rudolf did not identify for Baugh during the telephone call any specific actions that the "bad actors" took in "duping" the Board other than to differentiate between those who "originat[ed]" the "rigged" transactions and those who were "perpetuators."  (*Id.* at 319:25-320:12.)  Rudolf did not identify for Baugh how the Board was "duped" other than to claim that the Board was not told the truth "[a]s respects to the unlimited limit rig transactions," specifically the MedPartners excess policy.  (*Id.* at 328:17-24.)

87.     Rudolf did not identify for Baugh how he knew what the Board was (or was not) told about the MedPartners excess policy because he himself did not know what the Board was (or was not) told.  (*Id.* at 329:21-330:2.)

88.     Rudolf did not identify for Baugh what the Board was or was not told because it was unnecessary as, according to Rudolf, everyone at AIG knows what the word "rigged" means.  (*Id.* at 329:6-20.)

89.     Rudolf did not explain to Baugh any sort of loss that was incurred by the Commonwealth of Pennsylvania.  (*Id.* at 330:3-9.)

90.     Baugh understood Rudolf to have resigned during the telephone call.  In a text message sent shortly after the telephone call, Baugh wrote to Rudolf:

John - I sensed you were not satisfied with our conversation and that **you are very upset I heard you say family first** and I fully agree with that I also sensed you are telling me that **your resignation** will have grave consequences for AIG and while trying not to appear thick, I really don't follow. I think it's terrible that **you feel you have 19 lost years**. That only allows me **to try to help you in the way you are asking for help - to exit**. It sounds to me like an on boarding session in Philadelphia is not your most crucial issue right now. The offer to meet at 8:00am Tues. still stands. Entirely at your discretion. Lex

(Ex. 41 at AIG000003 (emphasis added).)

91.     Rudolf responded by writing "Thanks – I will take your offer to meet at 8 am Tuesday." (*Id.*)  Rudolf did not otherwise respond to that text from Baugh.  (Ex. 11, 336:17-337:8.)  Baugh and Rudolf agreed to meet in person on Tuesday, November 14, 2017 at AIG's offices in New York, NY.  (JSUF ¶ 20.)

92.     Following the telephone call, at 12:47 p.m., Rudolf wrote an email to Naik and asked: "If I were to resign from AIG, can you clarify [whether I would lose]" "Non-qualified Pension (non-vested)" "Recent two year retention bonus," and "all non-vested [long-term incentive pay]?"  (Ex. 42.)  Rudolf also asked Naik, "If I were to resign with or without a job, could I get an exit package?"  (*Id.*)  Naik responded that when employees resign, they typically lose unvested compensation elements like LTI, which are intended to be retention tools.  (*Id.*)  Naik also explained that employees whose jobs are eliminated qualify for severance and that "In the evolving structure [he would] have to discuss with Lex Baugh about how to transition an exit" to understand his options.  (*Id.*)  Rudolf understood from Naik's response that resigning would cause him to lose significant compensation.  (Ex. 12, 351:9-12.)

93.     Rudolf does not blame Baugh for, or think Baugh did anything wrong in, directing Rudolf to reach out to Human Resources, in this case Naik, to get information about what would happen to his compensation upon leaving AIG.  (*Id.* at 351:23-352:21.)

94.     Following his telephone call with Rudolf, Baugh sent an email to his manager, Zaffino, and McMillan at 11:50 a.m. and wrote:

**John just called me to render his resignation**.  At the same time he is obliquely referring to the fact that he is a Govt witness in the DOJ investigations, that he is required to give them an exit interview and that there will be negative ramifications for AIG from such an interview.

I offered to sit down with him again Tuesday morning at 8:00. Apparently he had his own lawyer but would like AIG to reimburse his costs.

**Regarding the resignation, I am inclined to accept it.  John has not been happy for many years.  His current role is not going to survive and I suspect he will be even less happy to do a pure client management role.** He needs to be based in Pittsburgh for personal reasons. I think we also have others who could step into that role.

**Regarding the legal issues.  I am a little in the dark.**  I did go through a deposition while in Paris, but I was not close to what went on in the US. Mike Leahy may be the AIG employee with the best knowledge here and I plan to give him a call. John is telling me there was a cover up by Kris Moor, John Doyle, Peter Eastwood, Mike Smith and Paul Lavelle and that they did not tell the Board the truth.  However he was all over the place on the call and I'm wondering what he is really after."

(Ex. 43 at AIG000750-51 (emphasis added).)

  95. Baugh explained what he meant by various parts of this email:

    a. When he wrote, "John has not been happy for many years," he meant that he had grown to know that Rudolf was frustrated with his position and compensation.  (Ex. 2, 146:25-147:6.)  Baugh and Rudolf met in his office in New York in 2016 and they discussed Rudolf's dissatisfaction with his compensation and Rudolf asked Baugh to put in a good word for him for a compensation increase, which Baugh did.  (*Id.* at 66:24-67:25.)  And again in 2017, Rudolf expressed dissatisfaction with his compensation to Baugh.  (*Id.* at 146:25-147:6.)  Rudolf agrees that the reasons for his unhappiness, as Baugh wrote, was Rudolf's belief that he was being overworked and unfairly paid.  (Ex. 12, 345:3-346:5; ECF 41 ¶¶ 133-34.)

    b. Baugh explained what he meant by "At the same time he is obliquely referring to the fact that he is a Govt witness into the DOJ investigations, that he is required to give them an exit interview and that there will be

negative ramifications for AIG."  Baugh explained that Rudolf was in an agitated state during the telephone call, which culminated in Rudolf touching on the need to speak with the DOJ before being allowed to leave AIG.  Baugh did not understand what Rudolf meant by needing to speak with the government, but knew that he himself could not resolve it for Rudolf and told Rudolf that he would get him in touch with the right people. (Ex. 2, 140:2-20; Ex. 3, 284:15-21.)

c.      Baugh also explained that the first part of the telephone call was spent talking with Rudolf about the fact that he had given more to AIG than AIG had given him, the pressures of travel, working long hours, not spending time with his family, and his family questioning why he was working at AIG and wasting years of his life.  (Ex. 2, 140:21-141:10.)

d.      Baugh explained what he meant by "I think we also have others who could step into that role."  He said that the role he was referring to was Rudolf's major account role and that he did not have anyone specifically in mind. (*Id.* at 156:20-157:7; Ex. 3, 284:12-14.)

e.      Baugh explained what he meant by "Regarding the legal issues.  I am a little in the dark."  He said that he was having trouble following what Rudolf was saying to him during the telephone call.  (Ex. 2, 157:8-12.)

f.      Baugh explained what he meant by "However he was all over the place on the call and I'm wondering what he is really after."  He said that Rudolf went from one aspect to another.  First, they spoke about Rudolf's family and not spending enough time with them as being the reason he had to leave

AIG and so Baugh asked him what other offers he had and Rudolf told
Baugh he had two.  Then Rudolf raised the issue of employees who had
long left the company not telling the Board the truth, which Baugh did not
know what to make of.  (*Id.* at 166:22-167:17.)

g.  The concept of whistleblowing did not occur to Baugh as a result of his
telephone call with Rudolf.  (*Id.* at 158:7-12.)

96.  Baugh apprised the Deputy General Counsel and Head of Litigation about his
telephone call with Rudolf who then instructed Andrew Curtin ("Curtin"), Senior Managing
Director and Global Head of Investigations of the Global Investigative Group ("GIG") (Ex. 66 ¶ 2)
to reach out to Rudolf.  (*Id.* ¶ 6; Ex. 43.)  Curtin reached out to Rudolf on Monday, November 13,
2017.  (JSUF ¶ 22.)

97.  Baugh and Rudolf met in person on Tuesday, November 14, 2017, at or about 8:00
a.m.  (JSUF ¶ 25.)

98.  Rudolf testified that the following ensued:

a.  That the meeting lasted 20-30 minutes.  (Ex. 11, 354:9-13; ECF 41 ¶ 146.)

b.  Baugh and Rudolf began the meeting by discussing ordinary business.  (Ex.
11, 354:19-23.)

c.  Then Rudolf shared with Baugh that he was surprised to receive a call from
Curtin.  (*Id.* at 356:9-12.)

d.  Rudolf then asked Baugh whether he said anything to anybody else about
their telephone conversation on November 12, 2017.  (*Id.* at 356:17-21.)
Baugh informed Rudolf that he told his manager that Rudolf had resigned.
(*Id.* at 356:22-24.)  Rudolf said he never resigned, but rather "reported

frauds" and how he thought the Board was "duped," including with respect to the MedPartners excess policy, which was in AIG's 10-K annual statement, and that he was concerned about "ongoing frauds with the 10-K and the SIFI[19] status" and "pretty much the meeting was over." (*Id.* at 357:7-357:17, 364:21-365:5.)

99.     On Tuesday, November 14, 2017, Rudolf had conversations with Joers, then AIG's Head of Employee Relations – Americas. (JSUF ¶ 26.)

100.     That same day, Joers sent an email at 5:28 p.m. to in-house counsel Annette Bernstein, Naik, and Merritt. (JSUF ¶ 27.)

101.     In the email, Joers wrote that he told Rudolf that as a result of a voluntary separation, he was in a position to lose his non-qualified retirement benefits. (Ex. 45 at AIG000773.) Joers wrote that Rudolf at this point had "become quite vocal that he never resigned. He's calling it a misunderstanding. He also claims he has been fully cooperative with Andy. I also talked to Andy. He agrees that he answers every question, but has not really provided anything new/ongoing that Andy can investigate. I left it that I would talk to him at some point tomorrow. My impression is that he has become very concerned about how this is playing out. He has a lot to lose here beside salary: STI, LTI, Continuation bonus, Non-qualified pension. He understands that a resignation would be costly." (*Id.* at AIG000774.)

102.     Naik forwarded Joers's email to Baugh on November 14, 2017 at 7:57 p.m. and wrote, "It is now a business decision on how you would like to proceed with John's resignation." (*Id.* at AIG000773; JSUF ¶ 29.) Naik believed Joers's email signaled that there was no legal

---

[19] In 2013, the Financial Stability Oversight Council of the U.S. Treasury Department designated AIG, Inc. as a systemically important financial institution ("SIFI"). (JSUF ¶ 12.) In September 2017, AIG, Inc.'s SIFI designation was removed. (*Id.*)

impediment, or "legal hold," to accepting Rudolf's resignation and thus it was Baugh's decision on how to proceed.  (Ex. 10, 154:14-157:9.)  Naik wrote this email without any knowledge that Rudolf claims to have reported supposed concerns of alleged fraud.  (*Id.* at 169:1-8.)

103.    On Wednesday, November 15, 2017 at 1:41 p.m., Rudolf sent an email to Joers and the two spoke around 2:45 p.m. during which time, Joers told Rudolf that Baugh would like to meet with him on Friday, November 17, 2017, and that Joers and Baugh "were meeting to discuss where we are related to his resignation and benefits."  (Ex. 44 at AIG000757; JSUF ¶ 29.)

104.    Following his conversation with Joers, Rudolf sent Baugh an email on November 15, 2017 at 4:49 p.m. claiming, among other things, that he had not resigned.  (Ex. 44 at AIG000756; JSUF ¶ 30.)  He also wrote that "[a]fter 24 years and all that I have done to perform and protect AIG, I hope this is truly a misunderstanding.  I did not resign, nor do I plan to resign." (Ex. 44 at AIG000756.)

105.    Baugh and Rudolf arranged to meet on Monday, November 20, 2017.  (JSUF ¶ 31.)

106.    The next day, November 16, 2017, Joers circulated draft talking points.  (Ex. 46 at AIG001335.)

107.    On Monday, November 20, 2017, Rudolf attended a meeting with Baugh and Merritt.  (JSUF ¶ 32.)  Baugh, relying on the talking points, delivered the message that November 20, 2017 would be Rudolf's last day of employment and that while Baugh had effectively accepted his resignation, he was being offered an exit package to help him transition financially.  (Ex. 2, 251:11-252:3; Ex. 46 at AIG001335.)

## IX.    The GIG Investigation

108.    On each of November 13 and 14, 2017, Rudolf engaged in discussions with GIG at least three different times.  (Ex. 48 at AIG001363, -1367, -1371, -1374.)  The following individuals

(all in GIG) participated in some or all of those discussions: Curtin, Zachary Jost, Kristen Lau, Gregory Lisa, and Frank Novick.

109.     Curtin is an attorney, admitted to the bar of the State of New York.  His legal experience includes employment with the New York County District Attorney's Office, from in or about 1982 until in or about 1996.  During this time, he conducted the investigation, prosecution and trial of complex white-collar financial services and insurance fraud and organized crime cases in both New York City Criminal Court and New York State Supreme Court.  From in or about 1996 until in or about 1999, he served as First Assistant Deputy Attorney General, Organized Crime Task Force, in the Office of the Attorney General of the State of New York.  In this position, he supervised and conducted the investigation and prosecution of organized crime, money laundering and asset forfeiture cases in both state and federal court. (Ex. 66 ¶ 3.)

110.     GIG is part of AIG's Global Legal, Compliance and Regulatory Department.  (*Id.* at ¶ 4.)  GIG is responsible for investigating allegations of employee, agent and vendor fraud, with a focus on forensic investigations of financial reporting, alleged corruption, fraud and misconduct and accounting matters.  (*Id.* at ¶ 5.)

111.     The purpose of the GIG investigation in Rudolf's case was to collect information from him about potentially alleged wrongdoing or illegal activity.  (*Id.* at ¶ 6.)

112.     The first conversation between Rudolf and GIG took place over the phone on November 13, 2017 from 9:33 a.m. until 10:23 a.m.  (Ex. 48 at AIG001363.)  Before the call began, Rudolf was given an *Upjohn* warning, which informed him that he was being interviewed at the direction of counsel, which represented AIG and not Rudolf.  (*Id.*)  Rudolf was also informed that AIG had a strict anti-retaliation policy to protect anyone who reports wrongdoing.  (JSUF ¶ 24.)  Rudolf acknowledged that he understood.  (Ex. 48 at AIG001363.)

113.    The second conversation took place on November 13, 2017 from 1:36 p.m. until 2:00 p.m.  (Ex. 48 at AIG001367.)

114.    The third conversation took place on November 13, 2017 from 2:09 p.m. until 2:33 p.m.  (*Id.*)

115.    The fourth conversation took place on November 14, 2017 from 8:45 a.m. until 9:00 a.m.  (Ex. 48 at AIG001371.)

116.    The fifth conversation took place on November 14, 2017 from 11:13 a.m. until 11:35 a.m.  (*Id.*)

117.    The sixth and last conversation took place on November 14, 2017 from 12:13 p.m. until 12:25 p.m.  (Ex. 48 at AIG001374.)

118.    Rudolf complained to GIG that he did not get a bonus for the work he did in the early 2000's with the Independent Consultant and restating AIG's financials and that his compensation had not changed in over twelve years.  (Ex. 48 at AIG001364; Ex. 12, 357:19-360:20.)  Rudolf testified what when he "tell[s] that story" of the past to understand "the present day fraud," he usually includes that he "was undercompensated along the way."  (Ex. 12, 360:21-361:11.)

119.    Rudolf did not review AIG's SEC filings before speaking with GIG.  (*Id.* at 368:25-369:5.)

120.    Curtin testified that Rudolf did not mention SIFI to GIG.  (Ex. 4, 216:6-12.)  ███  ████████████████████████████████  (Ex. 48 at AIG001361, -1363, -1367, -1371, -1374.)

121.    GIG prepared a final memorandum memorializing the outcome of its investigation. GIG concluded that Rudolf ████████████████████████ at all.  (Ex. 48 at AIG001361.)

122.    Baugh did not participate in the GIG investigation.  (Ex. 64 ¶ 12; Ex. 66 at ¶ 8.) Baugh never received any information or documents from the GIG investigation at any point in time and did not ask for them.  (Ex. 3, 331:14-19.)  Curtin never reported anything back to Baugh about Rudolf.  (Ex. 2, 238:11-13.)  Baugh never spoke with Curtin.  (*Id.* at 238:23, 254:16-18.) Baugh did not know what Curtin's job was at AIG beyond being an attorney.  (*Id.* at 247:5-9.)  The only basis Rudolf has that Baugh communicated with anyone on the GIG team is that Joers emailed both Baugh and Curtin, among others, the draft talking points for Baugh's separation discussion with Rudolf to which Baugh never replied and Curtin replied that he had no comments.  (Ex. 12, 414:15-415:9; Ex. 47.)  Rudolf has no knowledge if Baugh ever spoke with Curtin or anyone on the GIG team.  (*Id.* at 415:10-21.)

## X.    Background on Rudolf's Alleged Concerns

### A.    Alleged Rehiring of "Bad Actors"

123.    Rudolf claims to have had "concerns of bad actors returning.  And those concerns were related to specific acts [he] allege[s] they committed while at AIG, and those were in relation to the LMU and unlimited limit rigged transactions."  (Ex. 12, 325:5-17.)

124.    Rudolf alleges that AIG entered into unlimited "rigged" policies such as the MedPartners excess policy.  Rudolf claims these policies were all entered into prior to 1999.  (Ex. 11, 310:20-311:3.)

125.    With respect to the MedPartners excess policy, Rudolf alleges that it was "rigged" because "AIG 'bad actors' had negotiated through complicit legal counsel for AIG and class

plaintiffs [in the MedPartners action] a pre-determined settlement amount known as a rigged claim workout deal."  (Ex. 65 ¶ 19.)

126.    Rudolf has named several individuals who he considers to be "bad actors."  Rudolf asserts that he considers "bad actors" to be those who knew of unlimited "rigged" policies and those who negotiated them.  (ECF 41 ¶ 87.)  Rudolf considers Smith and Lavelle to be "bad actors." (*Id.* at ¶ 149.)

127.    Other than rumors, Rudolf had no basis to know who the candidates allegedly being referred to on the November 10, 2017 conference call, referred to above, were.  (Ex. 11, 260:8-23, 274:2-5.)  Rudolf had no knowledge whether the candidates allegedly being referred to on the conference call were interviewed or made offers of employment.  (*Id.* at 274:6-9; Ex. 12, 318:5-319:2, 323:2-324:17.)

128.    AIG never rehired Smith.  (Ex. 11, 264:19-20.)  AIG never rehired Lavelle.  (*Id.* at 264:21-24.)

129.    Lavelle is employed in a senior role at Zurich Insurance Group ("Zurich").  (*Id.* at 264:24-265:2, 271:18-23.)  Rudolf applied for employment at Zurich while Lavelle was employed by Zurich.  (*Id.* at 271:24-272:2.)  Rudolf felt comfortable joining Zurich even though he considered Lavelle to be a "bad actor."  (*Id.* at 272:22-273:4.)  Rudolf's employment at AIG overlapped with Lavelle's at least from 2000 to 2006.  During this time, Rudolf claims Lavelle had knowledge of wrongdoings (thus becoming a "bad actor") and Rudolf did not threaten to quit, Rudolf did not raise with AIG Legal any alleged bad acts committed by Lavelle, and Rudolf did not report any alleged bad acts committed by Lavelle to Cole.  (Ex. 12, 306:8-308:8.)

130.    Rudolf's employment at AIG overlapped with Smith's from approximately 2000 until January 2017.  During this time, Rudolf never threatened to quit if Smith was not fired, Rudolf

did not raise with AIG Legal any alleged bad acts committed by Smith, and did not report any alleged bad acts committed by Smith to Cole.  (*Id.* at 308:9-310:23.)

131.    Rudolf did not himself investigate the supposed "bad acts" allegedly committed by the alleged "bad actors."  (*Id.* at 316:6-17.)

132.    Rudolf considers himself "a different employee than all the other employees" because of his interactions with Cole, among other assignments, which provided him with "the greatest insight . . . of bad actors returning."  (Ex. 11, 290:16-291:3.)

**B.    Alleged Board "Cover-Up"**

133.    As explained above, Rudolf alleges that he told Baugh on November 12, 2017 about the MedPartners excess policy and other unspecified "unlimited" policies.

134.    AIG's annual 10K and quarterly 10Q forms from 2004 until the third quarter of 2016 made disclosures about the Caremark action.  (Ex. 48 at AIG001361; Ex. 15; Ex. 24.)

135.    Rudolf was asked at his deposition: "But you're now alleging that the [unlimited] policies prior to 2000 violated some law, is that what you're alleging here?"  Rudolf answered, "I didn't say that."  (Ex. 12, 221:13-16.)

136.    Rudolf had no involvement in the writing of or issuance of the MedPartners excess policy or any knowledge regarding the purpose of the policy.  (*Id.* at 188:6-9, 188:21-189:5, 231:19-21.)  Rudolf had no involvement in (a) the negotiation of the settlement of the MedPartners action or (b) conversations with counsel regarding that litigation.  (*Id.* at 188:10-12, 191:20-192:5, 231:22-24, 382:17-19.)

137.    Rudolf's allegation that AIG's counsel and plaintiff's counsel in the MedPartners action "rigged" the MedPartners excess policy is based on what others told him between 2002 and 2008.  (*Id.* at 191:20-192:11, 237:5-17; 239:2-7.)

138.    Rudolf had no involvement in the defense of the Caremark action or knowledge of what was actually litigated:

a.    Rudolf has no knowledge of the discovery in the Caremark action – depositions or documents exchanged by the parties.  (*Id.* at 234:23-235:5.)

b.    Rudolf does not know if the issue of whether the plaintiff's attorneys in the MedPartners action colluded with defendants was actually litigated in the Caremark action.  (*Id.* at 235:21-236:19.)  Rudolf does not know whether the plaintiffs in the MedPartners action ever brought a lawsuit against their counsel.  (*Id.* at 249:11-24.)

c.    Rudolf does not know what issues were involved in the Caremark action. (*Id.* at 264:22-265:3.)

d.    Rudolf did not know what the Caremark settlement was about as of July 2016 (*Id.* at 265:17-19; Ex. 33.)  Nor does Rudolf know how the settlement allocation was negotiated in resolving the Caremark action.  (Ex. 12, 333:5-8.)

139.    Rudolf has no knowledge of how AIG's Board was briefed about the allegations in the Caremark action other than through documents produced in this litigation.  (*Id.* at 248:17-249:5.)  Rudolf does not know what the Board was told about any "unlimited" insurance policies. (*Id.* at 250:12-15, 250:24-251:4.)  Rudolf does not know what the Board was told about any communications between counsel in the MedPartners action.  (*Id.* at 250:19-23.)  Rudolf does not know what the Board was told about the settlement of the Caremark action other than through documents produced in this litigation.  (*Id.* at 251:5-17.)

140.    The Caremark action, including the MedPartners excess policy, "wasn't an issue" for Rudolf from 2008 until 2017.  (*Id.* at 363:10-19.)



(Ex. 18 at AIG002932.)

(*Id.*)

(*Id.*)

(*Id.* at AIG002931.)

(*Id.*)  (*Id.* at AIG002930.)

142.    Responsibility for the Caremark action settlement primarily rested with Tatulli and Rick Woollams who retired as Chief Claims Officer of Commercial Insurance in mid-2016 after the Caremark action settlement was publicly announced in June 2016.  (*Id.* at AIG002931; Ex. 13, 155:10-17, 156:21-157:4, 175:9-23; Ex. 19; Ex. 20.)

143.    After his communications in the February 1, 2016 email chain, Rudolf was not updated by anyone and was "out of the loop." (Ex. 12, 260:16-21.)  Rudolf did not write to anyone about the email, and nothing about the email made Rudolf run to speak to someone about it.  (*Id.* at 261:10-14, 266:7-11.)

144.     Rudolf does not know what the February 1, 2016 email was specifically in reference to.  (*Id.* at 266:17-22.)  Rudolf does not know whether the President and CEO of CVS Health spoke with a then-member of the AIG Board in connection with the February 1, 2016 email.  (*Id.* at 260:22-24; *see also* ECF 41 ¶ 78.)

145.     Rudolf received an email on July 19, 2016 from Steven Walsh ("Walsh"), who was a former colleague of Rudolf's.  (Ex. 33 at AIG002935; Ex. 12, 261:20-21.)  The email consisted of Walsh forwarding to Rudolf a news alert of the Caremark action settlement and writing, "Any time I see this I think of you for some reason."  (Ex. 33 at AIG002935.)  Rudolf did not reply to Walsh's email.  (Ex. 12, 262:19-20.)

146.     Baugh was not involved in the Caremark action or the settlement of the action and is not familiar with the matter.  (Ex. 2, 201:3-8, 213:16-18, 215:16-18.)

147.     Rudolf testified that at the time Cole was serving as Independent Consultant, Rudolf was aware of "unlimited" insurance policies, such as the MedPartners excess policy; Rudolf asserts that all of them pre-dated the year 2000.  (Ex. 12, 187:11-23.)  Rudolf did not report any supposed concerns about the MedPartners excess policy or any "unlimited" policies to Cole.  (*Id.* at 192:18-20.)  Rudolf alleges that he did not do so because they pre-dated January 1, 2000, which, according to him, began the scope of the transactions Cole reviewed.  (*Id.* at 192:21-193:4.)

**XI.     A Planned Reorganization of AIG's Commercial Insurance Business Would Have Impacted Rudolf's Role**

148.     In the first part of 2017, Brian Duperreault became the new CEO of AIG, Inc.  (Ex. 12, 138:5-13; Ex. 2, 233:15-18.)

149.     The business area in which Rudolf worked underwent a reorganization, beginning in earnest in or about Fall 2017 and continuing into 2018.  (Ex. 69 ¶¶ 6, 7; Ex. 13, 27:13-28:25.)

150.    In September 2017, AIG announced that it would no longer have a Commercial Insurance segment and that it would transition to "General Insurance," which would be led by a newly-appointed CEO, Zaffino.   (Ex. 37 at AIG003476-77; *see also* Ex. 13, 27:13-28:25.) Commercial Insurance was renamed as General Insurance and reorganized away from global products and global functions to North America and International.   (Ex. 69 ¶ 6; *see also* Ex. 5, 194:14-23.)

151.    As stated above, Schimek's employment ended effective October 31, 2017.   (JSUF ¶ 14.)   On November 7, 2017 it was announced that Baugh would become the CEO of General Insurance North America and Johnson would be leaving AIG.   (Ex. 38; Ex. 69 ¶ 7.)

152.    In connection with Johnson's separation, Grabek took over management of the client engagement role (led by Rudolf) and broker engagement role (led by Propis).   (Ex. 5, 60:6-62:9.)   It was understood that Grabek's role as manager of these functions was temporary and that those direct reports, including Rudolf, would be "migrating elsewhere" as the new organization was put in place.   (*Id.* at 61:18-62:9.)

153.    By mid-November 2017 it was known that "the ancillary responsibilities that [Rudolf] had . . . would have definitely been subject to change [by being] moved back to the product towers."   (Ex. 7, 83:2-11.)   A natural outcome of this was that Rudolf's role would become more narrow; his client engagement responsibilities would survive but the other responsibilities that were assigned to him in 2016 and 2017 were likely going to be eliminated.   (*Id.* at 83:12-84:8; Ex. 8, 66:16-67:9; 67:17-69:1; Ex. 69 ¶¶ 10, 11.)

154.    Rudolf was aware as of his Sunday, November 12, 2017 telephone conversation with Baugh that AIG was planning and executing a reorganization of its Commercial Insurance

business based on widely distributed emails from senior executives alone.  (Ex. 37 at AIG003476-77; Ex. 38; Ex. 39.)

## XII.    The Reasons Baugh Accepted Rudolf's Resignation[20]

155.    Baugh and Baugh alone made the decision to accept Rudolf's resignation (or, as Rudolf claims, to terminate his employment).  (ECF 41 ¶ 6; Ex. 69 ¶ 5; Ex. 66 ¶ 10; Ex. 11, 23:17-22, 64:11-19, 67:1-9; Ex. 2, 254:4-7; Ex. 45 at AIG00772 ("Lex has decided to accept John Rudolf's resignation . . . .").)

156.    Based on the urgency with which Rudolf scheduled the November 12, 2017 telephone call and Rudolf's statements to Baugh during the telephone conversation, Baugh believed that Rudolf was resigning because he was unhappy with his job and the toll it was taking on him and his family.  (Ex. 2, 138:7-11, 141:14-17, 249:13-15, 264:22-266:9; Ex. 3, 309:21-22.)  In particular, Baugh understood that Rudolf did not like the fact that his job had taken away so much of his time with his family, he did not think he had been properly recognized for what he contributed, and felt deprived from being around to watch his children grow up; in particular, Rudolf mentioned his son.  (Ex. 2, 140:21-141:10, 248:24-249:11.)  During the call, Rudolf specifically said that "John Rudolf has given more to AIG than AIG has given to John Rudolf." (Ex. 11, 349:18-24; Ex. 12, 338:16-339:7.)  In addition, Rudolf talked about the pressures of the travel, working long hours, and that his family was questioning why he had wasted 18 or 19 years of his life and whether he should continue to do so.  (Ex. 11, 350:2-351:11; Ex. 2, 140:24-141:10.)

---

[20] Whether Baugh accepted Rudolf's resignation or terminated him as Rudolf claims is not something this Court need decide to grant summary judgment in favor of Defendants because Defendants do not seek summary judgment on the issue of whether Rudolf suffered an adverse employment action as to his separation.  Rudolf's claims still fail as a matter of law for numerous reasons even if, as Rudolf claims, he was terminated and did not resign.

157.    Baugh clearly understood that the reason why Rudolf had to get in touch with him on that day, a Sunday, was that Rudolf had timing issues.  (Ex. 41 at AIG000001; Ex. 2, 248:24-249:4.)  Baugh understood based on Rudolf's statements during that conversation that Rudolf had two job offers.  (Ex. 2, 169:10-170:3.)

158.    Following the November 12, 2017 telephone call with Rudolf, Baugh advised various colleagues that Rudolf had resigned.  (*See* Ex. 43 at AIG000751 ("John just called me to render his resignation."); Ex. 3, 317:9-15, 318:1-3; Ex. 10, 43:12-13, 45:3-6, 69:21-23.)

159.    As described above, following his telephone call with Rudolf, Baugh wrote to his manager and senior HR person that, "**John just called me to render his resignation**. . . . **Regarding the resignation, I am inclined to accept it. John has not been happy for many years.  His current role is not going to survive and I suspect he will be even less happy to do a pure client management role.**  He needs to be based in Pittsburgh for personal reasons.  I think we also have others who could step into that role. . . . (Ex. 43 at AIG000751 (emphasis added).)

160.    Baugh understood as of his November 12, 2017 telephone conversation with Rudolf that Rudolf had been unhappy with his compensation and job grade.  (Ex. 2, 66:24-67:25, 146:25-147:19.)  Among other things:

      a.    In 2016, Rudolf approached Baugh and asked him to "put in a good word" for him to Schimek in relation to Rudolf's request that his compensation be increased, which Baugh did.  (Ex. 2, 67:1-25, 68:9-25, 196:11-18.)

      b.    In the spring 2017, Rudolf had approached Baugh to discuss his career and what should be his next step.  (Ex. 2, 69:17-70:15.)  Baugh understood that it was important to Rudolf to move into a role where he could be potentially given a higher job grade.  (*Id.*)  Baugh advised Rudolf that to receive a

higher job grade, he would need to look for a different role – a "pure promotion" – rather than try to change the job grade for his current position. (*Id.*; Ex. 11, 46:4-9, 171:13-23; Ex. 12, 124:7-25; Ex. 3, 345:4-10.)

c.    On May 10, 2017, Rudolf followed up on his conversation with Baugh to ask if he should pursue a career path in "Multinational," expressing that "it might be a way for [him] to accomplish [his] future career aspirations." (Ex. 32 at AIG000652.)  In his correspondence with Baugh, Rudolf also wrote that he believed his "value is greater than [he was] being recognized today" and that he was interested in multinational as a potential "path to reach [his] future financial aspirations." (*Id.* at AIG000651.)  Baugh suggested that Rudolf apply for a role in multinational.  Rudolf testified that he never applied for the role because he decided it would not help him reach his financial and career aspirations.  (Ex. 11, 200:8-14; Ex. 12, 122:9-124:25, 125:25-127:8.)

161.    Baugh made his decision regarding Rudolf's separation because of Rudolf's expressed discontentment with his job and the toll he said he was taking on him and his family. (Ex. 43 at AIG000751 ("Regarding the resignation, I am inclined to accept it.  John has not been happy for many years."); Ex. 2, 264:14-267:7; Ex. 3, 355:4-14.)

162.    Baugh understood as of November 12, 2017 that even if the organization encouraged Rudolf to continue his employment, and he chose to remain with the company, Rudolf's dissatisfaction regarding his compensation, job grade, and his concerns about his family were unlikely to be cured.  (Ex. 43 at AIG000751; Ex. 3, 307:4-21.)

47

163.    Baugh's decision was also based on the fact that the Commercial Insurance business in which Rudolf had worked was undergoing a significant reorganization and Baugh believed Rudolf's then-current role would diminish, as described above.  (Ex. 43 at AIG000751; Ex. 69 ¶ 5; Ex. 2, 154:6-18, 148:3-149:12; Ex. 3, 282:5-283:24, 339:18-340:1.)

164.    With the inevitable disappearance of many of Rudolf's responsibilities, Baugh believed that Rudolf's dissatisfaction with his compensation was likely to continue and grow in the reorganized state where he would have had a role limited to client management.  (Ex. 43 at AIG000751; Ex. 2, 154:23-155:6; *see also* Ex. 8, 74:5-75:5.)

### XIII.   Rudolf's Role No Longer Existed After the 2017-2018 Reorganization

165.    On February 6, 2018, Baugh sent an email to the General Insurance organization about the evolving organizational design and operating model.  The email explained that General Insurance North America would include approximately eleven business segments, including realigning formerly global product segments to North America.  (Ex. 69 ¶ 10; Ex. 50.)

166.    By way of example, Tatulli became Head of Financial Lines, General Insurance North America in the reorganized structure.  (Ex. 69 ¶ 11; Ex. 50 at Rudolf 001631.)  With Tatulli at the helm of North America for Financial Lines, the North America oversight function Rudolf had been performing for Financial Lines on a global basis was redundant.  (Ex. 69 ¶ 11.)

167.    The same was true for the other functions Rudolf performed (what Rudolf describes as: (1) "Head of Bermuda CAT Excess (Financial Lines and Casualty)," (2) "Head of Financial Lines/Institutions," (3) "Head of Aerospace," (4) "Head of Trade Credit" and (5) "Head of Political Risk."))  (Ex. 69 ¶¶ 9, 11.)  No one assumed the North America oversight role Rudolf had been performing for Johnson after Grabek did.  (*Id.* at ¶ 11.)

168.    In connection with the reorganization, the "industry practices," such as retail, real estate and hospitality, were eliminated as well.  (Ex. 2, 153:22-25.)  Likewise, the "key priorities,"

as Rudolf has described them, of Industry, Product, Geography, and Multinational, were dissolved (however, the position of AIG's head of Multinational continued to exist).  (*Id.* at 175:4-14, 177:22-179:13; Ex. 7, 229:13-230:7.)

169.    After Rudolf's separation, Grabek assumed Rudolf's duties on an interim basis of indefinite length, and all of Rudolf's direct reports began reporting to Grabek.  (Ex. 40; Ex. 5, 107:7-108:1, 276:1-12, 283:1-14.)

170.    When Grabek assumed Rudolf's duties after Rudolf's separation, Grabek continued to perform the roles he had before taking on Rudolf's duties – as head of AIG's global distribution organization, among other management duties.  (Ex. 5, 64:7-66:4,196:15-197:8.)

171.    Then, over the course of 2018, those who formerly reported directly to Rudolf "migrated off into other parts of the new organization, once that organization was put in place." (*Id.* at 107:25-108:12.)

172.    From the time of Rudolf's separation until the end of 2019, excluding Grabek, no fewer than 11 different individuals managed the nine individuals who directly reported to Rudolf as of the time of his separation.  (Ex. 53.)

173.    Rudolf's role in client engagement continued to exist in the new General Insurance organization.  (Ex. 70 at No. 8.)  Hayes assumed the duties of Rudolf's client engagement role in or about the fall of 2018 as Client Engagement Leader.  (Ex. 69 ¶ 13; Ex. 70 at No. 8; Ex. 12, 151:20-152:17.)  Hayes reported to DeSett beginning in the fall of 2018.  (Ex. 69 ¶ 13.)  Hayes had a ███████████████ and Hayes's TDC in each of the years 2018, 2019, 2020 and 2021 was significantly lower than Rudolf's target TDC for 2017.  (Ex. 55 at AIG006685-88 (service date 08/04/2008).)

49

174.     Rudolf's Asian Client Solution responsibilities were assumed by Gambale in 2018. (Ex. 70 at No. 8; Ex. 5, 107:25-108:12.)  Gambale was a Zonal President, Northeast in 2018 and Zonal President, New York in 2019-2021.  (Ex. 55 at AIG006685-88 (service date 08/16/1999).) His job grade was ■ in each of those years.  (*Id.*)

**XIV.   Plaintiff Has Received Extensive Fact Discovery**

175.     Plaintiff has taken eleven depositions (Baugh, Grabek, Johnson, Schimek, Zaffino, Joers, Curtin, Merritt, Naik, McMillan, and a deposition of McMillan pursuant to Rule 30(b)(6)). Baugh's deposition was conducted over the course of two days.  (Ex. 73 ¶ 3.)

176.     Plaintiff served six separate document requests during discovery in this action, propounding 165 individual requests for documents (exclusive of subparts).  Plaintiff also served 24 interrogatories (exclusive of subparts).  (Ex. 73 ¶ 4.)

Dated: August 9, 2022                    Respectfully submitted,


                                         */s/ Kevin B. Leblang*
                                         Kevin B. Leblang (NY 1999507)
                                         kleblang@kramerlevin.com
                                         Izabel P. McDonald (NY 2515724)
                                         imcdonald@kramerlevin.com
                                         (Each admitted pro hac vice)

                                         Jaime S. Tuite (PA 87566)
                                         jaime.tuite@bipc.com
                                         Marjorie F. Bagnato (PA 313557)
                                         marjorie.bagnato@bipc.com

                                         BUCHANAN INGERSOLL & ROONEY PC
                                         Union Trust Building
                                         501 Grant Street, Suite 200
                                         Pittsburgh, PA 15219-1410
                                         Phone: 412-562-8800
                                         Fax: 412-562-1041

                                         *Attorneys for Defendants*