**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JOHN RUDOLF,                                )
                                            )
            Plaintiff,                      )        Civil Action No. 19-1468
                                            )        Magistrate Judge Maureen P. Kelly
      v.                                    )
                                            )
AMERICAN INTERNATIONAL GROUP,               )        Re: ECF No. 177
INC., NATIONAL UNION FIRE                   )
INSURANCE COMPANY OF                        )
PITTSBURGH, PA and ALEXANDER                )
BAUGH,                                      )
                                            )
            Defendants.                     )

## MEMORANDUM OPINION

Plaintiff John Rudolf ("Rudolf") initiated this action against Defendants American International Group, Inc. ("AIG"), National Union Fire Insurance Company of Pittsburgh, PA ("NUFIC"), and Alexander Baugh ("Baugh") (collectively, "Defendants") arising out of allegations that he was unlawfully terminated from his employment in violation of the Sarbanes-Oxley Act ("SOX"), the False Claims Act ("FCA"), the Age Discrimination in Employment Act ("ADEA"), Title VII of the Civil Rights Act, and the Pennsylvania Human Relations Act ("PHRA"). Rudolf also brings claims for Equal Pay Act violations, intentional interference with contractual relations, fraud, wrongful discharge, and breach of contract. ECF No. 41.

Presently before the Court is Defendants' Motion for Summary Judgment. ECF No. 177. For the reasons below, the Motion for Summary Judgment is granted in part and denied in part.[1] The Court grants summary judgment as to all claims, except (1) Rudolf's SOX whistleblower

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties voluntarily consented to having a United States Magistrate Judge conduct all proceedings in this case, including the entry of a final judgment. ECF Nos. 15 and 16.

retaliation claim (Count I), and (2) his age discrimination claims under the ADEA and PHRA (Counts III and VII) related to his alleged termination.

## I.   FACTUAL BACKGROUND

### A.  The Parties

Rudolf is a 58-year-old senior insurance executive who was formerly employed by AIG and/or NUFIC[2] from 1994 until November 20, 2017.  ECF No. 175 ¶ 1; ECF No. 205 ¶ 2.  Rudolf was based for a number of years in AIG's New York office and later relocated to AIG's offices in Pittsburgh, Pennsylvania in 2006.  ECF No. 175 ¶ 11.

AIG is a publicly held corporation headquartered in New York, whose subsidiaries and affiliates provide a wide range of property casualty insurance, life insurance, retirement products and other financial services.  ECF No. 175 ¶ 3; ECF No. 47 ¶ 2.  In 2013, the Financial Stability Oversight Council of the United States Treasury Department designated AIG as a systematically important financial institution ("SIFI").  ECF No. 175 ¶ 12.  AIG's SIFI status was removed in September 2017.  Id.

NUFIC is a subsidiary of AIG, which is incorporated in Pennsylvania.  Id. ¶ 2; ECF No. 205 ¶ 4.  NUFIC's financial information is included in AIG's consolidated financial statements. ECF No. 205 ¶ 4.

Baugh began working for AIG in June 1983.  ECF No. 175 ¶ 4; ECF No. 22-1 ¶ 3.  Rudolf claims that Baugh became his supervisor in November 2017.[3]  ECF No. 205 ¶ 12.  Shortly

---

[2] The parties agree that Rudolf was employed by NUFIC.  Defendants dispute Rudolf's claim that he was also employed by AIG. ECF No. 218 ¶ 2. AIG maintains that it is a holding company with no employees. Id.; ECF No. 215-9 ¶ 3.

[3] Defendants agree that Baugh was senior to Rudolf, but they dispute that he was Rudolf's direct supervisor.  ECF No. 218 ¶ 12.  According to Baugh, he was Rudolf's "second-line manager," as Rudolf was part of "his team" but reported directly to Stephen Grabek, who in turn reported to Baugh.  ECF No. 22-1 ¶ 7.

thereafter, he alleges that Baugh wrongfully terminated him for reporting wrongdoing and because of his age.[4]  ECF No. 218 ¶ 12.  Defendants contend that Rudolf was an unhappy employee who resigned, and that Baugh simply accepted this resignation.  ECF No. 185 at 12.[5]

### B. AIG's Code of Conduct/Employee Handbook

#### 1. Reporting Misconduct

The AIG Code of Conduct requires employees to report allegations of fraud, including accounting fraud.  Failure to do so by any employee is subject to discipline, including termination.  ECF No. 209-8 at 5-8.  Employees are instructed they "must not conduct [their] own investigation," rather, the employee must "retain any information (physical or electronic) relating to such suspected fraud, and provide it to the appropriate investigative group."  Id. at 6; ECF No. 205 ¶ 119.

As an employee, Rudolf was required to complete a Code of Conduct Certification annually.[6]  ECF No. 184 ¶ 70.  He completed Code of Conduct Certifications from 2012 through 2016.  In each of those years, Rudolf answered "no" to the following question: "Do you have any violations of the Code of Conduct, AIG policy, law or regulation to report?"  Id.  He did not complete a Code of Conduct Certification for 2017.  Id.

AIG's Code of Conduct includes a "Non-Retaliation Policy," which prohibits retaliation against any employee for making a good faith report of actual or suspected violations of the Code of Conduct, other AIG Policy or applicable laws and regulations.  ECF No. 205 ¶ 172.

---

[4] Rudolf also brings claims based on gender discrimination and unequal pay.  However, he does not oppose Defendants' Motion for Summary Judgment as to those claims.  ECF No. 206 at 17 n. 5 and 51-53.

[5] While the parties dispute whether Rudolf was terminated or resigned, they agree that it was Baugh's decision whether to end Rudolf's employment.  ECF No. 218 ¶ 5.

[6] AIG's Code of Conduct Certification states that "all officers and employees of AIG and its subsidiaries are subject to the AIG Code of Conduct."  ECF No. 179-12 at 2.

### 2.  At-Will Disclaimer

The AIG Employee Handbook for 2017 stated, "[y]our employment with AIG is 'at-will.'"[7] ECF No. 184 ¶ 71-72.  The Handbook included a disclaimer that it was "neither a contract of employment, nor a legally binding agreement and does not create a contract for wages or any other working conditions."  Id. ¶ 72.

### C.  Rudolf's Work for the Loss Mitigation Unit ("LMU")

Rudolf held several titles and roles throughout his employment, including President of the Loss Mitigation Unit ("LMU") from 1999 to 2006.  ECF No. 205 ¶ 14.   The LMU was formed in the 1990s, and it primarily marketed products involving retrospective elements, meaning that the client paid a premium for coverage of a known, potential loss event.  ECF No. 205 ¶ 14; ECF No. 209-6 at 48.

The LMU's products included: (1) litigation buyouts (clients paid AIG to assume anticipated or active litigation and cover any losses); (2) loss portfolio transfers (AIG insured a book of incurred but unsettled loses); and (3) claims workouts (transactions involving negotiated resolutions of claim disputed between AIG and its clients where, in some cases, AIG agreed to pay the disputed claim in exchange for additional or above-market premiums on new or renewed policies).  ECF No. 205 ¶ 15; ECF No. 209-6 at 8, 48.

### 1.  Brightpoint Transaction

Shortly after Rudolf became President of the LMU, the Securities and Exchange Commission ("SEC") initiated an investigation of the LMU based on its 1998 transaction with Brightpoint, Inc. ("Brightpoint").  ECF No. 205 ¶ 21.  The SEC found that AIG engaged in fraud

---

[7] AIG's employee handbook states that it applies to "American International Group, Inc. and all of its wholly-owned subsidiaries." ECF No. 179-8 at 4.

by marketing a purported "insurance" product that Brightpoint used to report false and misleading information to the public, which the SEC characterized as follows.

> AIG developed and marketed a so-called "non-traditional" insurance product for the stated purpose of "income statement smoothing," *i.e.*, enabling a public reporting company to spread the recognition of known and quantified one-time losses over several future reporting periods. In this case, the key to achieving the desired accounting result was to create the appearance of "insurance." Specifically, AIG agreed to make it appear that the "insured" (Brightpoint) was paying premiums in return for an assumption of risk by AIG. In fact, Brightpoint was merely depositing cash with AIG that AIG refunded to Brightpoint.
>
> AIG issued the purported insurance policy to Brightpoint for the purpose of assisting Brightpoint to conceal $11.9 million in losses that Brightpoint sustained in 1998 . . . As a result of the transaction, Brightpoint's 1998 financial statements overstated Brightpoint's actual net income before taxes by 61 percent.

ECF No. 208-4 at 49.

### 2. DOJ Independent Monitor

Based on its investigation findings, the SEC assessed a $10 million penalty against AIG in 2003. ECF No. 205 ¶¶ 21-22. AIG entered into a deferred-prosecution agreement, which included agreeing to retain an independent monitor to review certain transactions to which AIG was a party since 2000. Id. ¶ 23. The Department of Justice ("DOJ") appointed attorney James Cole ("Cole") as the independent monitor. Id. ¶ 24.

Rudolf assisted Cole and his team from 2005 to 2007 in reviewing hundreds of complex transactions involving clients and AIG's internal record management controls. ECF No. 175 ¶¶ 9-10; ECF No. 205 ¶ 31. Cole told Rudolf that if he were ever to leave AIG under "questionable circumstances," he should contact AIG legal to set up an exit interview with the DOJ and SEC. ECF No. 205 ¶ 36.

### 3.   Other LMU Transactions

Along with Brightpoint, Rudolf claims that as President of the LMU he learned of other problematic LMU transactions.  In particular, senior managers engaged in multiple "rigged claim workout deals," in which AIG agreed to pay a disputed claim in exchange for an additional or above-market premium on a new unlimited policy.  ECF No. 41 ¶ 33; ECF No. 205 ¶ 54.

Rudolf alleges that such deals allowed both the insured and AIG to achieve unwarranted accounting or financial reporting benefits—namely, AIG recouped some or all of the paid claim by receiving additional insurance premiums that it accounted for as insurance revenue. Meanwhile, the insured spread the effect of the prior loss by characterizing it as a premium and expensing it over the term of its policy.  ECF No. 41 ¶ 34.

### a.   MedPartners Policy

As an example of an alleged "rigged claim workout deal," Rudolf refers to a policy the LMU issued to MedPartners, Inc. ("MedPartners") in the 1990s ("MedPartners Policy").  ECF No. 205 ¶ 45.  After MedPartners was sued in a securities class action lawsuit ("MedPartners action"), AIG agreed to pay the disputed claim in exchange for an additional premium on a new policy where AIG's risk was "unlimited" (in other words, it did not specify any maximum limit for benefits to be paid under the policy).  Id. ¶¶ 46-47.

Rudolf alleges that he heard from other AIG employees, including Mike Smith ("Smith") and Paul Lavelle ("Lavelle"), that AIG only agreed to this transaction because AIG employees had colluded with the class action plaintiffs' attorney to negotiate a settlement before issuing the MedPartners Policy.  Id. ¶ 48.

According to Rudolf, "[a]t the time," he reported the MedPartners transaction and "unlimited rigged transactions" to his supervisors and other senior managers, including his

supervisor, John Doyle, Bill Jacobi (Head of Claims), Lavelle (Head of NUFIC Claims), and Kris Moor (Head of Domestic Brokerage Group). Id. ¶ 60. But no action was taken. Id. ¶ 61. Rudolf did not report these transactions to the independent monitor. Id. ¶ 65.

### b. The CVS Litigation

In 2003, two putative class actions were filed against CVS Caremark Corporation ("CVS"), as the successor to MedPartners (the "CVS Litigation").[8] ECF No. 205 ¶ 49; ECF No. 184 ¶ 68. The CVS Litigation arose out of the settlement of the MedPartners action. ECF No. 184 ¶ 68. In the CVS Litigation, plaintiffs alleged that the judge approving the MedPartners Settlement was misled as to the extent of available insurance coverage, and he would not have approved the settlement had he known of the existence or unlimited nature of the MedPartners Policy. Id.; see also CVS Caremark Corp. v. Lauriello, 175 So.3d 596 (Ala. 2014).

The court in the CVS litigation granted preliminary approval of a settlement on June 1, 2016, and final approval was granted on August 15, 2016. ECF No. 184 ¶ 69. Rudolf learned of the settlement on July 19, 2016 by email from a former AIG colleague, Steve Walsh ("Walsh"). ECF No. 209-3 at 78, 81. Walsh forwarded notice of AIG's recent settlement with the message, "[a]ny time I see this I think of you for some reason." ECF No. 205 ¶ 91.

After he received Walsh's email, Rudolf testified that he approached his then supervisor, Jeremy Johnson ("Johnson"), President of U.S. Commercial Insurance, in August 2016 suggesting that the settlement might relate to "some of [his] LMU work," that he had concerns about whether the "true nature of . . . everything was disclosed," and that he would "hate to see Steve Miller [the

---

[8] This action was originally filed against Caremark Rx as a successor entity to MedPartners. This entity later merged with CVS and became the CVS Caremark Corporation. See Lauriello, Brief of Appellees, 2013 WL 4397962 (Ala. July 12, 2013). The parties refer to this entity/litigation as CVS or Caremark. For simplicity, the Court refers to this entity as CVS.

AIG Board Chairperson] or AIG commit a new fraud." ECF No. 209-3 at 83. According to Rudolf, Johnson "brushed [him] off," saying he did not have any knowledge of those years. Id.

Rudolf testified that he also approached his then second-line supervisor Robert Schimek ("Schimek"), former CEO of Commercial Insurance, in October 2016 with a copy of Walsh's email. Rudolf stated that he thought it was "related to LMU and related to CVS," and that Rudolf wanted to "make sure Steve Miller and the Board . . . were told the truth about the true nature of the underlying CVS transaction where, you know, the transaction was rigged." ECF No. 209-3 at 86; ECF No. 205 ¶ 10. Schimek responded that he would "take care of it." Id. Schimek recalled Rudolf discussing "transactions that were not appropriately reported," and that he mentioned the CVS transaction. ECF No. 209-15 at 12, 14.

### D. Compensation

At AIG, an employee's compensation is made up of three parts: salary, short-term incentive pay ("STI") (cash bonus), and long-term incentive ("LTI") award (non-cash deferred compensation that vests over time). ECF No. 184 ¶ 17. Taken together, these components make up an employee's "total direct compensation" ("TDC"). Id.

Prior to 2013, AIG implemented a job grading system in which every type of job at AIG was grouped, coded, and evaluated for its impact to the organization. Id. ¶ 20. As a result of this process, each type of job has a job code and job grade. Id.

Compensation is based, at least in part, on an employee's job grade.[9] Id. ¶ 19. For each job grade, there is a corresponding range for base salary, target STI, target LTI, and target TDC.

---

[9] The parties dispute whether Rudolf's compensation as a managerial employee was also based on geographic region, in addition to job grade. ECF No. 203 ¶ 19.

Id. ¶ 21.  Roles that are job grade 27 and above, however, are market-priced and benchmarked directly.  Id. ¶ 23.

In 2013, Rudolf was promoted from a job grade 24 to a job grade 26.  ECF No. 175 ¶ 13. In 2016, AIG restructured and reduced its work force through the "Simplify AIG" initiative. Rudolf received additional responsibilities, and he was named Head of Client Engagement, Asian Client Solutions, and certain Industry Segments.  ECF No. 205 ¶ 70;[10] ECF No. 184 ¶ 7.  However, Rudolf's base salary and job grade did not increase.  He remained a job grade 26 until his employment ended in November 2017.  ECF No. 175 ¶ 13.

Rudolf was unhappy with his compensation and expressed his displeasure to multiple people, including over the course of 2016 and 2017 to his supervisors Johnson and Schimek.  ECF No. 175 ¶¶ 16-17; ECF No. 184 ¶ 30.  In September 2016, Nonna Shikhman ("Shikhman") of AIG Compensation analyzed Rudolf's compensation at Johnson's request.  ECF No. 184 ¶ 33.  Rudolf received an increase to his incentive compensation, resulting in an overall 15% increase in his target TDC.  ECF No. 184 ¶ 33; ECF No. 203 ¶ 33.

Several months after his target TDC was increased, in April 2017, Rudolf approached Schimek and spoke with him about his continued dissatisfaction with his compensation.  ECF No. 184 ¶ 36.  Based on this conversation, Schimek considered Rudolf to be "at risk" for leaving the organization.  Id.  According to Rudolf, in March or April 2017, Schimek directed HR to do a salary and job grade review, which did not result in any adjustment to Rudolf's TDC or job grade.

---

[10] Defendants dispute this fact, but the basis for this dispute is unclear.  Defendants refer the Court to their own description of Rudolf's roles throughout his employment, but they agree that Rudolf held the role of Head of Client Engagement (U.S. and Canada) as of 2013, and that he took on other responsibilities in 2016 that included client/engagement distribution duties Rudolf has described as "Asian Corporate/Client Solutions" and "Head of Industry" responsibilities.  ECF No. 218 ¶¶ 6, 70.

Id. Instead, he was offered a continuity award, to be paid out over three years. Id.; ECF No. 203 ¶ 36.

Rudolf accepted the continuity award, but he stated that he considered it a "temporary solution" and remained unsatisfied with his compensation. ECF No. 184 ¶¶ 41-43. In his September 2017 performance check-in conversation, he wrote, "[m]y biggest disappointment is compensation and job grade." Id. ¶ 43.

Rudolf claims that he was undercompensated compared to his younger and female counterparts as a result of discrimination.[11] For example, he refers to evidence that a nine-year younger direct report was making more than him. ECF No. 205 ¶ 73. He also refers to a younger female who was considered a peer and counterpart who received better compensation. Id. ¶¶ 74-75. As for this female employee, Rudolf claims that Johnson told him that no matter what Rudolf did, she "was going to make more money [than him] for less responsibility." Id. ¶ 76. Although Rudolf generally raised complaints about his compensation, he did not specifically report to HR that he was discriminated against based on his age or gender. ECF No. 184 ¶ 44.

### E. November 10, 2017 Conference Call

In early November 2017, Baugh became Rudolf's supervisor. ECF No. 205 ¶ 12. Baugh, in turn, reported to the new CEO of Commercial Insurance, Peter Zaffino ("Zaffino"). Id. ¶ 13.

On November 10, 2017, Zaffino and Baugh co-hosted a conference call with a large group to introduce Baugh in his new position. ECF No. 184 ¶ 77. During this call, it was announced that AIG was creating a Global Head of Claims role, and that two former AIG executives were candidates for the position. Rudolf was concerned that AIG was considering rehiring Smith or

---

[11] However, Rudolf does not oppose summary judgment relative to this age and gender discrimination claims based on unequal compensation. ECF No. 206 at 17 n. 5 and 51-53.

Lavelle—former employees whom Rudolf considered to be "bad actors" based on their alleged involvement in policies like the MedPartners excess policy.  Id.

### F.  November 12, 2017 Communications

#### 1.  Rudolf's Communications with Baugh

On Sunday, November 12, 2017, Rudolf texted Baugh.  ECF No. 175 ¶ 18.  He requested a meeting with Baugh in New York City to discuss "some developments with me."  ECF No. 179-22 at 2.  Baugh responded that he was unavailable to meet on Monday in New York, but that he could be available on Tuesday.  Id.  Citing "timing issues," Rudolf requested a phone conversation, to which Baugh agreed.  Id. at 2-3.

That morning, Rudolf and Baugh spoke for about 15 minutes.  ECF No. 184 ¶¶ 82-83. During the call, Rudolf said he wanted to talk for three reasons: (1) to reschedule his year-end check-in conversation, which had been cancelled because of Johnson's departure; (2) to discuss Rudolf's concern about "bad actors" returning to AIG; and (3) to explain why the "bad actors" should not come back, he wanted to discuss frauds that had occurred.  Id. ¶ 83.

According to Rudolf, Baugh said he did not understand what Rudolf meant by "bad actors returning."  Id. ¶ 84.  Rudolf responded that, in order to understand this concern, Baugh first had to understand "[Rudolf's] previous work with the Department of Justice and SEC, including . . . unlimited rigged claim workout deals and CVS."  Id.

Baugh asked Rudolf to identify the "bad actors."  Rudolf named Smith and Lavelle, among others.  Id.  After Baugh asked Rudolf to explain what Smith and Lavelle did, Rudolf said that Smith and Lavelle were not "the ones that originated the fraud," but that others had "rigged" transactions.  Id.  He pointed to the MedPartners policy as an example, and he noted that it was

listed in AIG's 10-K annual statement for over 10 years.  Id.  Rudolf told Baugh "that the unlimited limits in CVS transactions were rigged."  Id.

Rudolf told Baugh that Smith, Lavelle, and others "discovered the frauds and were aware of the frauds" and that "eventually . . . the AIG board was duped," meaning that the true nature of the MedPartners excess policy was covered up when settling the CVS action.  Id.

Baugh told Rudolf he still did not understand the "frauds."  Id.  Rudolf responded that if the "bad actors" returned, then it "might be a sad day for the Rudolf family" because the "bad actors" would "have another bite at the apple," and Rudolf would have to consider leaving AIG. Id.  Rudolf said that he likely used the language "family first," and he discussed with Baugh the negative impacts that his job, such as the hours and travel, were having on his family and the toll it took on him and his family to work this way.  Id.  Rudolf added that two employers, one on Long Island and one in Pittsburgh, had shown interest in hiring him if he left AIG.  Id.

Rudolf also told Baugh that if he were to leave AIG under "questionable circumstances," he had agreed with Cole to contact AIG Legal, which would in turn put him in contact with the DOJ/independent monitor.  Id.  Rudolf told Baugh this conversation "would be tough because he would have to disclose new discovery/concerns with past transactions that could damage AIG." Id.  Rudolf believed that "questionable circumstances" under which he would need to have an exit interview would include the "bad actors" returning.  Id.

At some point, Baugh and Rudolf discussed how Rudolf leaving AIG would impact the variable parts of his compensation, such as his pension and LTI.  Id.  Baugh concluded the call by suggesting Rudolf should contact HR to determine the impact on his compensation and other variables if he were to consider leaving AIG.  Id.

Following this call, Baugh texted Rudolf:

> John – I sensed you were not satisfied with our conversation and that you are very
> upset.  I heard you say family first and I fully agree with that.  I also sensed you are
> telling me that your resignation will have grave consequences for AIG and while
> trying not to appear thick, I really don't follow.  I think it's terrible that you feel
> you have 19 lost years.  That only allows me to try to help you in the way you are
> asking for help – to exit.  It sounds to me like an on boarding session in Philadelphia
> is not your most crucial issue right now.  The offer to meet at 8:00 a.m. Tues. still
> stands.  Entirely at your discretion.  Lex.

ECF No. 179-22 at 4.

In response, Rudolf agreed to meet Baugh in New York the following Tuesday, November

14, 2017, to continue their discussion.  Id.

### 2.  Rudolf Emails HR about Potential Resignation

After speaking with Baugh, Rudolf emailed Yogita Naik ("Naik"), Senior Human

Resources ("HR") Business Partner, to ask what would happen to his non-qualified pension,

retention bonus (continuity award) and LTI "if [he] were to resign from AIG[.]"  ECF No. 208-4

at 162-63.  Naik responded that employees typically lose unvested compensation elements like

LTI, which are intended to be retention tools, but that HR would need to review the specific details

of his employment to fully respond.  Id.

### 3.  Baugh Internally Reports Rudolf's "Resignation"

After he spoke with Rudolf, Baugh emailed his supervisor, Zaffino, explaining that Rudolf

had called to "render his resignation" and that Baugh was "inclined to accept it."  Baugh wrote:

> John just called me to render his resignation.  At the same time he is obliquely
> referring to the fact that he is a Govt witness into the DOJ investigations, that he is
> required to give them an exit interview and that there will be negative ramifications
> for AIG from such an interview.

> I offered to sit down with him again Tuesday morning at 8:00.  Apparently he had
> his own lawyer but would like AIG to reimburse his costs.

> Regarding the resignation, I am inclined to accept it.  John has not been happy for
> many years.  His current role is not going to survive and I suspect he will be even

less happy to do a pure client management role. He needs to be based in Pittsburgh for personal reasons. I think we also have others who could step into that role.

Regarding the legal issues. I am a little in the dark. [Rudolf] was in the loss mitigation/loss buy out group and this area was investigated by the SEC/DOJ. I did go through a deposition while in Paris, but I was not close to what went on in the US. Mike Leahy may be the AIG employee with the best knowledge here and I plan to give him a call. John is telling me there was a cover up by Kris Moor, John Doyle, Peter Eastwood, Mike Smith and Paul Lavelle and that they did not tell the Board the truth. However he was all over the place on the call and I'm wondering what he is really after.

ECF No. 179-24 at 3.

Following this email, Baugh also apprised the Deputy General Counsel and Head of Litigation, Mike Leahy ("Leahy"), about his call with Rudolf, who in turn instructed Andrew Curtin ("Curtin"), Senior Managing Director and Global Head of Investigations of the Global Investigative Group ("GIG"), to contact Rudolf and investigate his allegations to Baugh. ECF No. 184 ¶ 96; ECF No. 78-2 ¶ 6.

### G. November 13, 2017 Internal AIG Discussions

On November 13, 2017, Baugh, Naik and Ryan Merritt ("Merritt"), HR Business Partner, had a phone call. ECF No. 205 ¶ 155. After this call, Merritt emailed in-house counsel Annette Bernstein ("Bernstein") and Rick Joers ("Joers"), then AIG's Head of Employee Relations, Americas, stating that "[i]f John does not resign [during tomorrow's in-person meeting with Baugh,] [Baugh] will determine the risk of retaining [Rudolf] based on the conversation." Id. ¶ 156. Merritt also emailed Naik and Tracy McMillan ("McMillan"), then Head of HR, General Insurance, relaying that "[Rudolf] spoke to [Baugh] via phone on Sunday and said he was contemplating resigning and wanted to discuss the matter further in a face to face conversation with [Baugh]." Id. ¶¶ 159-160.

### H. GIG Investigation

Curtin contacted Rudolf by phone on Monday, November 13, 2017. ECF No. 175 ¶ 22. On November 13, 2017 and November 14, 2017, Rudolf had six discussions by phone and in person in New York with Curtin and other members of AIG's GIG team, Kristen Lau and Greg Lisa. Id. ¶ 23; ECF No. 209-7 at 77-89.

#### 1. Anti-Retaliation Policy

GIG members informed Rudolf over the phone on November 13, 2017, and again in person on November 14, 2017, that AIG "has a strict anti-retaliation policy to protect anyone who reports wrongdoing." ECF No. 175 ¶ 24. Rudolf acknowledged that he understood. ECF No. 184 ¶ 112.[12] According to Rudolf, he cooperated in the GIG investigation in reliance on the promise that he would not be subject to retaliation. ECF No. 205 ¶ 171.

#### 2. Rudolf's Allegations of AIG Misconduct

In his conversations with the GIG team, Rudolf outlined his work for the LMU during the SEC's investigation arising out of the Brightpoint transaction. He discussed three types of LMU transactions, including claim workout deals. ECF No. 209-1 ¶ 33; ECF No. 205 ¶¶ 175-76. Rudolf also referred to six "unlimited" policies, including the MedPartners Policy. ECF No. 205 ¶ 177. Rudolf said that LMU management "wanted to do big premium with little risk," and that "the guys thought the transaction was so riskless and put up unlimited limits." Id. ¶¶ 177-78; ECF No. 209-7 at 79. He also said AIG executives were "bid-rigging the claims settlements," and "conspired with claimants" to negotiate the settlement before "they put up the unlimited limits." ECF No. 205 ¶ 180; ECF No. 209-7 at 83. Rudolf said he did not believe the Board of Directors was informed of the bid-rigging, and he discussed that the CVS Litigation may have been improperly

---

[12] The *Upjohn* warning and notice of AIG's anti-retaliation policy are included in a document that appears to have been initialed by GIG members but not Rudolf. ECF No. 209-7 at 81.

15

removed from the 10-K.  ECF No. 209-1 ¶ 39; ECF No. 205 ¶¶ 187, 190; ECF No. 83, 90.  Rudolf

also states that he shared his concern that the "CVS/MedPartners fraudulent transaction constituted

a serious reputational risk and threatened its de-SIFI status."  ECF No. 209-1 ¶ 35.

According to Rudolf, he believed the "rigged claim workout deals" he identified were

improperly treated as insurance for accounting purposes instead of deposits in violation of

generally accepted accounting principles ("GAAP"), which in turn, constitutes a misleading or

inaccurate financial statement in violation of SEC rules and regulations, as well as inaccurate 10-

K and 10-Q statements.  Id. ¶ 26.

## I.  Rudolf's Other November 14, 2017 Meetings in New York

### a.  Meeting with Baugh

While he was in New York, Rudolf also met with Baugh on Tuesday, November 14, 2017

around 8:00 a.m.  ECF No. 175 ¶ 25.  During this meeting, Baugh said he told Zaffino that Rudolf

had resigned.  ECF No. 184 ¶ 98.  Rudolf denied that he had resigned.  Id.  Rather, he told Baugh

that he had "reported frauds and how [he] thought the AIG board was duped, including CVS, which

was in the 10-K restatement."  ECF No. 180-5 at 103-04.  He also stated that he expressed concerns

about "ongoing frauds with the 10-K and SIFI status," and that he provided a "resummary of what

we said on Sunday, in terms of CVS MedPartners being an unlimited limits rigged transaction that

was fraudulently reported in AIG's 10-K."  Id. at 105.

### b.  Meeting with Joers

Later that same day, Rudolf met with Joers.  ECF No. 175 ¶ 26.  Rudolf reiterated that he

did not resign.  Rudolf claims that he told Joers that Baugh was in charge of the area where the

"fraud" originated, and Joers threatened Rudolf that he should "watch what [he] was saying."  ECF

No. 209-1 ¶¶ 49-50.

After this meeting, Joers sent an email at 5:28 p.m. to Bernstein, Naik, and Merritt. Joers explained that he told Rudolf he could lose his non-qualified retirement benefits. Joers also wrote that:

> [Rudolf] has become quite vocal that he never resigned. He's calling it a misunderstanding.
>
> He also claims he has been fully cooperative with [Curtin].
>
> I also talked to [Curtin]. He agrees that [Rudolf] answers every question, but has not really provided anything new/ongoing that [Curtin] can investigate.
>
> I left it that I would talk to him at some point tomorrow.
>
> My impression is that he has become very concerned about how this is playing out. He has a lot to lose here beside salary: STI, LTI, Continuation bonus, Non-qualified pension. He understands that resignation would be costly.

ECF No. 179-6 at 4.

Naik forwarded Joers' email to Baugh on November 14, 2017 at 7:57 p.m. and wrote, "[i]t is now a business decision on how you would like to proceed with [Rudolf's] resignation." ECF No. 184 ¶ 102. Baugh also learned about the outcome of the GIG investigation in a meeting with HR. ECF No. 209-10 at 66.

### J. November 15, 2017 Communications

#### 1. Baugh's Decision about Rudolf's Employment

Baugh, Bernstein and Naik had a call about Rudolf's employment on Wednesday, November 15, 2017 at 11:00 a.m. ECF No. 205 ¶ 248. During this call, Baugh said Rudolf had talked about fraud and was referred to Leahy. Id. ¶ 249. Baugh was asked if he wanted to retain Rudolf, but he declined. Id. ¶¶ 251-252. Baugh said that while Rudolf "has done good things for the company," he was "not super productive recently" and spends "most of his time on how unhappy" he is. Id. ¶ 252.

After this call, Naik emailed McMillan and Merritt noting that Baugh "has decided to accept John Rudolf's resignation and offer a standard package to John, given his 20+ year tenure at AIG without the continuity bonus." Id. ¶ 259.

### 2. Rudolf's Continued Dispute that He Resigned

On November 15, 2017, at 1:41 p.m., Rudolf emailed Joers and the two later spoke around 2:45 p.m. Joers told Rudolf that Baugh would like to meet with him on Friday, November 17, 2017 "to discuss where we are related to his resignation and benefits." ECF No. 175 ¶ 29; ECF No. 209-7 at 100.

Following his conversation with Joers, Rudolf emailed Baugh on November 15, 2017 at 4:49 p.m. reiterating that he had not resigned. He also wrote that "[a]fter 24 years and all that I have done to perform and protect AIG, I hope this is truly a misunderstanding. I did not resign, nor do I plan to resign." ECF No. 184 ¶ 104. Baugh and Rudolf arranged to meet on Monday, November 20, 2017. ECF No. 175 ¶ 31.

Baugh did not respond to Rudolf about whether he resigned. Baugh wrote to Joers, "I see no point in debating whether [Rudolf] resigned. I do find the position an odd one." ECF No. 205 ¶¶ 267-68.

Joers emailed Baugh on Wednesday, November 15, 2017 at 5:59 p.m. and noted that he talked to Rudolf and Curtin to clarify there was no impediment to work with Curtin's team, and that Curtin reminded Rudolf that he has not presented a current issue for the team to investigate. Id. ¶ 269.

The next day, Thursday, November 16, 2017, Joers circulated draft talking points to Baugh, Naik, Bernstein, Curtin and Merritt for Baugh's upcoming conversation with Rudolf. ECF No.

184 ¶ 106; ECF No. 179-27.  Curtin responded that he "[did] not have any comments."  ECF No. 205 ¶ 260; ECF No. 208-7 at 120.

### K. Rudolf's Termination

On Monday, November 20, 2017, Rudolf attended a meeting with Baugh and Merritt.  ECF No. 175 ¶ 32.  Baugh delivered the message that November 20, 2017 would be Rudolf's last day of employment, and that while Baugh had effectively accepted Rudolf's resignation, he was being offered an exit package to help him transition financially.  ECF No. 184 ¶ 107.

Baugh delivered the "talking points" that Joers circulated, noting that Rudolf had made Baugh aware that he believed he needed to alert the organization about possible fraud issues. Baugh shared that Curtin concluded Rudolf presented no evidence of ongoing fraud; rather, Rudolf appeared to be focused on establishing a record of individuals he believed had put AIG at risk in the past.  Baugh reminded Rudolf of his reporting obligations, and he encouraged Rudolf to continue to work with Curtin's team.  ECF No. 205 ¶¶ 272-274, 276.

Rudolf was also asked to sign a general release, including a release of any claims under SOX.  He refused to sign the release.  ECF No. 175 ¶ 33; ECF No. 205 ¶¶ 299-300.

Following Rudolf's termination, Stephen Grabek assumed Plaintiff's duties on an interim basis.  ECF No. 205 ¶ 304.  Rudolf was later replaced by two younger employees: Michael Hayes, who was 10 years younger, and John Gambale, who was 11 years younger.  Id. ¶ 302.

## II.   PROCEDURAL HISTORY

### A. Pleadings/Legal Claims

Rudolf filed his original Complaint on November 11, 2019.  ECF No. 1.  Defendants moved to transfer or, in the alternative, to dismiss, which the Court denied.  ECF Nos. 20 and 36.  Rudolf

then filed the operative Amended Complaint on October 29, 2020. ECF No. 41. Defendants filed an Answer. ECF No. 47.

In the operative First Amended Complaint, Rudolf asserts fifteen claims: Count I: Whistleblower Retaliation under SOX; Count II: False Claims Act Retaliation; Count III: ADEA – Age Discrimination; Count IV: ADEA – Retaliation; Count V: Title VII – Gender Discrimination; Count VI: Title VII – Retaliation; Count VII: PHRA – Gender and Age Discrimination; Count VIII: PHRA – Retaliation; Count IX: Equal Pay Act Violation; Count X: Equal Pay Act Retaliation Violation; Count XI: Intentional Interference with Contractual Relationship; Count XII: Fraud; Count XIII: Wrongful Discharge; Count XIV: Breach of Contract; and Count XV: Pennsylvania Whistleblower Law. ECF No. 41 ¶¶ 233-367.

Counts III, IV, V, VI, IX, X and XV are only asserted against AIG and NUFIC. Count XI is only asserted against Baugh.

### B. Fact Discovery

The Court entered a Case Management Order, with fact discovery scheduled to conclude by December 31, 2021. ECF No. 55. At the parties' request, the Court extended the fact discovery deadline until April 30, 2022. ECF Nos. 80 and 81. Fact discovery was completed.

### C. Motion for Summary Judgment

After discovery closed, the parties filed a Joint Concise Statement of Material Facts. ECF No. 175. Defendants then filed the instant Motion for Summary Judgment, Brief in Support, and

Concise Statement of Material Facts, ECF Nos. 177, 178, 181, 184, and 185,[13] together with a supporting Appendix, ECF Nos. 179, 180, 182 and 186.[14]

Rudolf filed a Brief in Opposition to the Motion for Summary Judgment, a Response to Defendants' Concise Statement of Material Facts, a Statement of Additional Facts in Opposition to Motion for Summary Judgment ("Statement of Additional Facts"), ECF Nos. 202, 203, 204, 205, 206, 207,[15] and supporting exhibits, ECF Nos. 208 and 209.[16]

Defendants filed a Reply Memorandum of Law in Support of their Motion for Summary Judgment, a Response to the Statement of Additional Facts, ECF Nos. 214, 217, 218 and 220,[17] and supplemental exhibits, ECF Nos. 215, 215 and 219.[18]

Rudolf then filed a Sur-Reply, ECF Nos. 224 and 227,[19] and supplemental exhibits, ECF Nos. 226 and 227.

The Motion for Summary Judgment is ripe for consideration.

## III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[13] The Court granted the parties leave to file certain materials under seal. The documents filed at ECF No. 184 (Concise Statement of Material Facts) and ECF No. 185 (Brief in Support of Motion for Summary Judgment) are filed under seal, while redacted versions of those documents are filed at ECF Nos. 178 and 181, respectively.

[14] The exhibits filed at ECF Nos. 182 and 186 are under seal. The exhibits at ECF No. 180 are redacted.

[15] The documents at ECF No. 203 (Response to Concise Statement of Material Facts), ECF No. 205 (Statement of Additional Facts), and ECF No. 207 (Brief in Opposition) are filed under seal, while redacted versions of those documents are filed at ECF Nos. 202, 204, and 206, respectively.

[16] The exhibits at ECF No. 209 are filed under seal and ECF No. 208 contains redacted exhibits.

[17] The documents at ECF No. 218 (Response to Statement of Additional Facts) and ECF No. 220 (Reply Brief) are filed under seal, while the redacted versions of those documents are filed at ECF Nos. 214 and 217, respectively.

[18] The supplemental exhibits at ECF No. 219 are filed under seal, while the exhibits at ECF No. 216 are redacted.

[19] The Sur-Reply is filed under seal at ECF No. 225, and the redacted version is filed at ECF No. 224. The exhibits at ECF No. 227 are filed under seal and the exhibits at ECF No. 226 are redacted.

to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof"). Thus, summary judgment is warranted where, "after adequate time for discovery and upon motion . . . a party . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

The moving party bears the initial burden of demonstrating to the Court that there is an absence of evidence to support the non-moving party's case. Celotex, 477 U.S. at 322; Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Matreale v. N.J. Dep't of Mil. & Veterans Affairs, 487 F.3d 150, 152 (3d Cir. 2007); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001).

## IV.   DISCUSSION

### A.  SOX Whistleblower Retaliation Claim (Count I)

Defendants move for summary judgment as to Rudolf's SOX whistleblower retaliation

claim in Count I.  In Count I, Rudolf seeks relief pursuant to Section 806 of SOX, 18 U.S.C. §

1514A, "Civil Action to protect against retaliation in fraud cases," which provides in relevant part:

> (a)  Whistleblower protection for employees of publicly traded companies.
> No company with a class of securities registered under section 12 of the
> Securities Exchange Act of 1934 (15 U.S.C. 78l), or that is required to file
> reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C.
> 78o(d)) including any subsidiary or affiliate whose financial information is
> included in the consolidated financial statements of such company, or
> nationally recognized statistical rating organization (as defined in section 3(a)
> of the Securities Exchange Act of 1934 (15 U.S.C. 78c), or any officer,
> employee, contractor, subcontractor, or agent of such company or nationally
> recognized statistical rating organization, may discharge, demote, suspend,
> threaten, harass, or in any other manner discriminate against an employee in
> the terms and conditions of employment because of any lawful act done by
> the employee--
>
> > (1)  to provide information, cause information to be provided, or
> > otherwise assist in an investigation regarding any conduct which the
> > employee reasonably believes constitutes a violation of [18 U.S.C.]
> > section 1341[mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348
> > [securities fraud], any rule or regulation of the Securities and Exchange
> > Commission, or any provision of Federal law relating to fraud against
> > shareholders, when the information or assistance is provided to or the
> > investigation is conducted by--
> >
> > > (A)  a Federal regulatory or law enforcement agency;
> > >
> > > (B)  any Member of Congress or any committee of Congress; or
> > >
> > > (C)  a person with supervisory authority over the employee (or
> > > such other person working for the employer who has the
> > > authority to investigate, discover, or terminate misconduct); or

18 U.S.C. § 1514A.

In order to establish a *prima facie* case for retaliation in violation of SOX, Rudolf must

show that he "(1) engaged in a protected activity; (2) [t]he respondent knew or suspected that the

employee engaged in a protected activity; (3) [t]he employee suffered an adverse action; and (4) [t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action." Wiest v. Lynch ("Wiest I"), 710 F.3d 121, 129 (3d Cir. 2013) (quoting 29 C.F.R. § 1980.104(e)(2)(i)-(iv)) (internal quotations omitted).

If Rudolf satisfies his burden to identify evidence in support of all four elements, the burden then shifts to Defendants to demonstrate "by clear and convincing evidence that [they] would have taken the same [adverse] action in the absence of [any protected activity]." Wiest v. Tyco Elec. Corp. ("Wiest II"), 812 F.3d 319, 329 (3d Cir. 2016) (quoting 29 C.F.R. § 1980.109(b)).

### 1. *Prima Facie* Case

#### a. Protected activity

To establish that he participated in a protected activity, Rudolf must show that he "provide[d] information" that he "reasonably believes constitutes a violation of" (1) federal criminal law provisions prohibiting mail, wire, bank, or securities and commodities fraud; (2) any rule or regulation of the SEC; or (3) any provision of federal law relating to fraud against shareholders. 18 U.S.C. § 1514A(a)(1). Rudolf must have "both a subjective and an objective belief that the conduct that is the subject of the communication relates to an existing or prospective violation of one of the federal laws referenced in § 806." Wiest I, 710 F.3d at 134.

"A belief is objectively reasonable when a reasonable person with the same training and experience as the employee would believe that the conduct implicated in the employee's communication could rise to the level of a violation of one of the enumerated provisions in Section 806." Id. at 132. Because this inquiry is fact-dependent, "[t]he issue of objective reasonableness should be decided as a matter of law only when no reasonable person could have believed that the facts [known to the employee] amounted to a violation or otherwise justified the employee's belief

24

that illegal conduct was occurring." <u>Rhinehimer v. U.S. Bancorp Investments, Inc.</u>, 787 F.3d 797, 812 (6th Cir. 2015) (internal citations and quotations omitted).

In support of this claim, Rudolf asserts that SEC Rule 10b-5 prohibits filing false or misleading financial statements, and the SEC regulations require financial statements to be prepared in accordance with generally accepted accounting principles ("GAAP"). ECF No. 207 at 19 (citing 17 C.F.R. § 240.10b-5; 15 U.S.C. § 78j; <u>In re Campbell Soup Co. Sec. Litig.</u>, 145 F. Supp. 2d 574, 592 (D.N.J. 2001) ("Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed misleading or inaccurate.")). Under GAAP, he argues, if a purported insurance policy "does not involve risk transfer, GAAP treats it as a financing arrangement, with all premiums to be accounted for as deposits." <u>Id.</u> (quoting <u>In re Am. Int'l, Grp., Inc.</u>, No. 3-11254, 2003 WL 22469910, at *5 (S.D.N.Y. Sept. 11, 2003)).

Against this backdrop, Rudolf argues that he engaged in protected activity under SOX when he reported that AIG engaged in six rigged "claim workout" deals involving "unlimited limits." AIG executives allegedly pre-negotiated or "bid-rigged" litigation settlements before entering into "finite insurance" contracts in which AIG agreed to cover any liabilities up to an "unlimited" amount in exchange for high premiums. Because there was no actual risk transfer, he argues, under GAAP these transactions had to be accounted for as "deposits," and not "insurance." By improperly accounting for these transactions as "insurance," AIG was able to realize the premiums as income supporting its stock price, while the client could spread out its losses over a number of years. Based on this, Rudolf contends he reported violations of GAAP that were prohibited under SEC rules and regulations. <u>Id.</u> at 18-24.

In support of the Motion for Summary Judgment, Defendants dispute that Rudolf engaged in any protected activity, arguing that Rudolf cannot show he had any subjective or objective belief that he reported violations of any SOX-enumerated law.  Defendants argue there is no evidence Rudolf actually believed that AIG violated Rule 10-b5 or Regulation § 210.4-01 by failing to comply with GAAP in SEC filings.  Defendants argue that Rudolf never even mentioned GAAP in previously reporting the alleged misconduct, did not report this conduct to the independent monitor, took no action on this issue for over 17 years, and repeatedly certified that he had no AIG Code of Conduct violations to report.  ECF No. 185 at 21-31; ECF No. 220 at 11-13.

Upon review, construed in the light most favorable to Rudolf as the non-moving party, the facts support a plausible inference that Rudolf reasonably believed AIG's conduct violated one of the provisions of Section 806.  Rudolf reported concerns over "rigged claim workout deals." According to Rudolf, he believed that AIG improperly treated the claim workout deals as insurance instead of deposits in violation of GAAP, which constitutes a misleading or inaccurate financial statement in violation of SEC rules.

There is also evidence to support an inference that Rudolf's belief was objectively reasonable.  Although Rudolf did not refer to GAAP in his communications, "[t]he communication itself need not reveal all the facts that would cause a reasonable person with the whistleblower's training and background to conclude that a referenced federal law has been or will be violated." Wiest I, 710 F.3d at 134.  Rather, the "determination should be based upon all the attendant circumstances, and not limited to the facts conveyed by a whistleblower to the employer." Id. Here, a jury could find that a person with Rudolf's training and experience, including Rudolf's prior work with the DOJ/independent monitor involving analogous accounting issues, could have an objectively reasonable belief that a violation of a SOX-enumerated law had occurred.  Thus,

Rudolf proffers sufficient evidence to satisfy the first element of a *prima facie* case of retaliation in violation of SOX.

### b. Respondent's Knowledge of Protected Activity

As for the second prong of the *prima facie* case—that the employer knew or suspected that the plaintiff engaged in protected activity—the United States Court of Appeals for the Third Circuit has held that "in order for an employer to know or suspect that the whistleblower-plaintiff is engaged in protected conduct . . . the plaintiff's intra-corporate communications must relate in an understandable way to one of the stated provisions of federal law in Section 806." Wiest I, 710 F.3d at 134.

In support of the Motion for Summary Judgment, Defendants argue that Baugh, the decisionmaker, had no reason to believe that Rudolf reported a violation of any SOX-enumerated law. Defendants argue that Baugh had only two short conversations with Rudolf on this issue, did not know anything Rudolf reported to GIG, and did not understand to what Rudolf was referring— let alone that he was allegedly raising a SOX violation. ECF No. 185 at 31-32.

In response, Rudolf disputes that only his reporting to Baugh is relevant to establish that he engaged in protected activity. Rudolf also argues that a jury could reject Baugh's claim that he did not understand the reported misconduct. Rudolf points out that Baugh contacted AIG's legal department and advised that Rudolf had reported frauds, triggering the GIG investigation. ECF No. 207 at 33-34.

Upon review, there is also sufficient evidence to withstand summary judgment as to whether Defendants knew or suspected that Rudolf engaged in protected activity. As Rudolf points out, his reports triggered an investigation into potential wrongdoing. Based on Rudolf's allegations, including his discussion of the rigged claim workout deals in the context of those deals

being "riskless" and the nature of his previous work with the DOJ/independent monitor, a jury could find that his reports related to a SOX violation in an "understandable" way to Defendants. Accordingly, Rudolf can establish the second prong of his *prima facie* claim.

### c.  Adverse Action

The third prong of a *prima facie* claim requires Rudolf to show that he suffered an adverse action.  There is no dispute that Rudolf's alleged termination satisfies this element.

### d.  Causation

As for the fourth prong, the causation element of a *prima facie* case requires allegations that "'[t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action.'"  Wiest I, 710 F.3d at 129 (citing 29 C.F.R. § 1980.104(e)(2)(iv)).  Further, the Third Circuit has held that:

> a contributing factor [is] any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.  A plaintiff need not provide direct evidence to satisfy this element; rather, circumstantial evidence may be sufficient.  To that end, temporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation.

Wiest II, 812 F.3d at 330 (internal citations and quotation marks omitted).

In support of the Motion for Summary Judgment, Defendants argue that Rudolf cannot establish causation because Baugh believed that Rudolf resigned, and he had legitimate reasons for accepting Rudolf's resignation that were unrelated to any vague reports of wrongdoing.  ECF No. 185 at 33-34.

In response, Rudolf argues the close timing of his protected activity and his alleged termination support an inference of causation.  Before this, he argues, he was a highly regarded and well-liked senior insurance executive who had been with AIG for 23 years.  Rudolf also argues that he never resigned—a fact that he repeatedly denied.  ECF No. 207 at 36-38.

Upon review, the circumstances are enough to raise an inference that Rudolf's protected activity was a contributing factor in his termination. Rudolf claims, among other things, that he notified Baugh of alleged misconduct, and that he was terminated within just a few days after his reports and the GIG investigation. The close temporal proximity between Rudolf's protected conduct and the alleged termination is noted. While Defendants argue that Baugh understood Rudolf to have resigned, this is a disputed question of fact. Rudolf claims that he never resigned, and he repeatedly disputed that he resigned to Baugh and others in the days before his alleged termination. Thus, Rudolf also proffers sufficient evidence to establish the fourth prong of a *prima facie* claim.

### 2. Whether Defendants Would Have Taken the Same Action

Having satisfied his burden to identify evidence in support of all four elements of a *prima facie* case of retaliation in violation of SOX, the burden now shifts to Defendants to demonstrate "by clear and convincing evidence that [they] would have taken the same [adverse] action in the absence of [any protected activity]." Wiest II, 812 F.3d at 329.

While Defendants contend that they would have taken the same action regardless of any protected activity because Rudolf resigned, this conclusion involves disputed questions of material fact. Summary judgment is therefore improper on this basis. For these reasons, the request for summary judgment as to Count I is denied.

### B. False Claims Act Retaliation (Count II)

Rudolf also brings a claim under the FCA in Count II. The purpose of the FCA is "to protect the funds and property of the Government from fraudulent claims[.]" Rainwater v. United States, 356 U.S. 590, 592 (1958). "The FCA prohibits any person from, *inter alia*, knowingly presenting a 'false or fraudulent claim for payment or approval' to the United States government."

United States ex rel. Ascolese v. Shoemaker Constr. Co., 55 F.4th 188, 190 (3d Cir. 2022) (quoting 31 U.S.C. § 3729(a)(1)(A)). "It extends to all false claims resulting in the receipt of funds from the United States Treasury." Id. (citing Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 185 (3d Cir. 2001)).

Under the FCA, "[a] false or fraudulent claim may be either factually false or legally false." United States ex rel. Greenfield v. Medco Health Solutions, Inc., 880 F.3d 89, 94 (3d Cir. 2018). A claim is factually false if the claimant misrepresents what goods or services it provided to the Government. Id. It is legally false if the claimant "lies about its compliance with a statutory, regulatory, or contractual requirement." Id. (quotations and citations omitted).

If a plaintiff alleges that defendant's claim is legally false, he must also prove the defendant's misrepresentation about its compliance with a legal requirement is "material to the Government's payment decision." Id. (citing Universal Health Servs., Inc. v. United States ex rel. Escobar, 136 S. Ct. 1989, 1996 (2016)).

Through its anti-retaliation provision, the FCA "also shields whistleblowers from retaliation 'because of' conduct protected by the FCA." Ascolese, 55 F.4th at 191 (citing 31 U.S.C. § 3730(h)). To establish a claim for retaliation under the FCA, plaintiff must show that "(1) he engaged in protected conduct in furtherance of an [FCA] action . . . or other efforts to stop 1 or more violations of [the FCA], and (2) that he was discriminated against because of his protected conduct." Id. at 194; 31 U.S.C. § 3730(h). If plaintiff meets this standard, "the burden shifts to the employer to prove the employee would have been terminated even if he had not engaged in the protected conduct." Hutchins, 253 F.3d at 186.

### 1.  Claim against Baugh

Defendants argue that the FCA retaliation claim should be dismissed as to Baugh.  ECF No. 185 n. 12.  Because it is undisputed that there is no individual liability under the FCA, the Court grants the Motion for Summary Judgment relative to Count II as to Baugh.  Davis v. Point Park Univ., No. 10-1157, 2010 WL 4929104, at *4-5 (W.D. Pa. Nov. 30, 2010).

### 2.  Claims against AIG and NUFIC

As for AIG and NUFIC, Rudolf contends that his report to Baugh plausibly put his employer on notice that he was attempting to stop an FCA violation.  Rudolf argues that he believed the failure to disclose the true nature of the fraudulent unlimited limits policies could jeopardize AIG's de-SIFI status, and it constituted possible fraud in the government's SIFI oversight of AIG.  ECF No. 207 at 45-47; ECF No. 225 at 24.

In support of the Motion for Summary Judgment, Defendants argue that Rudolf cannot establish an FCA claim because his report had nothing to do with any false claim for payment to the U.S. government.  As for Rudolf's assertion that he reported concerns over AIG's SIFI status, Defendants also argue that Baugh could not have reasonably understood this from Rudolf's report, so he cannot show causation.  ECF No. 185 at 37; ECF No. 217 at 24.

Upon review, Rudolf did not report any conduct that the FCA protects.  The only alleged false claim that Rudolf points to is AIG's reporting on the nature of its unlimited limits transactions.  However, there is no evidence this occurred relative to any payment received from the government—let alone that it was material to the government's payment decision.  Accordingly, the Motion for Summary Judgment is granted as to Count II.

## C. Age Discrimination under the ADEA and PHRA (Counts III and VII)

Defendants also move for summary judgment with respect to Rudolf's age discrimination claims alleging violations of the ADEA and the PHRA.[20]  In an ADEA lawsuit lacking direct evidence of discrimination, as here, the order of proof mirrors that of a Title VII discrimination action, as described in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009).  First, plaintiff must establish a *prima facie* case of age discrimination by proving the following: (1) he was over the age of 40; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under conditions giving rise to an inference of discrimination.  Williams v. Temple Univ. Hosp., Inc., 345 F. Supp. 3d 590, 596-97 (E.D. Pa. 2018) (citing Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797-98 (3d Cir. 2003); Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 556-57 (3d Cir. 2009)).  Proof of these facts raises an inference of discrimination, which is given the force and effect of a rebuttable presumption.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).

Once a *prima facie* case is established, the burden shifts to the employer, who must articulate a legitimate, nondiscriminatory reason for the adverse employment action.  Id.; Santiago v. Brooks Range Cont. Servs., 618 F. App'x 52, 54-55 (3d Cir. 2015).  "This burden is 'relatively light' and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason."  Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013) (citing Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir.

---

[20] The United States Court of Appeals for the Third Circuit has held that "[t]he same analysis used for ADEA is also applied to PHRA claims."  Prewitt v. Walgreens Co., 92 F. Supp. 3d 292, 305 n. 4 (E.D. Pa. 2015) (citing Fasgold v. Justice, 409 F.3d 178, 183-84) (3d Cir. 2005)).

2006)).  At this stage, the employer is not required to prove this reason actually motivated its conduct.  Id.

After the employer has met its relatively light burden of articulating a legitimate nondiscriminatory reason for the adverse employment decision, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's proffered explanation is pretextual.  Id.  The plaintiff may meet this burden either directly, by persuading the court that the employer's action was more likely motivated by a discriminatory reason, or indirectly, by showing that the employer's proffered explanation is unworthy of credence.  See McDonnell Douglas, 411 U.S. at 804-05.

Throughout this burden-shifting analysis, the ultimate burden of proving intentional discrimination rests with plaintiff.  See Burdine, 450 U.S. at 253-57.  A plaintiff meets this burden if his "prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000).

In his Amended Complaint, Rudolf appears to claim that he suffered age-related discrimination based on his (1) unequal compensation and (2) termination.  ECF No. 41 ¶¶ 250-258. Defendants move for summary judgment as to both potential claims, and Rudolf only opposes summary judgment on the basis of his termination.   ECF No. 185 at 43-52.

Thus, the Court finds that summary judgment should be granted to the extent that Rudolf's claim is based on his unequal compensation, and it limits the following discussion to Rudolf's ADEA claim based on his alleged termination.  For the reasons that follow, that Court will deny the Motion for Summary Judgment as to the age discrimination claims related to Rudolf's termination.

### 1. *Prima Facie* Case

In support of the Motion for Summary Judgment, Defendants only challenge the fourth element of Rudolf's *prima facie* case. ECF No. 185 at 50-51. Defendants contend that Rudolf cannot show his separation occurred under circumstances that give rise to an inference of discrimination given that Baugh (the decisionmaker) was three years older than Rudolf, and that Rudolf was immediately replaced by Grabek, who was four years older. Id. at 51.

In response, Rudolf argues that although he was temporarily replaced by Grabek, he was ultimately replaced by younger employees, Michael Hayes (10 years younger) and John Gambale (11 years younger), which is sufficient to permit an inference of age discrimination. ECF No. 225 at 26.

Upon review, the Court finds that Rudolf can establish a *prima facie* case of age discrimination. There is no dispute that Rudolf can establish the first three elements of a *prima facie* case. First, as a fifty-three year old employee at the time of his separation, he was a member of an age-protected class. Second, based on Rudolf's years of experience in the insurance industry, there is no dispute that he was qualified for his position. And third, Defendants do not contest that Rudolf can proffer evidence of an adverse employment action based on his alleged termination.

As for the fourth element, the record also supports a finding that Rudolf was ultimately replaced by employees sufficiently younger to support an inference of discriminatory animus. See, e.g., Sempier v. John & Higgins, 45 F.3d 724, 729-30 (3d Cir. 1995) (ten-year age difference sufficient to support prima facie case). While Grabek temporarily assumed Rudolf's duties for a period of months, this does not necessarily defeat his claim. See, e.g., Burkholder v. State Chem. Mfg. Co., No. 86-2042, 1988 WL 149234, at *4 (W.D. Pa. Dec. 5, 1988) (evidence that defendant never intended older replacement to be permanent and ultimate replacement was younger created

disputed issue of material fact on age claim). Therefore, based on consideration of the evidence presented, the Court finds that Rudolf has presented sufficient evidence to present a reasonable trier of fact to find that Rudolf has made requisite showing of a *prima facie* case in violation of the ADEA.

### 2. Proffered Nondiscriminatory Reason

Rudolf does not dispute that Defendants have proffered a legitimate nondiscriminatory reason for his separation — that he resigned. ECF No. 207 at 52. As a result, the burden shifts back to Rudolf to show that Defendants' reason is pretextual.

### 3. Pretext

In order to establish pretext, Rudolf must "point to some evidence, direct or circumstantial, from which a fact-finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely that not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

As Rudolf points out, the record contains substantial evidence that would allow a jury to disbelieve Defendants' claim that he resigned. Most significantly, Rudolf repeatedly told Baugh and others that he did not resign in the days between his telephone call with Baugh on November 12, 2017 and his termination on November 20, 2017. Accordingly, construing the evidence in the light most favorable to Rudolf, as the Court must, there is sufficient evidence to withstand the request for summary judgment. Therefore, the Court will deny the Motion for Summary Judgment as to Rudolf's ADEA and PHRA age discrimination claims in Counts III and VII, except for his claims based on unequal compensation.

### D. Retaliation Claims under the ADEA, Title VII, PHRA, and EPA (Counts IV, VI VIII and X)

Defendants move for summary judgment on Rudolf's claims of retaliation under the ADEA, Title VII and the PHRA. ECF No. 185 at 54-56. Rudolf responds that he does not oppose the dismissal of Counts IV, VI and VIII, ECF No. 207 at 17 n. 5, and he does not address Count X in his Response. For these reasons, the Motion for Summary Judgment is granted as to Rudolf's retaliation claims in Counts IV, VI, VIII and X.

### E. Gender Discrimination Claims under Title VII, the PHRA, and EPA (Counts V, VII and IX)

Defendants also move for summary judgment as to Rudolf's gender discrimination claims in Counts V, VII and IX. Because Rudolf does not oppose the dismissal of these claims, ECF No. 207 at 17 n. 5, the Motion for Summary Judgment is granted as to Counts V and IX, and as to Count VII, in part, to the extent it includes a gender discrimination claim under the PHRA.

### F. Intentional Interference with Contractual Relationship (Count XI)

In Count XI of the Amended Complaint, Rudolf brings a claim of intentional interference with contractual relationship only against Baugh. ECF No. 41 ¶¶ 312-19. Rudolf alleges that Baugh interfered with Rudolf's employment relationship by falsely telling his employer that he had resigned his position on November 12, 2017. In addition, Rudolf claims that Baugh, an AIG employee, was not privileged to act in this manner. Id. He makes no mention in the Amended Complaint of interference with any continuing award or specific compensation plan. Id.

To state a claim for intentional interference with a contractual relationship under Pennsylvania law, Rudolf must show: "(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation

from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct." Crivelli v. Gen. Motors Corp., 215 F.3d 386, 394 (3d Cir. 2000).

In support of the Motion for Summary Judgment, Defendants make three arguments. First, they argue there was no contractual relationship because Rudolf was an at-will employee. ECF No. 185 at 60. Second, Defendants argue that Rudolf cannot show that Baugh acted with specific intent to harm his employment relationship because Rudolf approached Baugh for help on November 12, 2017 -- not the other way around. Id. Third, Defendants assert that, as Rudolf's supervisor, Baugh had privilege to report his understanding that Rudolf resigned, and he is not considered a "third party" for purposes of this claim. Id. at 61- 62.

In his Brief in Opposition, Rudolf argues there is a split in authority as to whether a claim for intentional interference with a contractual relation lies where the employment relationship is terminable at will. ECF No. 207 at 53 (citing Mason v. Range Res.-Appalachia, LLC, No. 12-369, 2012 WL 2116969, at *6 (W.D. Pa. May 9, 2012), report & recommendation adopted, 2012 WL 2116949 (W.D. Pa. June 11, 2012); In re Foamex Int'l, Inc., 491 B.R. 100, 106-07 (Bankr. D. Del. 2013); Dowling v. Pa. Psychiatric Inst., No. 473 MDA 2014, 2015 WL 7016337 (Pa. Super. 2015)). Second, Rudolf also argues that Baugh was a third party because he did not act for AIG's benefit, and that his actions motivated by personal animus were not privileged. Id. at 54.[21]

In their Reply, Defendants note Rudolf's acknowledgement of the split of authority on this issue. ECF No. 220 at 30. Defendants then point to the recent decision of the Pennsylvania Superior Court finding that Pennsylvania law does not recognize a claim for intentional interference with an existing at-will employment relationship. Salsberg v. Mann, 262 A.3d 1267,

---

[21] Rudolf does not respond to Defendants' argument that he cannot prove that Baugh acted with intent to harm because Rudolf initiated this series of incidents by calling Baugh.

1270 (Pa. Super. Ct. 2021).  Further, Defendants argue that even if Rudolf could state a claim, he must show interference in the performance of a contract between Rudolf and a third party.  In this case, Defendants argue, there are no third parties because Baugh was Rudolf's supervisor and controlled his employment.  ECF No. 220 at 30-31.

In his Sur-reply, Rudolf expands upon his assertion of interference in Count XI of the Amended Complaint.  Rudolf claims that Baugh interfered with Rudolf's employment relationship with AIG and NUFIC when Baugh falsely claimed that Rudolf resigned on November 12, 2017. ECF No. 225 at 27.  Rudolf now contends that in May 2017, Rudolf and AIG entered into a Continuity Award in which AIG agreed to pay Rudolf a six-figure cash award in three parts if he remained employed through April 2020 in the next three years in exchange for Rudolf's continued employment and agreements of non-disclosure and non-solicitation.  Id.  As such, Rudolf claims that Baugh and others involved in Rudolf's termination were aware of and interfered with his Continuity Award.  Id.

In considering the Motion for Summary Judgment as to the intentional interference claim, it is clear that Rudolf's claim is a tort claim based on state court common law.  As such, the Court must first look to the common law of the Commonwealth of Pennsylvania.  Of particular significance, the recent *en banc* decision of the Pennsylvania Superior Court in Salsberg is directly applicable here.  In Salsberg, the Superior Court held that claims for intentional interference of a contractual relationship do not apply when the plaintiff was an at-will employee.[22]  Salsberg, 262 A.3d at 1271-72.

---

[22] The Court notes that the decision in Salsberg has been appealed, and that the Pennsylvania Supreme Court agreed to consider the issue of "whether Pennsylvania should apply the Restatement (Second) of Torts § 766 to an intentional interference claim by an employee at will against a superior who acted against that employee, not as an agent on behalf of her employer, but ultra vires and pursuant to personal animus."  As of the date of this filing, however, no decision has been issued on appeal.

In this case, it is undisputed that Rudolf did not have a formal written employment contract. As such, he is an employee at will, who could be terminated at any time for any reason. Therefore, in accordance with the holding in Salsberg, Rudolf, as an at-will employee, cannot make out a claim for intentional interference with contractual relations against Baugh. The entry of summary judgment on Count XI is granted.[23]

### G. Fraud (Count XII)

In Count XII of the Amended Complaint, Rudolf claims that Baugh told him to contact HR about the status of his compensation and awards if he were to leave and take a job elsewhere. ECF No. 41 ¶ 322. Based on this directive, Rudolf emailed HR on November 12, 2017 to ask what would happen to his compensation and awards if he were to leave. Id. ¶ 323. In the November 20, 2017 termination meeting, Defendants relied on Rudolf's email to HR, which he sent at the direction of Baugh, to falsely and negligently claim that he resigned his employment. Id. ¶ 324. Rudolf claims that Defendants "tricked" him into sending this email, and they misrepresented that he resigned. Id. ¶ 325. Based on this conduct, Rudolf claims that Defendants are liable for fraud.

To state a claim for fraud, Rudolf must show that there was: (1) a representation; (2) material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994).

In support of the Motion for Summary Judgment, Defendants argue that Rudolf cannot satisfy these elements because: (1) a directive to contact someone (in this case, HR) is not a "material representation"; and (2) Rudolf cannot show that *he* justifiably relied on Baugh's

---

[23] In light of this ruling as to Count XI, the Court need not address Rudolf's attempt to expand this claim in his sur-reply to relate to the Continuity Award, as that award relates to his compensation as an at-will employee.

statement; instead, he claims that *Defendants* relied on Rudolf's inquiry to HR to falsely claim that Rudolf resigned. ECF No. 185 at 57.

In response, Rudolf makes two arguments. First, he argues that Curtin made a false representation that Rudolf would not suffer retaliation, which Rudolf relied on by cooperating in the GIG investigation. He argues that a jury could find Rudolf's termination resulted from reporting these frauds to management, and that Curtin knew his statement was false when he made it. ECF No. 207 at 56; ECF No. 225 at 29. Second, Rudolf argues that the contrived resignation was fraud by omission or silence. ECF No. 207 at 57. Rudolf argues that he asked various HR professionals, including Naik, what would happen if he resigned, and "they basically said they would find out." Rudolf claims he relied on the "important inference that this was an ongoing process rather than a complete resignation." Id.

In their Reply, Defendants assert that Rudolf advances two different theories of fraud that he did not raise in the Amended Complaint. ECF No. 220 at 27. Defendants also argue there is no evidence Curtin knew his statement was false or used it to induce Rudolf's cooperation, and that breaching a promise to do something cannot establish fraud. Id. As for Naik's statement, Defendants argue that Rudolf relied on his own inference, rather than any alleged misrepresentation about the status of his resignation. Id.

Upon review, neither of the two alleged misrepresentations that Rudolf now relies on— Curtin's anti-retaliation statement or the theory of fraud by omission—is the basis for his claim as set forth in Count XII of the Amended Complaint. Because Count XII sounds in fraud, Rudolf needed to "satisfy the 'stringent' Rule 9(b) requirements for particularity." Travelers Indem. Co. v. Cephalon, Inc., 620 F. App'x 82, 85 (3d Cir. 2015). Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.

Malice, intent, knowledge and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  To satisfy this requirement, plaintiff must identify "who made a misrepresentation to whom and the general content of the misrepresentation." Travelers Indem. Co., 620 F. App'x at 85 (quoting Lum v. Bank of Am., 361 F.3d 217, 224 (3d Cir. 2004)).

As Defendants point out, Rudolf did not plead either of these two alleged misrepresentations in Count XII of the Amended Complaint.  He newly advances this theory of fraud at the summary judgment stage.  Simply put, plaintiff is the "master of [his] complaint," and he chooses which claims and theories of recovery to plead. Summy-Long v. Pa. State Univ., 226 F. Supp. 3d 371, 387-88 (M.D. Pa. 2016), aff'd, 715 F. App'x 179 (3d Cir. 2017).  Rudolf "may not defeat summary judgment by asserting a claim [he] did not include in the Complaint." Id. (quoting Spengler v. Worthington Cylinders, 514 F. Supp. 2d 1011, 1017 (S.D. Ohio 2007)). "Rather, '[a]t the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a)." Id. (quoting Tucker v. Union of Needletrades, Indus. & Textile Employees, 407 F.3d 784, 788 (6th Cir. 2005)).  Because Plaintiff did not plead either of these alleged statements (or omissions) in support of the fraud claim in his Amended Complaint, he cannot now rely on them to defeat summary judgment.  Accordingly, the Motion for Summary Judgment is granted as to Count XII.

## H. Wrongful Discharge (Count XIII)

Defendants move for summary judgment as to Rudolf's wrongful discharge claim in Count XIII.  ECF No. 185 at 57.  Because Rudolf does not oppose the dismissal of this claim, ECF No. 207 at 17 n. 5, the Motion for Summary Judgment is granted as to Count XIII.

## I.   Breach of Contract (Count XIV)

In Count XIV, Rudolf claims that Defendants promised they would not retaliate against him for reporting financial wrongdoing in their employee handbook and similar manuals, and that this promise was repeated orally and in writing to Rudolf at the outset of the GIG investigation along with Curtin's *Upjohn* warning.  ECF No. 41 ¶¶ 333-38.

In support of the Motion for Summary Judgment, Defendants argue that Rudolf was an at-will employee, who could be terminated for any reason.  ECF No. 185 at 58-59.  As for AIG's handbooks and manuals, Defendants assert that AIG's handbook explicitly stated that it is not a contract, and that there was no meeting of the minds sufficient to overcome the presumption of at-will employment relative to Curtin's *Upjohn* warning.  Id. at 59-60.  Defendants also argue there is no basis for individual liability as to Baugh because none of the alleged contractual relationships were between Rudolf and Baugh.  Id. at 58 n. 27; ECF No. 220 at 29-30.

In response, Rudolf does not dispute the handbooks/manuals did not create any contract.  Instead, he argues that Defendants later entered into an implied contract whereby if Rudolf agreed to cooperate in the GIG investigation, AIG would ensure that he was not retaliated against for his good-faith participation.  ECF No. 207 at 54.  This contract was supported by consideration in the form of Rudolf's cooperation in the fraud investigation.  Id. at 54.  Rudolf claims that Defendants breached this duty when they terminated him in retaliation and without cause.  Id. at 54-55.  Rudolf also argues that Defendants violated the doctrine of promissory estoppel.  Id. at 55-56.

### a.   Baugh

Upon review, it is undisputed that Baugh was not a party to any contract.  Therefore, the Motion for Summary Judgment is granted relative to Count XIV against Baugh.  Nicholas v. Pa. State Univ., 227 F.3d 133, 145 (3d Cir. 2000) (under Pennsylvania law, a supervisor cannot be

liable for breach of contract when there is no contractual relationship between the plaintiff and supervisor).

### b. AIG and NUFIC

Under Pennsylvania law, in order to establish a breach of contract claim, Rudolf must show: "(1) the existence of a contract, including its essential terms; (2) a breach of duty imposed by the contract, and (3) resultant damages." Perlberger L. Assocs, P.C. v. Wells Fargo Bank, N.A., 552 F. Supp. 3d 490, 498 (E.D. Pa. 2021) (quotations and citations omitted).

"Pennsylvania presumes employment to be at will, meaning that either an employer or employee may terminate employment at any time, for any or no reason." Keich v. Worldwide Express Holdings, LLC, No. 5:19-cv-02764, 2020 WL 6262189, at *5 (E.D. Pa. Oct. 23, 2020). To rebut this presumption, Rudolf must show one of the following: "(1) an agreement for a definite duration; (2) an agreement specifying that the employee will be discharged for just cause only; (3) sufficient additional consideration; or (4) an applicable recognized public policy exception." Id. (citations omitted).

Upon review, Rudolf does not establish the existence of any contract not to retaliate against him. Rudolf does not dispute that the anti-retaliation policies in the AIG employee handbook do not form any contract. While he relies on Curtin/the GIG team's statement that "AIG has a strict anti-retaliation policy to protect anyone who reports wrongdoing," this statement simply refers to AIG's existing anti-retaliation policy, which Rudolf admits is not a contract. Thus, no contract was created.

The evidence also does not support Rudolf's claim that the at-will presumption was amended based on the exchange of "sufficient additional consideration." Courts find "additional consideration" exists when an employee "affords his employer a substantial benefit other than the

services which the employer is hired to perform, or when the employee undergoes a substantial hardship other than the services which he is hired to perform." Geiger v. AT&T Corp., 962 F. Supp. 637, 649 (E.D. Pa. 1997) (quoting Darlington v. Gen. Elec., 504 A.2d 306, 315 (Pa. Super Ct. 1986, *overruled on other grounds*, Krajsa v. Keypunch, Inc., 622 A.2d 355, 360 (Pa. Super. Ct. 1993)). Because there is no dispute that Rudolf was obligated under AIG's Code of Conduct to participate in the GIG investigation, he does not show that he provided a substantial benefit other than services he was hired to perform.[24] For these reasons, the Motion for Summary Judgment is granted to Rudolf's breach of contract claim, Count XIV.

### J. Pennsylvania Whistleblower Law (Count XV)

Rudolf brings a claim against AIG and NUFIC in Count XV under the Pennsylvania Whistleblower Law ("PWL"). The PWL prohibits employers from retaliating against an employee who reports "to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act." 43 Pa. C.S. § 1423(a).

"Wrongdoing" is defined as "[a] violation . . . of a Federal or State statute or regulation, of a political subdivision ordinance or regulation[,] or of a code of conduct or ethics designed to protect the interest of the public or the employer." Id. § 1422. "Waste" is "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from" Pennsylvania or its political subdivisions. Id.

---

[24] Rudolf also argues that he establishes a claim for promissory estoppel, but he does not plead this claim in his Amended Complaint. Further, "Pennsylvania does not recognize a cause of action for promissory estoppel as an exception to the employment at-will doctrine." Falcone v. WiredLogic, Inc., No. 06-800, 2006 WL 8459813, at *17 (E.D. Pa. Oct. 26, 2006). Therefore, this does not provide a basis for the Court to deny the Motion for Summary Judgment as to this claim.

In support of the Motion for Summary Judgment, Defendants argue that only NUFIC, not AIG, is an "employer" subject to the PWL. Defendants also argue that NUFIC is not a "public body" under the statute, so it can only be held liable if Rudolf reported "waste"—not "wrongdoing." Because Rudolf did not report any loss incurred by the Commonwealth of Pennsylvania, Defendants contend that he did not report waste and thus cannot prove this claim. ECF No. 185 at 37-38; ECF No. 220 at 24-25.

In his response in opposition, Rudolf contends that NUFIC is a public body because it is a government contractor, which provides insurance services to the Commonwealth and its agencies in exchange for Commonwealth funding. Thus, NUFIC can be held liable based on retaliating against Rudolf for reporting "wrongdoing," which he did.[25] Rudolf also argues that AIG can be held liable because it is a single employer/integrated enterprise with NUFIC. ECF No. 225 at 24-25; ECF No. 207 at 47-50.

Upon review, the Court finds that summary judgment should be granted as to Count XV.

The Court first considers whether NUFIC is a "public body." Under the PWL, a "public body" includes any entity "which is funded in any amount by or through" Pennsylvania or its political subdivisions. 43 Pa. C.S. § 1423(a).

Rudolf argues that NUFIC is a "public body" because it receives funding from the Commonwealth for providing insurance services. ECF No. 225 at 25. But the United States Court of Appeals for the Third Circuit has found that "a private entity does not qualify as a public body merely because it receives state funds through contracts with public programs or government agencies." Lomaskin v. Siemens Med. Solutions USA, Inc., 820 F. App'x 138, 141 (3d Cir. 2020).

---

[25] In particular, Rudolf argues that he believed AIG improperly treated the rigged claim workout deals as insurance instead of deposits in violation of GAAP, which in turn, constitutes a misleading or inaccurate financial statement in violation of the SEC rules, and that he also believed the transactions violated Pennsylvania law, including the Unfair Insurance Practices Act and Unfair Trade Practices and Consumer Protection Law. ECF No. 206 at 49.

Rather, the phrase "funded by or through" in the PWL refers to money "specifically appropriated by a governmental unit." Id. (quoting Grim v. May Grant Assocs., No. 18-2231, 2019 WL 358520, at *4 (E.D. Pa. Jan. 29, 2019)). Because there is no evidence that NUFIC received appropriations from the Commonwealth or any of its political subdivisions, NUFIC does not qualify as a public body under the PWL.

Because NUFIC is not a public body, it can only be held liable as an employer if Rudolf reported "waste." "Waste" is defined as "[a]n employer's conduct or omissions which result in substantial misuse, destruction, or loss of funds or resources belonging to or derived from" Pennsylvania or its political subdivisions. 43 Pa. C.S. § 1422. It is undisputed that Rudolf reported no such conduct. Based on the evidence, Rudolf cannot establish this claim against NUFIC.

As for AIG, it is undisputed that AIG does not independently qualify as an "employer" or "public body" subject to the PWL. Rudolf only argues that AIG is liable because it acted as a single employer/integrated enterprise with NUFIC. Given that Rudolf cannot establish this claim against NUFIC, summary judgment is also proper as to AIG. Accordingly, the Motion for Summary Judgment is granted as to Count XV.

**K. AIG's Liability**

Finally, Defendants argue summary judgment should be granted in AIG's favor because it was not Rudolf's employer. Defendants contend that AIG is holding company, which does not have any employees, and it cannot be held liable simply because it is the parent company of its subsidiary, NUFIC. ECF No. 185 at 61; ECF No. 220 at 31.

In response, Rudolf argues that AIG may be held directly liable and/or as an integrated employer for retaliation under SOX, and that it may be held liable based on a common law agency theory and for age discrimination under the ADEA/PHRA pursuant to the "integrated enterprise"

test.  In support, Rudolf points to evidence that: Rudolf believed he worked for AIG; all his supervisors worked for AIG, including Baugh; AIG provides services to NUFIC, including HR, legal and compliance, operation and systems, audit, administration, enterprise risk management and finance; all of the HR, employee relations and GIG employees involved in this case were employed by AIG; AIG owns 100% of NUIFC; and AIG includes NUFIC's financial statement within its own consolidated financial statement.  ECF No. 207 at 58-59.

Upon review, the Motion for Summary Judgment is denied.  While a parent corporation generally is not liable for the wrongful acts of its subsidiaries simply because the parent wholly owns the subsidiary, Rudolf does not merely rely on AIG's ownership of NUFIC to ascribe liability.  Instead, he points to a multitude of indicia of AIG's control over Rudolf's employment and NUFIC's operations, such that there are questions of fact relative to AIG's liability.  Accordingly, the Motion for Summary Judgment is denied as to Rudolf's remaining claims against AIG.

## V.   CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment, ECF No. 177, is granted in part and denied in part.  The Motion for Summary Judgment is granted as to these claims:

1. FCA retaliation claim (Count II);

2. Age discrimination under ADEA and PHRA (Counts III and VII), but only to the extent those claims arise out of unequal compensation;

3. Retaliation claims under the ADEA, Title VII, PHRA and EPA (Counts IV, VI, VIII and X);

4. Gender discrimination claims under Title VII, the PHRA, and the EPA (Counts V, VII and IX);

5. Intentional interference with contractual relationship (Count XI);

6. Fraud (Count XII);

7.  Wrongful discharge (Count XIII);

8.  Breach of contract (Count XIV); and

9.  PWL claim (Count XV).

The Motion for Summary Judgment is denied in all other respects, so that the following claims remain to proceed to trial:

1.  Rudolf's SOX whistleblower retaliation claim (Count I); and

2.  Age discrimination under ADEA and PHRA (Counts III and VII), but only to the extent those claims arise out of Rudolf's alleged termination.

AIG will remain a defendant along with NUFIC as to the claims remaining for trial.  An appropriate Order will be entered.

Dated: March 21, 2023                    BY THE COURT,

                                         MAUREEN P. KELLY
                                         UNITED STATES MAGISTRATE JUDGE

cc:     All counsel of record via CM/ECF.